## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————

CAUSE OF ACTION INSTITUTE,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　)　　　　Civil Action No. 19-1915 (JEB)
　　　　　　　　　　　　　　　　　　　)
EXPORT-IMPORT BANK　　　　　　　)
OF THE UNITED STATES,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　　)

—————————————————————————

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

*Counsel for Plaintiff CoA Institute*

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

Introduction ........................................................................................................................... 1

Factual and Procedural Background ................................................................................... 1

Standard of Review ............................................................................................................... 3

Argument ............................................................................................................................... 4

    I.    Ex-Im cannot withhold White House communications as non-agency records. ............... 4

        A.    Ex-Im improperly segmented its email correspondence with the White House into separate "records." ............................................................................................. 5

        B.    Ex-Im maintains legal control over its correspondence with the White House. ........ 9

            1.    Ex-Im "created or obtained" the White House correspondence. ...................... 9

            2.    Ex-Im exercises "control" over the White House correspondence. ............... 10

        C.    Ex-Im cannot use Exemption 6 to redact White House email addresses. ............... 12

    II.    Ex-Im cannot rely on Exemption 5 to withhold responsive records. ............................... 15

        A.    Ex-Im has not established that all relevant records meet Exemption 5's threshold "inter-agency or intra-agency" requirement. ........................................... 16

        B.    Ex-Im cannot use the deliberative-process privilege to withhold records. .............. 20

            1.    Portfolio or Enterprise Risk Management Reports ......................................... 21

            2.    EXIM Cyber Security Dashboard and Cyber Risk Acceptance Recommendations. .............................................................................................. 22

            3.    Confirmation Strategies for Political Nominees ............................................. 23

            4.    Senior Staff Reports ........................................................................................ 24

            5.    Document Productions to GAO and Responses to GAO Audit ..................... 25

            6.    "Other Emails" ................................................................................................ 26

        C.    Ex-Im cannot use the attorney-client privilege to withhold records. ...................... 27

    III.    Ex-Im cannot rely on Exemption 4 to withhold responsive records. ............................... 28

    IV.    Ex-Im has not satisfied its burden under the "foreseeable harm" standard. ..................... 31

    V.    Ex-Im did not segregate and release non-exempt portions of responsive records. ........... 34

Conclusion ........................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Immigration Lawyers Ass'n v.*
*Executive Office for Immigration Review*,
830 F.3d 667 (D.C. Cir. 2016) ................................................................................5, 6, 9

*American Oversight v. Department of Health & Human Services*,
380 F. Supp. 3d 45 (D.D.C. 2019) .................................................................................7, 8

*Ancient Coin Collectors Guild v. Department of State*,
641 F.3d 504 (D.C. Cir. 2011) ......................................................................................20

*Assassination Archives & Research Center v. Central Intelligence Agency*,
334 F.3d 55 (D.C. Cir. 2003) ........................................................................................13

*Besson v. Department of Commerce*,
No. 18-2527, 2020 WL 4500894 (D.D.C. Aug. 5, 2020) ...........................................28

*Bloomberg, L.P. v. Board of Governors of the Federal Reserve System*,
601 F.3d 143 (2d Cir. 2010) ..........................................................................................28

*Board of Trade v. Commodity Futures Trading Commission*,
627 F.2d 329 (D.C. Cir. 1980) ......................................................................................28

*Brinton v. Department of State*,
636 F.2d 600 (D.C. Cir. 1980) ......................................................................................27

*Bureau of National Affairs, Inc. v. Department of Justice*,
742 F.2d 1484 (D.C. Cir. 1984) .........................................................................18, 24, 25

*Burka v. Department of Health & Human Services*,
87 F.3d 508 (D.C. Cir. 1996) ........................................................................................10

*Cause of Action Institute v. Department of the Army*,
No. 16-1020, 2019 WL 4750213 (D.D.C. Sept. 29, 2019) ........................................10

*Cause of Action Institute v. Department of Justice*,
No. 18-2373, 2020 WL 1695049 (D.D.C. Apr. 6, 2020) .............................................7

*Center for Investigative Reporting v. Department of Labor*,
424 F. Supp. 3d 771 (N.D. Cal. 2019) .........................................................................33

*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
436 F. Supp. 3d 90 (D.D.C. 2019) ..........................................................................28, 33

*Clemmons v. U.S. Army Crime Records Center,*
   No. 05-02353, 2007 WL 1020827 (D.D.C. Mar. 30, 2007) ...................................................14

*Coastal States Gas Corp. v. Department of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) ...................................................................................20, 21, 27

*Competitive Enterprise Institute v. Environmental Protection Agency,*
   232 F. Supp. 3d 172 (D.D.C. 2017) .....................................................................................4

*Defenders of Wildlife v. U.S. Border Patrol,*
   623 F. Supp. 3d 83 (D.D.C. 2009) ........................................................................................3

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001).........................................................................................15, 18, 19, 31

*Department of Justice v. Tax Analysts,*
   492 U.S. 136 (1989).........................................................................................4, 5, 9, 10

*Department of State v. Washington Post Co.,*
   456 U.S. 595 (1982)........................................................................................................13

*Dow Jones & Co. v. Department of Justice,*
   917 F.2d 571 (D.C. Cir. 1990).........................................................................................19

*Doyle v. Department of Homeland Security,*
   331 F. Supp. 3d 27 (S.D.N.Y. 2018)................................................................................11

*Environmental Protection Agency v. Mink,*
   410 U.S. 73 (1973)..........................................................................................................18

*Food Marketing Institute v. Argus Leader Media,*
   129 S. Ct. 2356 (2019)...............................................................................................16, 30

*Forsham v. Harris,*
   445 U.S. 169 (1980)..........................................................................................................5

*Gatore v. Department of Homeland Security,*
   No. 15-459, 2017 WL 10777326 (D.D.C. June 27, 2017)....................................................7

*Gellman v. Department of Homeland Security,*
   No. 16-0635, 2020 WL 1323896 (D.D.C. Mar. 20, 2020) ....................................................8

*Goland v. Central Intelligence Agency,*
   607 F.2d 339 (D.C. Cir. 1978)..........................................................................................6

*Holy Spirit Ass'n for the Unification of World Christianity v.*
   *Central Intelligence Agency,*
   636 F.2d 838 (D.C. Cir. 1980)........................................................................................11

iv

*Horowitz v. Peace Corps*,
   428 F.3d 271 (D.C. Cir. 2005) ........................................................................................13

*Huffman v. Western Nuclear, Inc.*,
   486 U.S. 663 (1988) ..........................................................................................................4

*Ibrahim v. Department of State*,
   311 F. Supp. 3d 134 (D.D.C. 2018) ...............................................................................31

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ..........................................................................................................3

*Judge Rotenberg Educational Center, Inc. v. Food & Drug Administration*,
   376 F. Supp. 3d 47 (D.D.C. 2019) ...................................................................................7

*Judicial Watch, Inc. v. Department of Commerce*,
   375 F. Supp. 3d 93 (D.D.C. 2019) .................................................................................32

*Judicial Watch, Inc. v. Department of Energy*,
   412 F.3d 125 (D.C. Cir. 2005) ................................................................................16, 19

*Judicial Watch, Inc. v. Department of Justice*,
   No. 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019) .......................................32, 33

*Judicial Watch, Inc. v. Department of the Treasury*,
   796 F. Supp. 2d 13 (D.D.C. 2011) .................................................................................35

*Judicial Watch, Inc. v. Food & Drug Administration.*,
   449 F.3d 141 (D.C. Cir. 2006) ................................................................................13, 28

*Judicial Watch, Inc. v. National Energy Policy Development Group*,
   219 F. Supp. 2d 20 (D.D.C. 2002) .................................................................................17

*Judicial Watch, Inc. v. U.S. Secret Service*,
   726 F.3d 208 (D.C. Cir. 2013) .........................................................................9, 10, 11, 12

*Kissinger v. Reporters Committee for Freedom of the Press*,
   445 U.S. 136 (1980) ..........................................................................................................6

*Kleinert v. Bureau of Land Management*,
   132 F. Supp. 3d 79 (D.D.C. 2015) .................................................................................14

*Krikorian v. Department of State*,
   984 F.2d 461 (D.C. Cir. 1993) .......................................................................................34

*In re Lindsey*,
   148 F.3d 1100 (D.C. Cir. 1998) .....................................................................................27

*Long v. Office Personnel Management*,
    692 F.3d 185 (2d Cir. 2012)..................................................................................14

*Loving v. Department of Defense*,
    496 F. Supp. 2d 101 (D.D.C. 2007).................................................................23, 25

*Lucaj v. Federal Bureau of Investigation*,
    852 F.2d 541 (6th Cir. 2017) .............................................................................18

*Machado Amadis v. Department of State*,
    No. 19-5088, 2020 WL 4914093 (D.C. Cir. Aug. 21, 2020).................................32

*Mapother v. Department of Justice*,
    3 F.3d 1533 (D.C. Cir. 1993)...............................................................................20

*Mead Data Center, Inc. v. Department of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977)..............................................................................27

*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993)............................................................................17

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981)................................................................................4

*Milner v. Department of the Navy*,
    562 U.S. 562 (2011)..............................................................................................17

*Mingo Logan Coal Co. v. Environmental Protection Agency*,
    714 F.3d 608 (D.C. Cir. 2013)..............................................................................32

*Morely v. Central Intelligence Agency*,
    508 F.3d 1108 (D.C. Cir. 2007)............................................................................13

*Multi Ag Media LLC v. Department of Agriculture*,
    515 F.3d 1224 (D.C. Cir. 2008)..............................................................................3

*New York Times Co. v. National Aeronautics & Space Administration*,
    920 F.2d 1002 (D.C. Cir. 1990)..............................................................................5

*National Archives & Records Administration v. Favish*,
    541 U.S. 157 (2004).................................................................................................3

*National Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002)................................................................................28

*National Labor Relations Board v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1989).................................................................................................3

*National Labor Relations Board v. Sears, Roebuck & Co.*,
 421 U.S. 132 (1975)................................................................................15, 22

*New Prime Inc. v. Oliveira*,
 129 S. Ct. 532 (2019)................................................................................16

*Parker v. Department of Justice*,
 278 F. Supp. 3d 446 (D.D.C. 2017)............................................................7

*People for the American Way Foundation v. National Park Service*,
 503 F. Supp. 2d 284 (D.D.C. 2007)............................................................20

*Philadelphia Newspapers, Inc. v. Department of Health & Human Services*,
 69 F. Supp. 2d 63 (D.D.C. 1999)................................................................28

*Pinson v. Department of Justice*,
 177 F. Supp. 3d 56 (D.D.C. 2016)..............................................................14

*Public Citizen, Inc. v. Office of Management & Budget*,
 598 F.3d 865 (D.C. Cir. 2010)....................................................................20

*Quick v. Department of Commerce*,
 775 F. Supp. 2d 174 (D.D.C. 2011)............................................................3

*Rockwell International Corp. v. Department of Justice*,
 235 F. 3d 598 (D.C. Cir. 2001)..................................................................19

*Rojas v. Federal Aviation Administration*,
 927 F.3d 1046 (9th Cir. 2019) ....................................................................18

*Rosenberg v. Department of Defense*,
 342 F. Supp. 3d 62 (D.D.C. 2018)..............................................................32

*Ryan v. Department of Justice*,
 617 F.2d 781 (D.C. Cir. 1980)....................................................................18

*Sai v. Transportation Security Administration*,
 315 F. Supp. 3d 218 (D.D.C. 2018)............................................................14

*Save the Dolphins v. Department of Commerce*,
 404 F. Supp. 407 (N.D. Cal. 1975)............................................................5

*Schoenman v. Federal Bureau of Investigation*,
 575 F. Supp. 2d 136 (D.D.C. 2008)............................................................4

*Senate of Puerto Rico v. Department of Justice*,
 823 F.2d 574 (D.C. Cir. 1987)..............................................................23, 25

*Shapiro v. Central Intelligence Agency*,
   247 F. Supp. 3d 53 (D.D.C. 2017) ....................................................................7

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ....................................................................18

*Stonehill v. Internal Revenue Service*,
   534 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................14

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
   177 F.3d 1022 (D.C. Cir. 1999) ....................................................................34

*United States v. Weber Aircraft Corporation*,
   465 U.S. 792 (1984) ......................................................................................15

*United We Stand America, Inc. v. Internal Revenue Service*,
   259 F.3d 595 (D.C. Cir. 2004) ......................................................................11

*Vaughn v. Rosen*,
   484 F.2d 820 (D.C. Cir. 1973) ................................................................13, 20

**Statutes**

5 U.S.C. § 552(a)(4)(B) .......................................................................................3

5 U.S.C. § 552(a)(8)(A)(i)(I) .............................................................................31

5 U.S.C. § 552(a)(8)(A)(i)(II) ......................................................................33, 34

5 U.S.C. § 552(b) ...............................................................................................34

5 U.S.C. § 552(b)(4) ..........................................................................................28

5 U.S.C. § 552(b)(5) ....................................................................................15, 16

5 U.S.C. § 552(b)(6) ..........................................................................................13

5 U.S.C. § 552(f)(2)(A) .....................................................................................5, 6

**Rules**

Federal Rule of Civil Procedure 56(a) .................................................................3

**Other Authorities**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ...............31

Kevin Schmidt, *GAO Report Finds EXIM Potentially Provides Billions in Financing to Companies with Delinquent Federal Debt*, Cause of Action Inst., June 3, 2019, https://bit.ly/2Fu862V ........................................................................26

S. Rep. 104-272 (1996) ...........................................................................................6

Webster's Third New International Dictionary (1961) .................................................17

## INTRODUCTION

This case concerns a pair of Freedom of Information Act ("FOIA") requests that seek access to records of communications between several of Defendant Export-Import Bank's ("Ex-Im") senior officials on a variety of topics, including congressional hearings regarding Kimberly Reed's nomination as Bank President, and matters involving the Government Accountability Office ("GAO"). In the case of each request, Ex-Im failed to provide a timely response. By filing this lawsuit, CoA Institute enforced its rights under FOIA, compelled determinations from Ex-Im, and obtained copies of the requested records. But Ex-Im has persisted in withholding a number of those records—often in full—under various statutory exemptions. The agency also has improperly segmented correspondence with the White House and withheld portions as non-agency "records."

As the relevant law and undisputed facts demonstrate, Ex-Im's redactions and control arguments must fail. The agency's correspondence with the White House—in its original unified format—is under Ex-Im's legal control and therefore subject to disclosure. Ex-Im's arguments for the use of Exemptions 4, 5, and 6 are similarly unavailing. And, at the least, Ex-Im failed to undertake reasonable efforts to segregate non-exempt material for release.

CoA Institute respectfully requests that the Court deny Ex-Im's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2018, CoA Institute sent its first FOIA request to Ex-Im seeking access to all records reflecting communications to or from four named Ex-Im employees that included any of twelve search terms listed in the request. Pl.'s Statement of Undisputed Materials Facts ¶ 1 [hereinafter "Pl.'s SUMF"]. Ex-Im issued an acknowledgement letter the next day and assigned the request tracking number 201800076F. *See* Pl.'s SUMF ¶ 6. Ex-Im thereafter failed to provide

a timely response to FOIA Request No. 201800076F before CoA Institute filed this lawsuit.  *See* Pl.'s SUMF ¶¶ 13, 15.

CoA Institute submitted its second FOIA request to Ex-Im in May 2019.  Pl.'s SUMF ¶ 7. That request sought access to records reflecting communications between five senior agency officials that included any of five search terms listed in the request.  Pl.'s SUMF ¶ 7.  Ex-Im acknowledged receipt of the request the same day and assigned it tracking number 201900047F.  Pl's SUMF ¶ 12.  Once again, Ex-Im failed to provide a timely response prior to CoA Institute filing the instant action.  *See* Pl.'s SUMF ¶¶ 13, 17–18.

In February 2020, Ex-Im provided a determination on FOIA Request No. 201900047F, thus completing processing.  *See* Pl.'s SUMF ¶ 18.[1]  The parties thereafter opened negotiations to discuss the adequacy of the agency's responses and production of records.  Following these discussions, the parties agreed to narrow the issues to be raised before the Court.  CoA Institute does not challenge the adequacy of Ex-Im's search for responsive records, *see* Pl.'s SUMF ¶ 24, and it limits its challenge to the withholding of a small universe of records in part or in full. *See* Pl.'s SUMF ¶ 22; *see also* Decl. of Ryan P. Mulvey ¶ 6; Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 3 [hereinafter "Def.'s Mot."], ECF No. 27-2.

Specifically, CoA Institute maintains Ex-Im has (1) improperly redacted records under Exemptions 4, 5, and 6; (2) failed to meet its burden under the FOIA's "foreseeable harm" standard; (3) failed to undertake reasonable efforts to segregate and disclose non-exempt portions of records; and (4) incorrectly segmented White House correspondence to exclude portions of records that it claims are non-agency "records."

---

[1] In July 2020, Ex-Im re-released several pages of records from its production of records responsive to FOIA Request No. 201800076F.  Pl.'s SUMF ¶ 20.  The redactions on those re-released records are still at issue in the instant summary judgment proceedings.

## STANDARD OF REVIEW

"Congress enacted the FOIA to introduce transparency into government activities." *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citing *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984)). The statute serves as a "means for citizens to know what the Government is up to" and it "defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted); *see Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1989) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."). The rights afforded under the FOIA are a bulwark to the "fundamental principle of public access" to records of the administrative state, which can often be "shielded unnecessarily from public view . . . [by] possibly unwilling official hands." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (cleaned up and citation omitted).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 3d 83, 87 (D.D.C. 2009). In a FOIA case, "the burden is on the agency to sustain its action[.]" 5 U.S.C. § 552(a)(4)(B). The district court must determine *de novo* "'whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure[.]'" *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). Similarly, with respect to the particular question of whether a record is subject to the FOIA—or, put differently, whether a record is under agency control—

"[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records[.]'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).

An agency may meet its burden on summary judgment by proffering affidavits that "describe the documents and the justifications for nondisclosure with reasonably specific detail" that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency "must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed[.]" *Competitive Enter. Inst. v. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). Courts should analyze "all underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

## ARGUMENT

**I.    Ex-Im cannot withhold White House communications as non-agency records.**

Ex-Im partially redacted four records reflecting communications between agency officials and the White House about pending nominees in the U.S. Senate.[2] Ex-Im maintains that the White House email addresses listed in these communications—as well as incoming email messages from the White House in single, distinct email chain—qualify as separate records outside of agency control. *See* Mulvey Decl. Ex. 6 at 201800076F0357, 201800076F1729–30, 201800076F1946, 201800076F1957; *see also* Def.'s *Vaughn* Index at 2–3, ECF No. 27-4. That is, Ex-Im claims that

---

[2] CoA Institute uses "White House" and "Executive Office of the President" interchangeably throughout this brief because Ex-Im has not specified exactly which components or offices are implicated by the records at issue.

4

each email address within an email is a record separate and distinct from the email in which the address resides.  In the alternative, Ex-Im seeks to withhold the same email addresses under Exemption 6.  Either way, Ex-Im's redactions must be rejected.  The Court should order the relevant records re-released in their entirety.  Ex-Im may not segment records under its control to avoid disclosure, and it may not withhold government officials' email addresses under the guise of protecting personal privacy.

### A.  Ex-Im improperly segmented its email correspondence with the White House into separate "records."

The FOIA provides requesters with access to records, "not information in the abstract." *Forsham v. Harris*, 445 U.S. 169, 185 (1980); *see Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Rev.*, 830 F.3d 667, 677 (D.C. Cir. 2016) [hereinafter "*AILA*"].  The FOIA defines a "record" as "any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format[.]"  5 U.S.C. § 552(f)(2)(A).  This straightforward, two-part definition provides an important framework for understanding an agency's disclosure obligations.

The first clause of the definition—"any information that would be an agency record subject to the requirements of this section"—describes the *type of material* that qualifies as a "record."  *Id.* It incorporates the concept of an "agency record" as defined by the Supreme Court's decision in *Tax Analysts*, which requires that in order for a record to be subject to the FOIA an agency must (1) "create or obtain the requested materials" and (2) "be in control of the requested materials at the time the FOIA request is made."  492 U.S. 136, 144–45 (1989).  This first clause also clarifies that the FOIA covers informational material generally, not just documents.  *See N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1005 (D.C. Cir. 1990); *see also Save the Dolphins v. Dep't of Commerce*, 404 F. Supp. 407, 411 (N.D. Cal. 1975) (finding video recordings

covered because in "common parlance ['record'] includes various means of storing information for future reference").

The second clause of the definition—"when maintained by an agency in any format, including an electronic format"—describes the *status of informational material* in an agency's hands before a requester submits a request. *See* 5 U.S.C. § 552(f)(2)(A). Congress added this language to ensure that electronic records, in addition to paper documents and other tangible objects, were covered by the FOIA. *See* S. Rep. 104-272 at 27 (1996) (The FOIA "requires that Federal agencies provide records to requesters in *any form or format in which the agency maintains those records*[.]" (emphasis added)). Thus, it was Congress's intent to grant access to informational materials in the form or format that an agency currently maintains them at the time a requester submits a request.

This focus is important because a requester may not ask an agency to create or manipulate an existing record in response to a FOIA request. An "agency is not required to reorganize its files in response to a plaintiff's request[.]" *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978) (citation and internal quotation marks omitted). Indeed, the FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980). As a corollary, the FOIA must be interpreted so that an agency is required to process and disclose *any* responsive informational material, that meets the *Tax Analyst* test, *in the form or format in which it maintains* such records. Agencies may not divide existing records—such as an email or email chain—into multiple so-called "records" to withhold information. *See generally AILA*, 830 F.3d at 667. That approach would violate the principle that

records exist objectively and cannot be created or "defined" based on the intent of a requester or a FOIA officer's interpretation of that intent.

Although a few district courts have permitted agencies to segment responsive records, *see, e.g.*, *Shapiro v. Cent. Intelligence Agency*, 247 F. Supp. 3d 53, 74–75 (D.D.C. 2017), most courts have recognized the need to limit the practice as abusive. *See, e.g.*, *Am. Oversight v. Dep't of Health & Human Servs.*, 380 F. Supp. 3d 45, 50–51 (D.D.C. 2019) (refusing to allow agency to segment an email chain into multiple records); *Judge Rotenberng Educ. Ctr., Inc. v. Food & Drug Admin.*, 376 F. Supp. 3d 47, 60 (D.D.C. 2019) (refusing to allow agency "midway through litigation" to redefine "collections of information that have been treated as one agency record as multiple agency records"); *Parker v. Dep't of Justice*, 278 F. Supp. 3d 446, 451–52 (D.D.C. 2017) (refusing to allow agency to segment a letter from its attachment); *Gatore v. Dep't of Homeland Sec.*, No. 15-459, 2017 WL 10777326, at *2 (D.D.C. June 27, 2017) (finding "specious the [agency's] assertion that [its] entire FOIA Processing Guide is not itself 'a single discrete record'"); *see also Cause of Action Inst. v. Dep't of Justice*, No. 18-2373, 2020 WL 1695049, at *7 (rejecting segmentation of "unified exchange[s]" in individual "Questions for the Record") (D.D.C. Apr. 6, 2020), *appeal docketed*, No. 20-5182 (D.C. Cir. 2020). This Court should follow the dominant majority trend.

Turning to the purported "records" at issue here—namely, White House email addresses and a series of White House-originated email messages in a single email chain—Ex-Im's segmentation is unreasonable and contrary to the FOIA. As an initial matter, Ex-Im has failed to offer *any* argument for why it determined email addresses and portions of an email chain qualify as separate records. Ex-Im also failed to identify these purportedly separate "records" as such in its *Vaughn* index. *See* ECF No. 27-4 at 2–3. If Ex-Im believes White House email addresses are

actually separate records, then consistency requires it to claim every email address across all emails are also separate records, and to account for such in its *Vaughn* index. It does not do so, which is fatal. In the rare case when courts have allowed the segmentation of an email or email chain, they have required the agency to demonstrate the reasonableness of its segmentation and the consistency of its position throughout the lawsuit, as evidenced by its *Vaughn* index.[3] *See Gellman v. Dep't of Homeland Sec.*, No. 16-0635, 2020 WL 1323896, at *3–4 (D.D.C. Mar. 20, 2020).

More importantly, Ex-Im's segmentation of emails and an email chain violates the statutory definition of a record, as described above. *See supra* at pp. 5–7. The email correspondence in question, in its entirety, constitutes informational material created or obtained by Ex-Im, within its control at the time of CoA Institute's request, and maintained in a unified form and format. "It is commonly understood that an email chain operates as a single record." *Am. Oversight*, 380 F. Supp. 3d at 50–51. Ex-Im has not offered any reason to conclude otherwise. When an agency compiles information into a single document and keeps it as such in its recordkeeping system, that document is a unified "record" for purposes of the FOIA.

Again, the matter is clear with email chains. In *American Oversight v. Department of Health & Human Services*, the court explained that an email reply "incorporates what came before, and the two [messages] form a unified exchange" and "[w]hether that was a conscious or subconscious choice is irrelevant; what matters is that the emails sent by agency personnel did in fact contain the prior exchanges with [White House] staff." *Id.* at 51. The email chain here begins—or, rather, ends—with a reply *from* an Ex-Im official *to* an official in the Executive Office of the President. *See* Mulvey Decl. Ex. 6 at 201800076F1729–30. That final reply incorporates

---

[3] In this respect, it is important to note that Ex-Im re-processed the White House correspondence before moving for summary judgment and modified the extent to which it was withholding portions of emails as "EOP Not Subject to FOIA." *See* Mulvey Decl. ¶ 10; Mulvey Decl. Ex. 5.

earlier correspondence originating outside the agency and creates a new "record" maintained in an official Ex-Im account.  Ex-Im cannot treat this unified chain as a series of distinct records—let alone a series of distinct records, only some of which fall under agency control.

As for Ex-Im's decision to treat individual email *addresses* as distinct records, that sort of segmentation flies in the face of *AILA*.  There, the D.C. Circuit's found it is "difficult to believe that any reasonable understanding of a 'record' would permit withholding an *individual sentence* within a paragraph within an email on the ground that the sentence alone could be conceived of as a distinct, non-responsive 'record.'" *AILA*, 830 F.3d at 679 (emphasis added).  If a single sentence is too small to constitute a record, then there can be little debate when it comes to an email address.

### B.     Ex-Im maintains legal control over its correspondence with the White House.

Whether a record qualifies as an "agency record" depends upon two facts.  *First*, an agency must have "'create[d] or obtain[ed]'" the record.  *Tax Analysts*, 492 U.S. at 144 (citation omitted). *Second*, it must have "control" of it "at the time [a] FOIA request is made."  *Id.* at 145.  Both prongs of the *Tax Analysts* test are satisfied here.

#### 1.     Ex-Im "created or obtained" the White House correspondence.

The D.C. Circuit has observed that "[t]he 'creator' of an electronic record . . . [can be] ambiguous."  *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 217 (D.C. Cir. 2013) [hereinafter "*Judicial Watch I*"].  But the records at issue here originated with an Ex-Im official. *See* Mulvey Decl. Ex. 4 at 201800076F0357, 201800076F1729–30, 201800076F1946, 201800076F1957.  The agency's *Vaughn* index confirms as much.  *See* ECF No. 27-4 at 2–3.  If there were any doubt as to whether Ex-Im "created" its correspondence with the White House, it is incontrovertible that the agency "obtained" copies in the legitimate course of business.  *See Judicial Watch I*, 726 F.3d at 217.

### 2.    Ex-Im exercises "control" over the White House correspondence.

In most cases, "control" is analyzed through the four-fact *Burka* test, which takes into account "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record systems of files." *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (citation and internal quotation marks omitted). With purported presidential records, the first two *Burka* factors are typically dispositive as part of the so-called "modified control test." Any uncertainty as to whether a record is subject to FOIA "redound[s] to the benefit of" the requester. *Judicial Watch I*, 726 F.3d at 220.

In this case, regardless of the test applied, Ex-Im has failed to meet its "burden . . . to demonstrate . . . that the materials sought are not 'agency records.'" *Tax Analysts*, 492 U.S. at 142 n.3 (citation omitted). The agency's argument is entirely conclusory and amounts to little more than averring that it "withheld documents [it received] from the Executive Office of the President . . . [because] those documents are exempt from disclosure under FOIA." Def.'s Mot. at 20; Decl. of Lennell Jackson ⁋ 46, ECF No. 27-3 ("The Executive Office of the President is not subject to FOIA. Therefore, any documents that are the property of the EOP were redacted."). That sort of generalized argument cannot carry the day. The control inquiry is "fact-intensive," and "judicial sensitivity to the important separation-of-powers considerations that animate the special considerations test" precludes courts from deferring to an unsupported determination that records fall under presidential control. *Cause of Action Inst. v. Dep't of the Army*, No. 16-1020, 2019 WL 4750213, at *7 (D.D.C. Sept. 29, 2019). If anything, the record militates in favor of treating Ex-Im's correspondence with the White House as subject to agency control.

*First*, there is no evidence that the White House manifested a clear intent to maintain control over the email exchanges in question—let alone portions of an email chain or individual email addresses. That requisite intent may "not merely [be] 'general,'" but must "explicitly extend[] to each of the 'particular records' at issue." *Judicial Watch I*, 726 F.3d at 223 (citations omitted). Neither the White House nor Ex-Im can rely on far-reaching arrangements, let alone a "consistent course of dealing," to prove such intent. *United We Stand Am., Inc. v. Internal Revenue Serv.*, 259 F.3d 595, 601–02 (D.C. Cir. 2004); *see Holy Spirit Ass'n for the Unification of World Christianity v. Cent. Intelligence Agency*, 636 F.2d 838, 841 (D.C. Cir. 1980).

The D.C. Circuit's decision in *Judicial Watch I* provides helpful illustration of the level of detail required in proving White House intent to retain control over records. In *Judicial Watch I*, the government relied upon a Memorandum of Understanding that governed the management of White House visitor log ("WHACS") records, which were in the physical possession of the Secret Service. *See* 726 F.3d at 212–13, 215, 222–23. The agreement provided that "the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS records.'" *Id.* at 218 (citation omitted); *accord Doyle v. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27 (S.D.N.Y. 2018). Similar specificity is nonexistent in the record here, and Ex-Im offers no factual basis for excluding correspondence with the White House as outside agency control.

*Second*, with respect to Ex-Im's ability to use and dispose of the records at issue, the agency's argument again lacks the required specificity to conclude that correspondence with the White House falls under presidential control. In *Judicial Watch I*, the Secret Service was able to point to a memorandum that explicitly delimited its use of White House visitor logs, described the way in which they were to be created and received into agency systems, and which set forth the process by which they were to be regularly purged from agency servers. *See* 726 F.3d at 218–19.

Ex-Im fails to offer an such evidence that it lacks the ability to use and dispose of its own email records or that it has an agreement with the White House which delimits its use of such emails. If anything, the agency's decision to re-release the records at issue with modified redactions strongly suggests that it does maintain legal control over them. *See supra* note 3.

*Finally*, assuming that the remaining *Burka* factors were relevant, Ex-Im still has not met its burden. The records at issue suggest agency personnel used them for the preparation of nominees for Senate confirmation. *See* Mulvey Decl. Ex. 4 at 201800076F0357, 201800076F1729–30, 201800076F1946, 201800076F1957 (discussing "strategic plans" and planning for conference calls with the White House); Jackson Decl. ¶ 44 ("These communications were strategic plans related to nominees for political positions within EXIM[.]").[4] So long as Ex-Im's use of the records, as opposed to its disposal authority, was relatively unrestricted, then the third *Burka* factor is satisfied. *See Judicial Watch I*, 726 F.3d at 219. As for integration of the records into agency systems, Ex-Im offers nothing to rebut the reasonable assumption that its email is retained in official recordkeeping systems. That Ex-Im searched for, retrieved, processed, and produced the records strongly implies that the fourth *Burka* factor cuts in CoA Institute's favor.

### C.    Ex-Im cannot use Exemption 6 to redact White House email addresses.

In addition to withholding White House email addresses as purportedly separate non-agency records, Ex-Im argues that they are protected "on privacy grounds under Exemption 6." Jackson Decl. ¶ 46; *see* Def.'s Mot. at 19–20.[5] Exemption 6 protects "[(1)] personnel and medical

---

[4] Although Ex-Im's *Vaughn* index suggests that the agency is withholding some of the White House correspondence under Exemption 5, *see* ECF No. 27-4 at 3, there is no such indication on the redacted records, and the agency offers no argument in its brief to that effect.

[5] Ex-Im does not explain how it may concurrently exclude records as under White House control and also redact them under Exemption 6. FOIA exemptions apply only to agency records within agency control.

files and similar files [(2)] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Records may only be withheld when both elements of this exemption are satisfied. *See Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 598 (1982).

*First*, "information must be contained in personnel, medical or 'similar' files." *Id.* The term "similar files" has been broadly construed to include most records that contain information about an individual, so long as "the release of [that information] would 'create . . . a palpable threat to privacy.'" *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir. 2006) [hereinafter "*Judicial Watch II*"] (citation omitted). *Second*, "the information must be of such a nature that its disclosure would constitute a *clearly unwarranted invasion* of personal privacy." *Wash. Post Co.*, 456 at 598 (emphasis added). Individual privacy interests are balanced "against the public interest (namely, 'the basic purpose of the [FOIA],' which is 'to open agency action to the light of public scrutiny')." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005).

Ex-Im has not adequately justified the withholding of email addresses as personally identifying information. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). Whether it asserts Exemption 6 to protect details about its own employees or those of the White House, Ex-Im "bears the burden of establishing the applicability of the claimed exemption." *Assassination Archives & Res. Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003). This entails giving "a relatively detailed justification, specially identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Judicial Watch II*, 449 F.3d at 146 (cleaned up and citation omitted). "[C]onclusory and generalized allegations of exemptions' are unacceptable." *Morely v. Cent. Intelligence Agency*, 508 F.3d 1108, 1115 (D.C. Cir. 2007).

Ex-Im failed to specify in its *Vaughn* index or accompanying declaration how it was applying Exemption 6; it did not describe *whose* email addresses were being withheld, or *why* those individuals warrant special protection or are more likely to face harassment if their contact information is disclosed. *See Stonehill v. Internal Revenue Serv.*, 534 F. Supp. 2d 1, 12 (D.D.C. 2008). Civilian federal employees do not enjoy the same privacy protections as non-governmental individuals identified in agency records. Moreover, "[t]he disclosure of names and contact information 'is not inherently and always a significant threat to . . . privacy[.]" *Sai v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 262 (D.D.C. 2018). Ex-Im has "offered little more than conclusory assertions . . . without regard to the position held by the relevant [White House] employee[s], the role[s] played by th[ose] employee[s], the substance of the underlying agency action, or the nature of the agency record at issue[.]" *Id.* It also "has failed to explain . . . how the release of contact information . . . would constitute a 'clearly unwarranted' invasion of . . . privacy." *Id.* at 263.

Because Exemption 6 does not create a "per se rule" that protects official government contact information in any and all cases, Ex-Im's failure "to explain with meaningful specificity why releasing the challenge information would significant threaten anyone's privacy" is fatal. *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 97 (D.D.C. 2015). There is no caselaw to support the notion that White House employees are entitled to heightened privacy merely because they work in the Executive Office of the President. Personal information—including email addresses—is typically withheld only "if [its] release will endanger a staff member's safety." *Pinson v. Dep't of Justice*, 177 F. Supp. 3d 56, 83 (D.D.C. 2016). And courts consistently consider whether there is a *real* threat of such harm. *See, e.g.*, *Long v. Office Personnel Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012) (discussing "employees in the sensitive agencies and occupations" of "national security, homeland security, or law enforcement"); *accord Clemmons v. U.S. Army*

14

*Crime Records Ctr.*, No. 05-02353, 2007 WL 1020827, at *6 (D.D.C. Mar. 30, 2007) (considering possibility of "harassment or reprisal").

As for Ex-Im's passing suggestion that "[d]isclosure of this contact information would in no way advance the public's understanding of government activity," that is hardly the case. The White House officials implicated here are important figures and not low-level employees, as a simple online search of their names demonstrates. As CoA Institute explained in its FOIA request, public understanding of "Ex-Im's collaboration with external supporters during confirmation hearings has not been revealed" and understanding *who* was involved, and *how* they were contacted by Ex-Im, is an important part of transparency. ECF No. 1-1. Even more so when those agency outsiders are in the White House. At the least, official contact information may assist the public in further investigating Ex-Im's operations or filing new FOIA requests that target communications with certain White House email accounts.

**II.    Ex-Im cannot rely on Exemption 5 to withhold responsive records.**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed Exemption 5 to cover "those documents, *and only those documents* that are normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (emphasis added and footnote omitted); *see Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) [hereinafter "*Klamath*"]. Although Exemption 5 encompasses various statutory and common law privileges, *see United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800–01 (1984), two of the most commonly invoked privileges—which are relevant here—are the deliberative-process and attorney-client privileges. *See Sears, Roebuck & Co.*, 421 U.S. at 149–50.

Ex-Im asserts that the deliberative-process and attorney-client privileges shield responsive records from disclosure either in part of in full.  *See* Def.'s Mot. at 10–16.  But Ex-Im fails to justify, with the requisite specificity, its reliance on those privileges.  Moreover, with respect to communications with the White House and GAO, Ex-Im has not shown how those records qualify as "inter-agency or intra-agency" records.

### A.    Ex-Im has not established that all relevant records meet Exemption 5's threshold "inter-agency or intra-agency" requirement.

Among the records withheld in full or in part under Exemption 5, Ex-Im has identified one record reflecting communications with the Executive Office of the President about confirmation strategies for agency nominees, *see* Mulvey Decl. Ex. 6 at 201800076F0358–201800076F0367, and nine records reflecting Ex-Im's interactions with GAO during an audit.  *See* Mulvey Decl. Ex. 6 at 201900047F032Interim–201900047F352Interim, 201900047F028.  Not all of these records meet Exemption 5's threshold "inter-agency or intra-agency memorandum or letter" requirement. 5 U.S.C. § 552(b)(5).  Although courts in this jurisdiction have tended to read the threshold requirement in an expansive way—most often to include the President and non-agency components of the Executive Office of the President, *see Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005) [hereinafter "*Judicial Watch III*"]—that expansion conflicts with textual limitations imposed by Congress and the plain meaning of Exemption 5.

It is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 129 S. Ct. 532, 539 (2019) (citation omitted).  The Supreme Court has confirmed that this canon applies with no less force in the FOIA context.  *See Food Mktg. Inst. v. Argus Leader Media*, 129 S. Ct. 2356, 2362–63 (2019) ("[A]s usual, we ask what [a statutory] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966."

(citation omitted)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 569 (2011) ("Our consideration of [FOIA] Exemption 2's scope starts with its text.").

The prefixes "inter-" and "intra-" have ordinary meanings that work in tandem with the term "agency" to define the scope of Exemption 5. They limit its attendant privileges to "memorandums or letters" exchanged *within* or *among* entities subject to the FOIA. *See, e.g.*, Webster's Third New International Dictionary 440 (1961) (defining "inter" to mean "between" or "among"); *id.* at 444 (defining "intra" to mean "within"). Neither the President, nor the Vice President, nor their immediate staff are an "agency" under the FOIA. *See Meyer v. Bush*, 981 F.2d 1288, 1291–92 (D.C. Cir. 1993); *see also Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 55 (D.D.C. 2002). And, as Ex-Im readily concedes, GAO is part of the legislative branch and "not subject to FOIA." Jackson Decl. ¶ 36a.[6] Records exchanged between Ex-Im and the White House or GAO are therefore not automatically "inter-agency or intra-agency" communications protected by Exemption 5.

The Supreme Court has increasingly expressed suspicion of interpretations of the FOIA that deviate from the plain meaning of the statute. Last year, the Court rejected the D.C. Circuit's long-standing construction of the term "confidential" in Exemption 4. *Food Mktg. Inst.*, 139 S. Ct. at 2364. And, in 2011, it adopted a textual approach to Exemption 2, rejecting an overbroad reading of the term "personnel." *Milner*, 562 U.S. at 569–71. In each case, the Court abandoned widely held precedents and looked to plain meaning and commonsense readings of the statute.

This Court should adopt the same textual approach with Exemption 5. In fact, the undergirding of the current interpretative regime is already beginning to crumble. Many courts

---

[6] Ex-Im also claims that the records produced to CoA Institute are "property of GAO." Jackson Decl. ¶ 36a. This make little sense because Ex-Im produced the records and therefore presumably maintains legal control over them.

previously accepted that an agency could withhold a record under Exemption 5 using the deliberative-process privilege if it were "solicited by [an] agency" but created by an "outside consultant." *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980). The Supreme Court attempted to stem the growth of this so-called "consultant corollary" doctrine nearly twenty years ago, after it recognized that agencies tended to treat Exemption 5's threshold requirement as "a purely conclusory" matter satisfied whenever "any document [is found] . . . valuable to keep confidential." *Klamath*, 532 U.S. at 12. The Supreme Court stressed that "[t]here is . . . no textual justification for draining [Exemption 5's threshold] of independent vitality[.]" *Id.* Interestingly, a Ninth Circuit panel recently explained why the consultant-corollary doctrine explicitly "contravenes Exemption 5's plain language." *Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1055 (9th Cir. 2019) (citation omitted), *reh'g granted*, 948 F.3d 952 (9th Cir. 2020).[7] That well-founded panel decision is not unprecedented. The Sixth Circuit has similarly rejected the same atextual expansion of the consultant corollary to non-agency entities. *Lucaj v. Fed. Bureau of Investigation*, 852 F.2d 541, 547–48 (6th Cir. 2017). This Court should follow course.

Although Ex-Im did not directly address Exemption 5's threshold requirement, its rote reliance on prevailing precedent is revealing. The only cases cited in passing by Ex-Im are *Environmental Protection Agency v. Mink* and *Judicial Watch, Inc. v. Department of Energy*. Def.'s Mot. at 14–15; Jackson Decl. ¶ 38c. *Mink* is entirely conclusory, *see supra* note 7, and

---

[7] *Rojas* is also instructive for distinguishing cases used to justify the extension of Exemption 5 to records exchanged with the White House. For example, the panel criticized the D.C. Circuit's decision in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), which it identified as the "source" of the "consultant corollary." *See Rojas*, 927 F.3d at 1056 ("The [*Soucie*] court cited no authority for [its] propositions. Nor did it acknowledge, never mind reconcile, FOIA's text and purpose."). Other cases are conclusory in addressing the "inter-agency or intra-agency" requirement, *see, e.g.*, *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 85 (1973), or they are inapt because they involved White House components subject to the FOIA. *See, e.g.*, *Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984) (Office of Management and Budget).

*Judicial Watch III* depends heavily on the consultant-corollary doctrine. *See* 412 F.3d at 130. Further, the consultant corollary, *on its own terms*, cannot apply in this case. Ex-Im readily admits that the records at issue "contain information *provided to the President* vital for *his* decision-making." Def.'s Mot. at 14 (emphasis added); *see* Jackson Decl. ▯ 38c ("[B]ecause the documents prepared by agency officials on political nominees contain information provided to the President of the United States vital for his executive decision-making process . . . the documents requires [*sic*] extreme candor in their presentation[.]"). The Supreme Court has explained that the consultant corollary grew out of the practice of agencies hiring outside experts who "play[] essentially the same part in an agency's process of deliberation" as agency employees. *Klamath*, 532 U.S. at 10. The "consultant," or an equivalent, is thus expected to "function[] just as an employee[.]" *Id.* at 11. Yet the President and other White House officials do not serve Ex-Im's decision-making, *by the agency's own admission*. They do not "step into the shoes" of Ex-Im personnel. They are the furthest thing from "consultants."

As for records reflecting Ex-Im's dealings with GAO, courts have already acknowledged the limits of applying Exemption 5 in the context of agency dealings with the legislative branch. The D.C. Circuit, for example, has recognized that, while "Congress . . . [could] have drafted [Exemption 5] more broadly to include Executive Branch communications to Congress," it "did not, and the words simply will not stretch to cover this situation, because Congress is simply not an agency." *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 574 (D.C. Cir. 1990). Thus, an agency may withhold communications with the legislative branch under the deliberative-process privilege only so long as they "are part and parcel of *the agency's* deliberative process," *id.* at 575 (emphasis added and cleaned up), but not if they were "created specifically to assist Congress" and shared "for the sole purpose of assisting [it] . . . with *its* deliberations." *Rockwell Int'l Corp.*

*v. Dep't of Justice*, 235 F. 3d 598, 604 (D.C. Cir. 2001) (emphasis added).  Here, Ex-Im admits

that some of the records at issue reflect responses to GAO for the purposes of an audit.  *See* Def.'s

Mot. at 15–16; *see also* Jackson Decl. ⁋ 39a.  These records do not implicate Ex-Im's decision-

making, but GAO's efforts to conduct an audit.  They cannot satisfy Exemption 5's threshold

requirement, and they cannot be withheld.[8]

### B.    Ex-Im cannot use the deliberative-process privilege to withhold records.

To withhold a record under the deliberative-process privilege, an agency must demonstrate

that it is "both pre-decisional and deliberative."  *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537

(D.C. Cir. 1993).  A record is "predecisional" when it is generated "'[a]ntecedent to the adoption

of an agency policy.'"  *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C.

Cir. 2011) (citation omitted).  It is "deliberative" when it forms "a direct part of the deliberative

process in that it makes recommendations or expresses opinion on legal or policy matters,"

*Vaughn*, 523 F.2 at 1144, thereby reflecting the "give-and-take of the consultative process" typical

of agency decision-making.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C.

Cir. 1980); *see Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010)

("To the extent the documents . . . neither make recommendations for policy change nor reflect

internal deliberations on the advisability of any particular course of action, they are not

predecisional and deliberative despite having been produced by an agency that generally has an

advisory role.").  "The key question" is "whether disclosure would tend to diminish candor within

an agency."  *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C.

---

[8] CoA Institute concedes that certain *intra*-agency records responsive to FOIA Request No. 201900047F satisfy Exemption 5's threshold requirement.  *See* ECF No. 27-4 (Rows 34–39).

2007). In this case, Ex-Im's reliance on the deliberative process privilege fails. The six categories of records addressed in Ex-Im's brief are discussed in turn.[9]  *See* Def.'s Mot. at 13–16.

### 1.    Portfolio or Enterprise Risk Management Reports

These records are identified in Ex-Im's *Vaughn* index in Rows 4–8.  *See* ECF No. 27-4. The agency's declarant describes them as "reports [that] contain staff analysis of transactions that, for any variety of reasons, have developed credit issues since they were approved." Jackson Decl. ❡ 38a.[10]  Importantly, however, Ex-Im also implies that the *specific* reports at issue here were attached to the "minutes" of the Enterprise Risk Committee and discussed as part of that body's deliberations. Def.'s Mot. at 13 ("The Enterprise Risk Committee issues minutes of its minutes, and these Portfolio Risk Management Reports are attached."); *see* Jackson Decl. ❡ 38a ("These matters are generally widely discussed at various levels of the agency before they are finally presented to the Enterprise Risk Committee[.]").  Thus, no matter whether the reports are deliberative, they may no longer predecisional to the extent Ex-Im decided to finalize action and rely on agency staff's recommendations and analysis.

It is well-established that, "even if [a] document is predecisional at the time it is prepared, it can lose that status, if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal State Gas Corp.*, 617 F.2d at 866. The Risk Committee's regular use of management reports, and its apparent incorporation of those reports into minutes of its decision-making, takes them outside the scope of the privilege. Similarly, the danger of "chill" is without moment because these reports—as Ex-Im itself explains—are regularly considered and attached to the Risk Committee's official record.  *See*

---

[9] CoA Institute adopts the headings employed by Ex-Im.

[10] The agency's *Vaughn* index indicates that at least one email and two sets of meeting minutes are at issue, but Ex-Im does not address those records in its brief.

Def.'s Mot. at 13. "The probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice[,] if adopted, will become public is slight." *Sears, Roebuck & Co.*, 421 U.S. at 161.

Neither Ex-Im's *Vaughn* index nor its declarant provide any greater level of specificity about the records at issue that could clarify the exact nature of the Risk Committee Meetings. Although it is conceivable that *some* content in these records could pertain to subjects on which the agency did not act, and which could therefore be privileged, Ex-Im leaves this to the Court's conjecture. That is inadequate.

### 2. EXIM Cyber Security Dashboard and Cyber Risk Acceptance Recommendations

These records are identified in Rows 9–11 of Ex-Im's *Vaughn* index and concern "analysis by EXIM's Chief Information Officer to the Enterprise Risk Committee of issues related to cybersecurity risks[.]" Jackson Decl. ⁋ 38b. CoA Institute acknowledges that *portions* of these records are likely properly withheld, insofar as they are purely deliberative and concern intra-agency decision-making regarding cyber risks. But all of these records have been *withheld in full*. *See* Mulvey Decl. Ex 6 at 201800076F0116–201800076F0135. It is likely that there is some factual portion of the records that may be released.

More importantly, Ex-Im fails to distinguish between the different types of records it has grouped together. Although the agency's declarant provides context for cybersecurity risk recommendations, *see* Jackson Decl. ⁋ 38b, she fails to provide any similar description for Ex-Im's "Cybersecurity Dashboard." *See* ECF No. 27-4 (Row 9). She also does not explain why factual material in a Risk Committee meeting agenda cannot be released. *See id.* (Row 10).

### 3.    Confirmation Strategies for Political Nominees

This record, which Ex-Im identifies in Row 14 of its *Vaughn* index, is part of the White House correspondence addressed above.[11]    That correspondence does not meet Exemption 5's threshold requirement as an "inter-agency or intra-agency" record.  *See supra* at pp. 16–20.  If the Court disagrees, it may still reject Ex-Im's use of the deliberative-process privilege.

The caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making.  *See, e.g.*, *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). A privileged record must be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]"  *Id.* (emphases added and citations omitted).  Even when courts have considered the possibility of the privilege extending to a record exchanged between an agency and the White House, they have made pains to distinguish *whose* decision-making was implicated.  *See Loving v. Dep't of Def.*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007).

Here, Ex-Im's declarant described how the documents at issue "represent the proposals of their author [at Ex-Im] to White House officials."  Jackson Decl. ⁋ 38c.  She also explained how the "documents [were] prepared by agency officials on political nominees . . . [and] provided to the President . . . for his executive decision-making process[.]"  Jackson Decl. ⁋ 38c; *see* Def.'s Mot. at 14 ("[T]hey contain information provided to the President vital for his decision-making process[.]").  Clearly, on the agency's own view, the relevant *decisionmaker* at hand is the President, not Ex-Im.  This is fatal to any privilege claim.

What matters is how *Ex-Im* or another *agency* has used any correspondence related to confirmation hearings.  "Exemption 5 explicitly covers communications *between* agencies, not just

---

[11] Elsewhere in the *Vaughn* index, Ex-Im suggests that it withheld portions of the records identified in Rows 29–30 under Exemption 5.  This is inaccurate.

within agencies." *Bureau of Nat'l Affairs, Inc.*, 742 F.2d at 1497.  But the White House is not an "agency."  The President is not an "agency."  And Ex-Im does not suggest that it corresponded with officials at a component of the Executive Office of the President subject to the FOIA.

### 4.    Senior Staff Reports

Ex-Im groups together a variety of records, which are identified in Rows 16–25 of the *Vaughn* index, ECF No. 27-4, as "Senior Staff Reports," or "cover emails and actual staff reports from various senior staff at EXIM to the President discussing matters involving all aspects of EXIM transactions and operations[.]"  Def.'s Mot. at 15.  Although the agency suggests that "[t]hese documents require candor," are "highly confidential," and could "chill" internal deliberations, *id.*, it offers little in the way of specific detail about why the records are either *predecisional* or *deliberative*.  This may be because the agency considered it too burdensome to provide a more detailed *Vaughn* index.  *See* Jackson Decl. ⁋ 38d ("The analytical, deliberative portions of the Senior Staff Reports vary widely as they come from all corners of the agency.").  Ex-Im's declarant instead muddles the relevant facts to support application of the deliberative-process privilege by offering entirely unrelated context.  *See* Jackson Decl. ⁋ 38d ("The Office of General Counsel regularly reports about pending litigation—including this very litigation—and such reports often cover assessments regarding strengths and weaknesses of such litigation.  Release of such assessments could undermine the agency's approach to litigation[.]").

A cursory examination of the produced records demonstrates that Staff Reports have not been redacted in a uniform fashion from week-to-week, despite the same *type* of factual and non-deliberative information appearing on a regular basis.  *Compare* Mulvey Decl. Ex. 6 at 201800076F1054–201800076F1083 *with* Mulvey Decl. Ex. 6 at 201800076F1778–201800076F1897.  Large block redactions in the reports, which are not intended to be the basis of

decision-making but merely allow senior agency leadership "to see both what has happened in other group . . . and what is proposed to happen," are likewise troubling and suggest that Ex-Im failed to take reasonable efforts to segregate and disclose non-exempt portions of the Staff Reports.

### 5.   Document Productions to GAO and Responses to GAO Audit

These three records, which Ex-Im identifies in Rows 32, 33, and 41 of its *Vaughn* index, reflect correspondence with GAO, including document productions and responses to GAO inquiries. Although Ex-Im describes the records as "Redacted in Part," they were withheld in full. *See* Mulvey Decl. Ex. 6 at 201900047F032Interim–201900047F154Interim, 201900047F028. These records do not categorically meet Exemption 5's threshold requirement as "inter-agency or intra-agency" records. *See supra* at pp. 16–20. If the Court disagrees, it should still reject Ex-Im's use of the deliberative-process privilege.

Again, the caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making. *See, e.g.*, *Senate of P.R.*, 823 F.2d at 585. A privilege record must be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]" *Id.* (emphases added and citations omitted). Even when courts have considered the possibility of the privilege applying to a record exchanged between an agency and the White House, they have made pains to distinguish *whose* decision-making was implicated. *See Loving*, 496 F. Supp. 2d at 108.

Here, some of the records reflect "responses to questions posed by the GAO during an audit." Def.'s Mot. at 15. But such records do not relate to Ex-Im's decision-making or deliberations. "Exemption 5 explicitly covers communications *between* agencies, not just within agencies." *Bureau of Nat'l Affairs, Inc.*, 742 F.2d at 1497. GAO is not an "agency" subject to the FOIA; it is part of the legislative branch.

As for records requested by GAO and transmitted by Ex-Im, the agency has failed to provide a reasonably specific description of those documents.  Consequently, there is no way for the Court to evaluate the agency's blanket claim that everything is "inherently analytical in nature." Jackson Decl. ℙ 39a.  Although the agency refers in its *Vaughn* index to another email record that catalogs the documents produced to GAO, Ex-Im failed to provide the Court with a copy, or to endeavor to provide any description of the sorts of files at issue.  In that respect, Ex-Im has not met its burden to justify its use of the deliberative-process privilege.

### 6.    "Other Emails"

Ex-Im describes these records as "other internal documents that relate to the Defendants [*sic*] response to questions from the GAO."  Def.'s Mot. at 16.  The agency's declarant claims that "[t]hese emails are inherently deliberative in that they set forth different points of view on the best way to respond to GAO requests and comments."  Jackson Decl. ℙ 39b.  Yet at least one record, which is identified on Row 35 of Ex-Im's *Vaughn* index, is decidedly *not* related to a GAO inquiry, let alone deliberations about "the best way to respond to GAO requests and comments."  Jackson Decl. ℙ 39b.  Instead it appears to concern an article then-recently published by CoA Institute about financial mismanagement and fraud susceptibility at Ex-Im.[12]  *See* Mulvey Decl. Ex. 6 at 201900047F262Interim; *see generally* Kevin Schmidt, *GAO Report Finds EXIM Potentially Provides Billions in Financing to Companies with Delinquent Federal Debt*, Cause of Action Inst., June 3, 2019, https://bit.ly/2Fu862V.  Ex-Im's *Vaughn* index is arguably misleading.  The agency provides *no* explanation for why its employees' reaction to a blogpost by a government watchdog would qualify as "deliberative" or "predecisional."

---

[12] With respect to the records identified on Rows 34 and 36–39 of Ex-Im's *Vaughn* Index, *see* ECF No. 27-4, CoA Institute no longer challenges the agency's redactions under Exemption 5, and it no longer considers those records at issue.

### C.    Ex-Im cannot use the attorney-client privilege to withhold records.

The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Ctr., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (footnote omitted). The privilege is "not limited to communications made in the context of litigation of even a specific dispute," but it must nevertheless reflect a client's request for his "attorney's counsel . . . on a legal matter." *Coastal States Gas Corp.*, 617 F.2d at 862.   Indeed, the privilege "must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle[.]'" *In re Lindsey*, 148 F.3d 1100, 1108 (D.C. Cir. 1998) (citation omitted).

Here, Ex-Im withheld a record concerning its employees' reactions to a blogpost published by Plaintiff CoA Institute.[13] *See supra* at p. 26.  It argues that this email "fall[s] within the attorney-client" privilege.  Def.'s Mot. at 16.  But it is difficult to countenance this claim.  Ex-Im suggests that the content of the purportedly privileged communication relates to "advising the Defendant how to respond to inquiries from the GAO, or correspondence between senior officials discussing and reflecting advice from counsel on the subject." *Id.*; *see* Jackson Decl. ⁋ 41.  But intra-agency correspondence—even between lawyers—about a government watchdog's work product, does not fall within the scope of advising Ex-Im how to respond to a formal GAO inquiry.  And the privilege does not apply simply because an attorney is involved in correspondence with senior managers. *See Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980).  The Court should reject Ex-Im's use of the attorney-client privilege.

---

[13] Again, CoA Institute does not challenge the agency's use of the attorney-client privilege to withhold portions of records identified on Rows 34 and 36–39 of the *Vaughn* index.

### III.    Ex-Im cannot rely on Exemption 4 to withhold responsive records.

FOIA Exemption 4, in relevant part, protects from disclosure information that is "[(1)] commercial or financial . . . [(2)] obtained from a person and [(3)] privileged or confidential[.]" 5 U.S.C. § 552(b)(4).  The terms "commercial or financial" are given their "ordinary meanings." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  Thus, "information is commercial . . . if, in and of itself, it serves a commercial function or is of a commercial nature." Turning to the second requirement that information be "obtained from a person," courts have consistently held that Exemption 4 only applies to "data which have not been generated within the [federal] Government."  *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 329, 403– 04 (D.C. Cir. 1980); *see Judicial Watch II*, 449 F.3d at 148.  Although some courts have extended the scope of Exemption 4 to cover data "collected and slightly reprocessed by the government," *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 148 (2d Cir. 2010), when an agency goes beyond "a summary or reformulation of information supplied" from outside parties, and injects its own "analysis," the underlying information is no longer "obtained from a person."  *Phila. Newspapers, Inc. v. Dep't of Health & Human Servs.*, 69 F. Supp. 2d 63, 66–67 (D.D.C. 1999).  Finally, with respect to whether information is "confidential," the Supreme Court has clarified that this requires an agency to demonstrate that information "is both customarily and actually treated as private by its owner."  *Food Mktg. Inst.*, 139 S. Ct. at 2366.[14]

Ex-Im has withheld a wide array of records under Exemption 4.  *See* ECF No. 27-4 (Rows 5–8, 16–17, 19, 21, 23, 25, 32–33).  The agency claims that these records reflect "[c]onfidential

---

[14] The Supreme Court did not resolve the question of whether information must be submitted to the government with an assurance that it will be kept private.  Courts in this Circuit, however, have tended to treat an assurance of privacy as an element of the Exemption 4 test.  *See Besson v. Dep't of Commerce*, No. 18-2527, 2020 WL 4500894, at *5 n.1 (D.D.C. Aug. 5, 2020); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019).

business information" that "come[s] from documents" the agency received, or "oral information . . . collect[ed] by phone or in meetings." Jackson Decl. ⁋ 34. But Ex-Im does little to demonstrate *what* sort of information is at issue or *whence* it was obtained. Without laying that foundation, the agency also unsurprising fails to show how the information at hand is "both customarily and actually treated as private by its owner[s]." *Food Mktg. Inst.*, 139 S. Ct. at 2366.

For example, with respect to Portfolio Risk Management Reports, Ex-Im argues that these records "have extensive discussion regarding default transactions, broken down by various geographic and market segments." But not every piece of commercial information relating to a transaction in default is likely to be "customarily" and "actually" treated as secret by the "troubled participant." Jackson Decl. ⁋ 34a. Ex-Im bears the burden of proving this, and it has not attempted to do so. Mere conjecture is inadequate. Yet conjecture seems to be Ex-Im's general approach to assessing "confidentiality." *See, e.g.*, Jackson Decl. ⁋ 34b ("Generally, borrowers do not want competitors knowing how much money they are borrowing for specific projects.").

At one point, Ex-Im claims to withhold or redact "information which businesses do not customarily publicize." Jackson Decl. ⁋ 31. But this confuses the relevant test for "customarily"— it is not that an entire industry or set of businesses tends to keep certain information secret; rather, the correct inquiry is whether "information communicated to [an agency] . . . remains confidential whenever it is customarily kept private . . . *by the person imparting it*[.]" *Food Mktg. Inst.*, 139 S. Ct. at 2363 (emphasis added). "Conclusory statements by an agency official about what the agency official may believe about how a submitter customarily treats the information at issue are simply insufficient." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 111. Particularity and a well-developed evidentiary foundation are essential. *See id.* at 110–14.

It also appears that much of the information that Ex-Im is withholding under Exemption 4 is not actually "obtained from a person." The agency repeatedly explains how the underlying commercial or financial information implicated in the records was incorporated with extensive "analy[sis] . . . in various ways and from various angles." Jackson Decl. ⁋ 34a. The information was "woven into staff analysis" and other "inherently analytical" deliberative materials, such as staff reports for senior management. Jackson Decl. ⁋ 34b. And, at times, it was included in "living" agency documents of an "inherently analytical natural" to track "specific confidential business information which poses risks to the agency." Jackson Decl. ⁋ 34c. It is unclear how *any* ostensibly commercial information repurposed for internal "analytical" purposes can still meet the relevant Exemption 4 standard. Ex-Im is not merely "summar[izing] or reformulati[ng] . . . information supplied by a source outside the government," but conducting "analysis" on its own initiative. *Phila. Newspapers, Inc.*, 69 F. Supp. 2d at 66–67.[15] That sort of independent transformation of commercial or financial information precludes the use of Exemption 4.

Finally, with respect to Ex-Im's supposed assurance of confidentiality to unidentified submitters of commercial or financial information, the agency does little beyond proffering an undated "Memorandum" addressed to "Interested Parties," which still incorporates language that echoes the "substantial harm" test eliminated by the Supreme Court last year in *Food Marketing Institute*. *See* ECF No. 27-5. Ex-Im offers *no* evidence that the relevant submitters received this document. Even assuming this could be shown, the agency's assurances of confidentiality cannot

---

[15] Ex-Im even admits that it is withholding "aggregate" information that it created, and which was not "obtained from a person." Jackson Decl. ⁋ 34b ("[A]t times these Senior Staff Reports set forth aggregate information that does not directly reveal information about a specific transaction or specific borrower, but is nonetheless withheld or redacted because of the potential for this information to be analyzed over time and thus to indirectly reveal non-public confidential information about specific parties.").

cure the failure to establish a basis for demonstrating that the information at issue was "obtained from a person" and "actually and customarily kept secret" by its submitter.  For these reasons, the Court should reject Ex-Im's invocation of Exemption 4.

**IV.    Ex-Im has not satisfied its burden under the "foreseeable harm" standard.**

The FOIA mandates that an agency release records unless they fall under a specifically enumerated exemption.  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant object of the Act[.]"  *Klamath*, 532 U.S. at 7–8 (internal citations omitted).  With the passage of the FOIA Improvement Act of 2016, Congress introduced significant amendments, including changes that raise the standard by which an agency must evaluate its withholdings.  As the law stands now, an agency may "withhold information" under the FOIA "only if [it] *reasonable foresees* that disclosure would harm an interest protected by an exemption[.]"  5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).

Under this "foreseeable harm" standard, is it not enough that an agency make a case for the *technical* application of a statutory exemption; it must articulate *precise* reasons why *specific* records, or portions thereof, could be reasonably foreseen to harm an interest protected by an exemption.  *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ("Importantly, codifying the presumption of openness will help reduce the perfunctory withholding of documents through the overuse of FOIA exemptions.  It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the application exemption is meant to protect.").  Congress did not merely codify existing policies or practices.  To construe the FOIA in such a way would offend the traditional canon against surplusage, which directs "courts 'to give effect, if possible, to every clause and word of a statute[.]'"  *Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 140 (D.D.C. 2018).  The unambiguous

language of the foreseeable harm standard manifests Congress's intent to require something more of an agency when it defends its withholdings. *Cf. Mingo Logan Coal Co. v. Envtl. Prot. Agency*, 714 F.3d 608, 612–14 (D.C. Cir. 2013).

Courts in this jurisdiction have repeatedly recognized the impact of the new standard and the added burden it places on an agency. *See, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018). It is not enough that an agency merely recites "boiler plate language to justify [its] redactions." *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019). "[G]eneral explanations of the possibility of a 'chilling effect' fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'" *Id.* (citation omitted); *see Machado Amadis v. Dep't of State*, No. 19-5088, 2020 WL 4914093, at *4 (D.C. Cir. Aug. 21, 2020) ("[A]gencies, to justify withholding records under FOIA's foreseeable-harm provision, cannot simply rely on 'generalized' assertions that disclosure 'could' chill deliberations. We have no quarrel with that proposition.").

Here, with Exemption 5, Ex-Im's declarant simply claims that "EXIM determined that the foreseeable harm in much of what was redacted . . . was that releasing such information would have a detrimental effect on the free and open exchange of ideas within the Bank." Jackson Decl. ¶ 38. And when addressing categories of records, such as "Senior Staff Reports," the declarant's testimony is no more enlightening: "The select portions of the Senior Staff Reports withheld on grounds of Exemption 5 all contain similar types of information, the release of which could cause significant harm to the agency[.]" Def.'s Mot. at 15–16. In short, Ex-Im has offered nothing but "generic and nebulous articulations of harm," which are "insufficient." *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). Ex-Im has "failed to identify specific harms"—beyond generic "chill"—"to the relevant protected interests

that it can reasonably foresee would actually ensue from disclosure of the withheld material." *Id.*
It has not "connected the harms in any meaningful way to the information withheld, such as by
providing context or insight into the specific decision-making processes or deliberations at
issue[.]" *Id.*

Ex-Im also has failed to describe how it satisfied the foreseeable harm standard when
applying Exemptions 4 and 6. There is nothing in the FOIA itself which precludes the standard
from applying to these exemptions, as neither explicitly prohibits disclosure as a matter of law.
*See* 5 U.S.C. § 552(a)(8)(A)(i)(II). Courts in multiple jurisdictions have acknowledged as much,
at least with respect to Exemption 4. *See, e.g.*, *Ctr. for Investigative Reporting v. Dep't of Labor*,
424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) ("Defendant argues that to impose the foreseeable harm
standard would render *Argus Leader* meaningless. The Court disagrees. . . . [The FOIA
Improvement Act of 2016] codifies the requirement that the agency articulate a foreseeable harm
to an interest protected by an exemption," even Exemption 4.) (citation omitted), *appeal and cross-
appeal docketed sub nom. Evans v. Dep't of Labor*, Nos. 20-16416 & 20-16538 (9th Cir. 2019).

This Court, in *Center for Investigative Reporting v. U.S. Customs & Border Protection*,
explained the matter more directly:

> The FOIA Improvement Act's "foreseeable harm" requirement replaces to some
> extent the "substantial competitive harm" test that the Supreme Court overruled in
> *Food Marketing*. . . . The foreseeable-harm requirement, as applied to Exemption
> 4, enhances the useful "tool" of FOIA. To meet this requirement, the defendants
> must explain how disclosing . . . the specific information withheld under Exemption
> 4 would harm an interest protected by this exemption, such as by causing "genuine
> harm to [the submitter's] economic or business interests," and thereby dissuading
> others from submitting similar information to the government[.]

436 F. Supp. 3d 90, 113 (D.D.C. 2019) (citations omitted).

Ex-Im refuses to acknowledge that the foreseeable harm standard applies to Exemption 4,
*see* Mulvey Decl. Ex. 4, and it provides no basis for the Court to determine whether the release of

the records at issue could reasonably harm an interest protected by Exemption 4 by causing genuine harm to submitters' economic or business interests, or by chilling future submissions of confidential commercial or financial information.

For these reasons, the Court should reject Ex-Im's use of Exemptions 4, 5, and 6 for failure to satisfy the FOIA's foreseeable harm standard.

**V.    Ex-Im did not segregate and release non-exempt portions of responsive records.**

Regardless of whether Ex-Im can sustain its use of any exemptions, it has failed to show that it released all reasonably segregable portions of the records at issue.  The failure to carefully review responsive records conflicts with the explicit mandate of the FOIA, which requires an agency to release "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II).  An adequate segregability analysis is so vital to the FOIA's broad mandate of disclosure that a court has "an affirmative duty to consider the segregability issue *sua sponte*."  *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs."  *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citation omitted).

Despite repeatedly describing records as being "Redacted in Part," *see* ECF No. 27-4, even a cursory examination of the records disproves Ex-Im's claims.  *See* Mulvey Decl. Ex. 6.  The agency repeatedly withheld *in full* records that it tells the Court were only partially redacted.  A prime example is the Risk Management Reports (and related records) described in Rows 4–8 of the agency's *Vaughn* index.  Although Ex-Im claims these records were only partially redacted, in

fact almost the exact opposite is true.[16]  Only *one* record was released in part; the others were withheld in full.  *See* Mulvey Decl. Ex. 6 201800076F0007–201800076F00115.  This strongly suggests that the agency failed to take reasonable steps to segregate out purely factual material, such as administrative details or non-deliberative facts in the Risk Committee's meeting minutes.  *See Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011).  And, as detailed elsewhere in this brief, there are other specific instances where inconsistent or blanket redactions suggest a more careful approach would have been appropriate.

## CONCLUSION

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: September 21, 2020                Respectfully submitted,

                                         */s/ Ryan P. Mulvey*
                                         Ryan P. Mulvey
                                         (D.C. Bar No. 1024362)
                                         Lee A. Steven
                                         (D.C. Bar No. 468543)

                                         CAUSE OF ACTION INSTITUTE
                                         1310 North Courthouse Road, Suite 700
                                         Arlington, VA 22201
                                         Telephone: (571) 482-4182
                                         ryan.mulvey@causeofaction.org
                                         lee.steven@causeofaction.org

                                         *Counsel for Plaintiff CoA Institute*

---

[16] The records identified in Rows 9–11 of the *Vaughn* index—which relate to Cyber Risk Acceptance Recommendations—and Rows 32–33 and 41—which relate to Ex-Im's dealings with GAO—were also withheld in full, despite being described as "Redacted in Part."