## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
CAUSE OF ACTION INSTITUTE,              )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )       Civil Action No. 19-1915 (JEB)
                                        )
EXPORT-IMPORT BANK                      )
OF THE UNITED STATES,                   )
                                        )
            Defendant.                  )
_____)


## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS
## <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

_Counsel for Plaintiff CoA Institute_

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Introduction ..................................................................................................................... 1

Argument ......................................................................................................................... 1

I.   Ex-Im cannot treat certain White House communications as outside agency control
     or, in the alternative, withhold them under Exemption 6. ...................................... 1

     A.   Ex-Im improperly segmented email records reflecting White House
          correspondence, which fall squarely within agency control. .......................... 2

     B.   Exemption 6 does not protect White House email addresses. ......................... 4

II.  Exemption 5 does not protect any of the records at issue. ..................................... 6

     A.   Ex-Im has not satisfied the threshold "inter-agency or intra-agency" requirement... 6

     B.   The deliberative-process privilege does not apply ......................................... 9

          1.   Portfolio or Enterprise Risk Management Reports ............................. 9

          2.   EXIM Cyber Security Dashboard and Cyber Risk Acceptance
               Recommendations ............................................................................ 11

          3.   Confirmation Strategies for Political Nominees ............................... 12

          4.   Senior Staff Reports ........................................................................ 12

          5.   Document Productions to GAO and Responses to GAO Audit ...................... 13

          6.   "Other Emails" ................................................................................ 14

     C.   The attorney-client privilege does not apply. .............................................. 15

     D.   Ex-Im's Exemption 5 claims do not satisfy its burden under the
          "foreseeable harm" standard. ...................................................................... 16

III. Exemption 4 does not protect the records at issue. .............................................. 18

IV.  Ex-Im did not segregate and release non-exempt portions of responsive records ........... 24

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Besson v. Department of Commerce*,
No. 18-2527, 2020 WL 4500894 (D.D.C. Aug. 5, 2020) ........................................................21

*Board of Trade v. Commodity Futures Trading Commission*,
627 F.2d 392 (D.C. Cir. 1980)..............................................................................................21

*Bureau of National Affairs, Inc. v. Department of Justice*,
742 F.2d 1484 (D.C. Cir. 1984)............................................................................................14

*Center for Auto Safety v. Department of the Treasury*,
133 F. Supp. 3d 109 (D.D.C. 2015).....................................................................................21

*Center for Investigative Reporting v. Department of Labor*,
424 F. Supp. 3d 771 (N.D. Cal. 2019)..................................................................................23

*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
436 F. Supp. 3d 90 (D.D.C. 2019)...................................................................16, 18, 19, 23

*Clemmons v. U.S. Army Crime Records Center*,
No. 05-02353, 2007 WL 1020827 (D.D.C. Mar. 30, 2007) ...................................................6

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980)................................................................................10, 11, 12

*Comstock International (U.S.A.), Inc. v. Export-Import Bank*,
464 F. Supp. 804 (D.D.C. 2010)..........................................................................................19

*Department of the Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001).................................................................................................................7

*Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989)..........................................................................................................4, 9

*Department of State v. Washington Post Co.*,
456 U.S. 595 (1982)............................................................................................................21

*Dow Jones & Co. v. Department of Justice*,
917 F.2d 571 (D.C. Cir. 1990).............................................................................................8

*Edelman v. Securities & Exchange Commission*,
239 F. Supp. 3d 45 (D.D.C. 2017).......................................................................................21

*Environmental Protection Agency v. Mink*,
410 U.S. 73 (1973)...............................................................................................................7

*Food Marketing Institute v. Argus Leader Media*,
139 S. Ct. 2356 (2019)........................................................................................18

*Gulf & Western Industries, Inc. v. United States*,
615 F.2d 527 (D.C. Cir. 1979)............................................................................22

*Hornbeck Offshore Transportation, LLC v. U.S. Coast Guard*,
No. 04-1724, 2006 WL 696053 (D.D.C. Mar. 20, 2006) ......................................10

*Judicial Watch of Florida, Inc. v. Department of Justice*,
102 F. Supp. 2d 6 (D.D.C. 2000) ..........................................................................9

*Judicial Watch, Inc. v. Department of Commerce*,
No. 17-1283, 2020 WL 6939807 (D.D.C. Nov. 25, 2020) ....................................17

*Judicial Watch, Inc. v. Department of Energy*,
412 F.3d 125 (D.C. Cir. 2005)..........................................................................7, 8

*Judicial Watch, Inc. v. Department of Justice*,
No. 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019)....................................17

*Judicial Watch, Inc. v. Export-Import Bank*,
108 F. Supp. 2d 19 (D.D.C. 2000)..................................................................19, 20

*Judicial Watch, Inc. v. Food & Drug Administration*,
449 F.3d 141 (D.C. Cir. 2006)............................................................................21

*Kleinert v. Bureau of Land Management*,
132 F. Supp. 3d 79 (D.D.C. 2015)........................................................................5

*Philadelphia Newspapers, Inc. v. Department of Health & Human Services*,
69 F. Supp. 2d 63 (D.D.C 1999)..........................................................................21

*Pinson v. Department of Justice*,
177 F. Supp. 3d 56 (D.D.C. 2016)..........................................................4, 5, 12, 24

*Public Citizen, Inc. v. Department of Justice*,
111 F.3d 168 (D.C. Cir. 1997).............................................................................8

*Rockwell International Corp. v. Department of Justice*,
235 F. 3d 598 (D.C. Cir. 2001).............................................................................9

*Rosenberg v. Department of Defense*,
342 F. Supp. 3d 62 (D.D.C. 2018)........................................................................16

*Safecard Services, Inc. v. Securities & Exchange Commission*,
926 F.2d 1197 (D.C. Cir. 1991)............................................................................10

*Sai v. Transportation Security Administration*,
   315 F. Supp. 3d 218 (D.D.C. 2018) ................................................................4, 5

*Seife v. Food & Drug Administration*,
   No. 17-3960, 2020 WL 5913525 (S.D.N.Y. Oct. 6, 2020) ..................................23

*Senate of Puerto Rico v. Department of Justice*,
   823 F.2d 574 (D.C. Cir. 1987) .........................................................................14

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
   177 F.3d 1022 (D.C. Cir. 1999) .......................................................................21

*WP Co. LLC v. U.S. Small Business Administration*,
   No. 20-1240, 2020 WL 6504534 (D.D.C. Nov. 5, 2020) ...................................20

**Constitutional Provisions**

U.S. Const. amend. I .........................................................................................6

**Other Authorities**

Motion for Leave to Intervene, *Besson v. Department of Commerce*,
   No. 18-2527 (D.D.C. filed Oct. 23, 2020) ........................................................21

# INTRODUCTION

This case concerns a pair of Freedom of Information Act ("FOIA") requests seeking access to records of communications between and among senior officials at the Export-Import Bank ("Ex-Im") on a variety of topics, including matters involving the Government Accountability Office ("GAO") and the White House.  Ex-Im has withheld a number of those records—often in full—under various exemptions.  It has also withheld certain portions of its correspondence with the White House by characterizing them as non-agency records.

Ex-Im's redactions and control arguments must fail.  In large part, the agency has not addressed the more outlandish aspects of its treatment of the records.  For example, Ex-Im does not argue why the White House has control over portions of email chains, or why it is appropriate to segment those chains into separate records.  It also ignores part of its required "foreseeable harm" analysis.  And Ex-Im provides a confused defense of how it satisfied Exemption 5's threshold "inter-agency or intra-agency record" requirement.  Other arguments for the use of Exemptions 4, 5, and 6 are unsupported by the record and fail as a matter of law.  Cause of Action Institute ("CoA Institute") respectfully requests that the Court deny Ex-Im's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment.

# ARGUMENT

## I.   Ex-Im cannot treat certain White House communications as outside agency control or, in the alternative, withhold them under Exemption 6.

Ex-Im's defense of its segmentation and redaction of certain White House communications reveals its misunderstanding of the relevant legal standards.  Among other things, Ex-Im conflates "agency control" with Exemption 5's threshold "inter-agency or intra-agency" requirement.  It also unsuccessfully attempts to distinguish "segmentation" and "segregation."  Ex-Im not only mischaracterizes CoA Institute's arguments—and fails to rebut them—but flatly contradicts the

testimony of its own declarant. The agency's confused arguments likely result from its attempt to treat portions of responsive records as not subject to the FOIA, while concurrently claiming their protection under Exemption 6.

### A. Ex-Im improperly segmented email records reflecting White House correspondence, which fall squarely within agency control.

Ex-Im redacted portions of four records reflecting communications between agency officials and the White House about nominees pending before the U.S. Senate. Specifically, the agency treated White House email addresses in these communications—as well as the entirety of incoming email messages from the White House in a single, distinct email chain—as separate records outside of agency control. *See* Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. at 4–12 [hereinafter "Pl.'s Cross-Mot."], ECF No. 28-1. This was improper because Ex-Im cannot segment unified records, *see id.* at 5–9, and it maintains control of the unified correspondence with the White House. *See id.* at 9–12.

Ex-Im refuses to acknowledge that it segmented White House email correspondence into "agency" and "non-agency" "records." It suggests instead that "[b]ecause the White House correspondence is protected [under Exemption 6]. . . [its] removal is 'segregation.'" Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. at 23 [hereinafter "Def.'s Opp'n"], ECF No. 31. But Ex-Im explicitly withheld portions of these records on the basis of "EOP Not Subject to FOIA." *See* Decl. of Ryan P. Mulvey Ex. 6 at 201800076F0357, 201800076F1729–30, 201800076F1946, 201800076F1957, ECF No. 28-4. It characterized the same redactions in its *Vaughn* index with the label "EOP." *See* Def.'s *Vaughn* Index at 2–3, ECF No. 27-4. And Ex-Im's declarant addressed segmentation—*not* segregation—of "documents that are the property of the EOP" in a paragraph set apart from discussion of the use of statutory exemptions. *See* Decl. of Lennell Jackson ¶ 46, ECF No. 27-3.

It is nonsensical for Ex-Im to claim certain "records" are *not* subject to the FOIA but simultaneously to withhold them under Exemption 6, which of course would mean they *are* subject to FOIA.  *See* Def.'s *Vaughn* Index at 5 n.1 ("EXIM continue[s] to redact the email addresses of these senders and recipients from the EOP on the grounds of Exemption 6, privacy, as well as on grounds that such email addresses are the property of the EOP, which is not subject to FOIA."); *see also* Jackson Decl. ¶ 44 ("In communications initiated by personnel from the Executive Office of the President, we withheld both the names and the contact information of the sender because such communications are rightfully property of the Executive Office of the President, which is not subject to FOIA.").  CoA Institute alerted the agency to the error of attempting to "concurrently exclude records as under White House control and also redact them under Exemption 6."  Pl.'s Cross-Mot. at 12 n.5.  But Ex-Im failed to provide any clarification.  It is logically impossible for something to be, at once, a separate record subject to White House control *and* a portion of an agency record protected by Exemption 6.[1]

Ex-Im does make a fruitless attempt to address the "control" question.  Besides failing to analyze control with respect to the individual email addresses withheld as "EOP Not Subject to FOIA," the agency discusses a document that it previously conceded was an agency record, namely, a "multipage report[] from [the] EXIM Vice President to the Executive Office of the President of the United States regarding potential and actual political nominees to the EXIM Bank."  Def.'s Opp'n at 6 (citing Jackson Decl. ¶ 38c and Def.'s *Vaughn* Index at 2 (Rows 13–14)).  Ex-Im withheld this report in full under Exemption 5, and it is addressed below.  *See infra* at p. 12.  The remainder of the agency's argument pertains to distinct legal questions, such as

---

[1] CoA Institute noted that Ex-Im incorrectly identified two White House messages in its *Vaughn* index as protected by Exemption 5.  *See* Pl.'s Cross-Mot. at 12 n. 4.  The agency failed to provide any relevant clarification or correction in its reply brief.

whether the White House is subject to FOIA, *see* Def.'s Opp'n at 6, or whether records exchanged with the White House qualify as "inter-agency or intra-agency records" under Exemption 5. *See id.* at 7; *see also infra* at pp. 6–9.

Ex-Im bears the burden of demonstrating "the materials sought are not 'agency records.'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). It has not met that burden. There is *no* evidence in the record that demonstrates the White House manifested a clear intent to maintain control over email correspondence—or email addresses within that correspondence—or that the White House otherwise restricted Ex-Im's ability to use its own agency email as it sees fit. Ex-Im merely cites various cases, such as "*Judicial Watch I*" and "*Kissinger*," in conclusory fashion and without discussion of how the relevant control tests ought to be applied. The agency ends its attempted rebuttal with the incoherent and self-contradictory claim that "irrespective of whether [White House email messages] are under the 'control' of EXIM Bank, they are not agency records subject to FOIA." Def.'s Opp'n at 9. But it is Ex-Im's control of the email records *that makes them* agency records subject to the FOIA.

Because Ex-Im failed to respond cogently to CoA Institute's arguments concerning the proper definition of a "record," Ex-Im's segmentation of White House email correspondence, and the existence of agency control over such correspondence, the Court should treat these arguments as conceded. *See Pinson v. Dep't of Justice*, 177 F. Supp. 3d 56, 81 (D.D.C. 2016).

**B.    Exemption 6 does not protect White House email addresses.**

Ex-Im failed to specify in its *Vaughn* index or accompanying declaration how it was applying Exemption 6 to withhold White House email addresses. "The disclosure of names and contact information 'is not inherently and always a significant threat to . . . privacy[.]" *Sai v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 262 (D.D.C. 2018). Ex-Im has "offered little more than

conclusory assertions . . . without regard to the position held by the relevant [White House] employee[s], the role[s] played by th[ose] employee[s], the substance of the underlying agency action, or the nature of the agency record at issue[.]" *Id.* It also "has failed to explain . . . how the release of contact information . . . would constitute a 'clearly unwarranted' invasion of . . . privacy." *Id.* at 263. Because Exemption 6 does not create a *per se* rule that protects official government contact information in any and all cases, Ex-Im's failure "to explain with meaningful specificity why releasing the challenged information would significant threaten anyone's privacy" is fatal. *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 97 (D.D.C. 2015).

Most of Ex-Im's rebuttal consists of lengthy recitation of background caselaw and relevant standards that are undisputed. *See* Def.'s Opp'n at 9–10. The meat of the agency's argument is that disclosure is unwarranted and will "subject White House personnel to harassment" because CoA Institute "has gone on record stating that it has the intent and the ability to disclose this information to a broad audience." *Id.* at 11. Ex-Im surmises that CoA Institute's future use of disclosed materials will "undoubtedly include contacting employees about matters that are exempt from FOIA disclosure[.]" *Id.*

The Court need not give these claims any credence. Ex-Im has not pointed to any substantive evidence to establish how mere dissemination of email addresses would result in a clearly unwarranted invasion of privacy. If disclosure itself were enough to justify the use of Exemption 6, it would effectively become a categorical exemption and would defeat the purpose of a balancing test. There is no caselaw to support the notion that White House employees are entitled to heightened privacy merely because they work in the Executive Office of the President. Personal information is routinely withheld under FOIA only "if [its] release will endanger a staff member's safety." *Pinson*, 177 F. Supp. 3d at 83. Courts must consider whether there is a *real*

threat of harm. *See Clemmons v. U.S. Army Crime Records Ctr.*, No. 05-02353, 2007 WL 1020827, at *6 (D.D.C. Mar. 30, 2007). No real threat of harm or invasion of privacy exists here.

Relatedly, Ex-Im offers no proof for why CoA Institute would endeavor to contact White House officials as part of its watchdog activities, let alone to discuss "matters that are exempt from FOIA," whatever that means. Def.'s Opp'n at 11. The agency cites to the Complaint and attached exhibits, but those pleadings are devoid of any reference to such an intended use. Ex-Im's argument also makes little sense. By the time any records are disclosed, a new Administration will have taken office, and the employees whose information is at issue will have left the White House. Regardless, the public enjoys a right to petition its government officials, including those within the Executive Office of the President. *See generally* U.S. Const. amend. I.

Finally, Ex-Im suggests that "disclosure of this contact information would in no way advance the public's understanding of government activity." Def.'s Opp'n at 11. That is untrue. As CoA Institute previously argued, the White House officials implicated here are important figures and not low-level employees. *See* Pl's Cross-Mot. at 15. Official contact information could at least assist the public in further investigating Ex-Im's operations or filing new FOIA requests that target communications with certain White House email accounts.

## II.  Exemption 5 does not protect any of the records at issue.

### A.  Ex-Im has not satisfied the threshold "inter-agency or intra-agency" requirement.

Among the records withheld in full or in part under Exemption 5, Ex-Im has identified one record reflecting communications with the Executive Office of the President about confirmation strategies for agency nominees, *see* Mulvey Decl. Ex. 6 at 201800076F0358–201800076F0367, and nine records reflecting Ex-Im's interactions with GAO during an audit. *See* Mulvey Decl. Ex.

6 at 201900047F032Interim–201900047F352Interim, 201900047F028.  Not all of these records

meet Exemption 5's threshold "inter-agency or intra-agency memorandum or letter" requirement.

The prevailing expansion of Exemption 5's threshold requirement to accommodate the

President and non-agency components of the Executive Office of the President conflicts with (1)

textual limitations imposed by Congress, (2) the plain meaning of Exemption 5, and (3) the

Supreme Court's direction that FOIA's provisions are subject to the same textual adherence as any

other statute.  *See* Pl.'s Cross-Mot. at 16–20.  Ex-Im rejects CoA Institute's arguments out-of-hand

and resorts to rote recitation of prevailing precedent.  The agency's off-base arguments are spread

throughout its reply brief—perhaps because of its conflation of Exemption 5's threshold

requirement with the concept of "agency control," as well as the extent to which the White House

itself is subject to FOIA.  *See* Def.'s Opp'n at 7–8, 12–14, 22–23.  In any case, Ex-Im does not

offer a persuasive refutation of CoA Institute's textualist arguments.

Ex-Im cites both *Environmental Protection Agency v. Mink*, 410 U.S. 73 (1973) and

*Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001).  *See* Def.'s

Opp'n at 12.  The former case is entirely conclusory and contains no detailed discussion of the

"inter-agency or intra-agency" requirement.  *See Mink*, 410 U.S. at 85.  The latter, contrary to Ex-

Im's representations, exemplifies the Supreme Court's attempt to limit the growth of the so-called

"consultant corollary" doctrine, which had been used to treat Exemption 5's threshold requirement

as "purely conclusory" whenever "any document [is found] . . . valuable to keep confidential."

*Klamath*, 532 U.S. at 12.

As for *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005), that

case depends heavily on the consultant-corollary doctrine.  *See id.* at 130.  On its own terms, the

consultant corollary cannot apply here.  "[T]he President and other White House officials do not

serve Ex-Im's decision-making, *by the agency's own admission*."  Pl.'s Cross-Mot. at 19.  "They

do not 'step into the shoes' of Ex-Im personnel" and "are the furthest thing from 'consultants.'"

*Id.*  Ex-Im has not addressed these distinctions or the underlying foundational infirmity of *Judicial*

*Watch*, as CoA Institute has done in its cross-motion.

In a footnote, Ex-Im appears to suggest caselaw concerning the Presidential Records Act

is somehow relevant to the Exemption 5 threshold inquiry.  *See* Def.'s Opp'n at 8 n.2.  It isn't.

Disregarding Ex-Im's confusion of "control" with the scope of the "inter-agency or intra-agency"

requirement in this note, the cited authority is unpersuasive.  If anything, *Public Citizen, Inc. v.*

*Department of Justice*, 111 F.3d 168 (D.C. Cir. 1997), supports CoA Institute's argument that, to

the extent records exchanged with a non-agency could ever qualify as "inter-agency" or "intra-

agency," they must be exchanged in the context of a consultative relationship.  To wit: *Public*

*Citizen* involved deliberative discussions between the National Archives and former President

George Bush concerning disposition and access to certain presidential records.  This discussion

was effectively mandated by statute.  The court recognized that the relevant communications were

"'created for the purpose of aiding the *agency's* deliberative process,'" that is, the National

Archives's operations.  111 F.3d at 170.  Here, by contrast, the records at issue were *not* created

to aid Ex-Im's operations or activities.  Ex-Im concedes they contain information "provided to the

President . . . vital for his executive decision-making process[.]"  Jackson Decl. ⁋ 38c.

Finally, with respect to records reflecting Ex-Im's dealings with GAO, the agency has done

nothing to distinguish the precedential force of *Dow Jones & Co. v. Department of Justice*, 917

F.2d 571 (D.C. Cir. 1990).  As the *Dow Jones* court explained, an agency may withhold

communications with the legislative branch under the deliberative-process privilege only so long

as they "are part and parcel of *the agency's* deliberative process."  *Id.* at 575 (emphasis added and

cleaned up). Records are not protected by Exemption 5 if they are "created specifically to assist Congress" and shared "for the sole purpose of assisting [a legislative branch agency] . . . with *its* deliberations." *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F. 3d 598, 604 (D.C. Cir. 2001) (emphasis added). Here, Ex-Im admits the records at issue concern the conduct of a GAO audit. *See* Pl.'s Cross-Mot. at 20. And the agency's reply brief only reinforces the matter: "GAO conducted an audit," "asked questions and requested documents," and Ex-Im "generated [the requested documents] to provide to GAO as part of that review and decision-making process[.]" Def.'s Opp'n at 14. Perhaps without realizing it, Ex-Im has endorsed CoA Institute's arguments.[2]

### B.    The deliberative-process privilege does not apply.

#### 1.    Portfolio or Enterprise Risk Management Reports

These records are identified in Ex-Im's *Vaughn* index in Rows 4–8. *See* ECF No. 27-4. They consist of "reports [that] contain staff analysis of transactions that, for any variety of reasons, have developed credit issues since they were approved." Jackson Decl. ⁋ 38a. CoA Institute has argued that they could be non-exempt, and the current record is inadequate. *See.* Pl.'s Cross-Mot. at 21. Testimony provided by the agency's declarant implies that at least some reports may reflect final decision-making by the agency. In response, Ex-Im offers two arguments.

---

[2] Ex-Im suggests that the same "GAO communications are not subject to disclosure because the GAO requests and inquiries are the property of GAO, a Congressional unit not subject to FOIA." Def.'s Opp'n at 14 n.4. This claim further confirms Ex-Im's erroneous reading of *Dow Jones* and *Rockwell International Corp.* More importantly, this bare-bones claim is entirely unsupported by the record. Ex-Im has *never* argued that the GAO correspondence comprises "legislative records" not subject to agency control. Ex-Im's supporting declaration and *Vaughn* index do not reflect this position. And the agency's briefing is bereft of any attempt to apply the relevant control tests to the records at hand. Ex-Im bears the burden of demonstrating that "the materials sought are not 'agency records.'" *Tax Analysts*, 492 U.S. at 142 n.3. It has not done so. And, at this point in the game, Ex-Im may not raise a new defense to disclosure. *See Judicial Watch of Fla., Inc. v. Dep't of Justice*, 102 F. Supp. 2d 6, 12 (D.D.C. 2000).

*First*, Ex-Im argues that "the predecisional character of a document is not altered by the fact that an agency has subsequently made a final decision." Def.'s Opp'n at 15 (citing *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 (1979)). This is inaccurate. A "predecisional" record "can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). The agency bears the burden of proof either way, *see id.* at 866, and it must meet that burden with adequately detailed declarations and *Vaughn* indices that describe "not only the contents of the document[s] but also enough about its context, *viz.*, the agency's decisionmaking process[.]" *Safecard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1204 (D.C. Cir. 1991). This entails providing a functional description of the actual records at issue. *See Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, No. 04-1724, 2006 WL 696053, at *19–20 (D.D.C. Mar. 20, 2006).

Ex-Im's declarant provided little *specific* context for the withheld reports. As CoA Institute previously noted, Ms. Jackson's vague description leaves open the reasonable assumption that the agency acts upon certain reports—or portions of reports—once they are "*finally presented* to the Enterprise Risk Committee" and "propose[d] remedies" are adopted. Jackson Decl. ⁋ 38a (emphasis added). To the extent reports have content that reflects matters deferred to another meeting, they could be easily segregated for release in part. *See* Jackson Decl. ⁋ 38a ("Portfolio Risk Management Reports go case by case through each troubled transaction.").

*Second*, Ex-Im claims CoA Institute's argument "is based upon the incorrect assertion that the EXIM Enterprise Risk Committee makes a 'final decision' which is encapsulated in a document that has copies of the Portfolio or Enterprise Risk Management Report attached." But this response is problematic. There is nothing in the record to support Ex-Im's assertion that the

Enterprise Risk Committee does not make "decisions," or that its consideration of the Portfolio Risk Management Reports "do[es] not result in a finalized action." Def.'s Opp'n at 15; *see id.* at 16 n.5 ("There is no 'decision point.'"). Ex-Im points to Ms. Jackson's declaration, but there is nothing in the cited paragraph to that effect. The agency's *Vaughn* index also implies that reports are attached to committee minutes and agenda. *See* Def.'s *Vaughn* Index at 1 (Rows 4–8). Because these records have been withheld in full—as opposed to "Redacted in Part," as claimed on the *Vaughn* index, *see* Pl.'s Cross-Mot. at 34–35—there is no way for CoA Institute or the Court to confirm the matter. CoA Institute's position, however, is not rank speculation, as Ex-Im insinuates. CoA Institute alerted Ex-Im to the fact that it had failed to address all the relevant records in its briefing, *see id.* at 21 n.10, but the agency did not respond.

## 2. EXIM Cyber Security Dashboard and Cyber Risk Acceptance Recommendations

These records are identified in Rows 9–11 of Ex-Im's *Vaughn* index and concern "analysis by EXIM's Chief Information Officer to the Enterprise Risk Committee of issues related to cybersecurity risks[.]" Jackson Decl. ¶ 38b. CoA Institute reiterates that *portions* of these records are likely exempt. All the records, however, have been *withheld in full*, *see* Mulvey Decl. Ex 6 at 201800076F0116–201800076F0135, even though Ex-Im's *Vaughn* index indicates they are "Redacted in Part." *See* Def.'s *Vaughn* Index at 1; *see also* Pl.'s Cross-Mot. at 35 n.16. Ex-Im has failed to address this inconsistency. It also has failed to provide any detail about the different *types* of records that fall under this category. *See* Pl.'s Cross-Mot. at 22 (delineating "risk recommendations," "Risk Committee meeting agenda," and "Cybersecurity Dashboard" records). Ex-Im bears the burden of proving all requirements for the deliberative-process privilege have been satisfied. *See, e.g.*, *Coastal States Gas Corp.*, 617 F.2d at 866. Ms. Jackson's three-sentence description in her declaration cannot justify the agency's withholding.

### 3.     Confirmation Strategies for Political Nominees

This record, which Ex-Im identifies in Row 14 of its *Vaughn* index, is part of the White House correspondence addressed above.  *See supra* at pp. 6–9.  CoA Institute has argued this correspondence does not meet Exemption 5's threshold requirement as an "inter-agency or intra-agency" record.  *See also* Pl.'s Cross-Mot. at 16–20.  CoA Institute also has argued, assuming the threshold requirement were satisfied, the deliberative-process privilege would not apply.  *See* Pl.'s Cross-Mot. at 23–24.  "[O]n the agency's own view, the relevant *decisionmaker* at hand is the President, not Ex-Im.  This is fatal to any privilege claim.  What matters is how *Ex-Im* or another *agency* has used any correspondence related to confirmation hearings."  *Id.* at 23.  Ex-Im does not respond to this argument, and provides no explanation for why *presidential* decision-making, as opposed to *agency* decision-making (including agency decisions involving consultation with the President or his staff), qualifies for the privilege.  Ex-Im restricts its discussion to related, yet distinct, issues, *see* Def.'s Opp'n at 6–9, which CoA Institute addresses above.  *See supra* at pp. 6–9.  Thus, the matter is conceded in favor of CoA Institute.  *See Pinson*, 177 F. Supp. 3d at 81.

### 4.     Senior Staff Reports

These records, which Ex-Im identifies in Rows 16–25 of its *Vaughn* index, are "Senior Staff Reports."  They include "'cover emails and actual staff reports from various senior staff at EXIM to the President discussing matters involving all aspects of EXIM transactions and operations[.]'"  Pl.'s Cross-Mot. at 24 (citation omitted).  CoA Institute has explained how Ex-Im failed to provide "specific detail about why the records are either *predecisional* or *deliberative*."  *Id.*  Ex-Im bears the burden of proving both points.  *See Coastal States Gas Corp.*, 617 F.2d at 866.  Ex-Im protests that it has, in fact, "set out a significant amount of detail to support the application of the Exemption."  Def.'s Opp'n at 17.  But the *length* of a declaration, which Ex-Im

is quick to mention, does not make up for its qualitative deficiency. Ms. Jackson only addressed what "may" be included in the reports and made no effort to describe the actual records at issue. Jackson Decl. ¶ 34d. Ex-Im merely pleads that "[t]he select portions of the Senior Staff Reports withheld on grounds of Exemption 5 all contain similar types of information." Jackson Decl. ¶ 34d. The agency's *Vaughn* index adds little context because it provides no subject-matter references and only identifies "Various" authors. *See* Def.'s *Vaughn* Index at 2–3. Most damningly, despite CoA Institute highlighting how Ex-Im inconsistently treated the same sections of different reports, Ex-Im failed to offer any further explanation. *See* Pl.'s Cross-Mot. at 24–25. It is curious that factual material under the heading "Legislation Related to EXIM" would be disclosed in one report but withheld in others. *See, e.g.*, Mulvey Decl. Ex. 6 at 201800076F1064. This is precisely the sort of information that ought to have been addressed in the agency's *Vaughn* index and supporting declaration. It wasn't. Ex-Im's silence speaks volumes.

### 5. Document Productions to GAO and Responses to GAO Audit

These three records, which Ex-Im identifies in Rows 32, 33, and 41 of its *Vaughn* index, reflect correspondence with GAO, including document productions and responses to GAO inquiries. Ex-Im describes the records as "Redacted in Part," Def.'s *Vaughn* Index at 3–4, but it withheld them in full. *See* Mulvey Decl. Ex. 6 at 201900047F032Interim–201900047F154Interim, 201900047F028. These records do not satisfy Exemption 5's threshold requirement as "inter-agency or intra-agency" records. *See supra* at pp. 6–9; *see also* Pl.'s Cross-Mot. at 16–20. Ex-Im responded only to this threshold argument. *See* Def.'s Opp'n at 14. It did not address the application of the deliberative-process privilege, except to claim that "[b]ecause [the] Bank generated documents to provide to GAO as part of [its] review and decision-making process, the documents are protected, no matter who requested them." *Id.* Such an argument is inadequate.

13

The caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making.  *See, e.g.*, *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987).  A privilege record must be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]"  *Id.*  (emphases added and citations omitted).  Ex-Im's document productions to GAO do not relate to Ex-Im's decision-making or deliberations.  "Exemption 5 explicitly covers communications *between* agencies, not just within agencies," *Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484, 1497 (D.C. Cir. 1984), but GAO is not an "agency" subject to the FOIA—it is part of the legislative branch.[3]

### 6.    "Other Emails"

The remaining record at issue in this category is the email identified on Row 35 of Ex-Im's *Vaughn* index.  *See* Def.'s *Vaughn* Index at 4.  Previously, the agency argued that this record reflected deliberations about "how best to respond to issues *raised by the GAO*," as well as attorney advice about "how to respond to inquiries *from the GAO*."  Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 16 [hereinafter "Def.'s Mot."] (emphases added), ECF No. 27-2; *see* Jackson Decl. ⁋ 39b ("These emails are inherently deliberative in that they set forth different points of view on the best way *to respond to GAO requests and comments*." (emphasis added)).  Yet the email identified on Row 35 is *not* about responding to a GAO inquiry—it concerns reaction to a blog post authored by one of CoA Institute's employees.  *See* Pl.'s Cross-Mot. 26.

Ex-Im protests that its *Vaughn* index should control.  That document is "arguably misleading."  Pl.'s Cross-Mot. at 26.  It describes the email in Row 35 as related to "questions

---

[3] Again, as CoA Institute argued in its cross-motion, Ex-Im has "failed to provide a reasonably specific description" of the documents provided to GAO.  Pl.'s Cross-Mot. at 26.  "Consequently, there is no way for the Court to evaluate the agency's blanket claim that everything is 'inherently analytical in nature.'"  *Id.* (citing Jackson Decl. ⁋ 39a).

*regarding* [the] GAO report." Def.'s *Vaughn* Index at 4 (emphasis added). But Ms. Jackson's declaration provides fuller context, as does Ex-Im's opening brief. Ex-Im cannot ignore CoA Institute's arguments and instead rely on "Plaintiff's own description" to support its use of Exemption 5. *See* Def.'s Opp'n at 18. Ex-Im bears the burden of demonstrating how its reaction to CoA Institute's blog post is both "predecisional" and "deliberative." It has not done so.

### C.    The attorney-client privilege does not apply.

Ex-Im concurrently withheld the same email identified in Row 35 of its *Vaughn* index under the attorney-client privilege. But internal agency discussion, even amongst lawyers, about a CoA Institute blog post, cannot fall within the scope of the attorney-client privilege. In its opening brief, Ex-Im argued that it had based its use of the attorney-client privilege on "attorneys within the Office of General Counsel . . . discussing and advising the Defendant how to respond to inquiries *from the GAO*[.]" Def.'s Mot. at 16 (emphasis added). Ms. Jackson's declaration reflected the same: "The documents consists of emails from attorneys within the Office of General Counsel . . . discussing and advising the Defendant how to respond to inquiries *from the GAO*." Jackson Decl. ⁋ 41 (emphasis added). CoA Institute's blog post is not an "inquiry from the GAO."

Conveniently, Ms. Jackson has supplemented the record to change her prior testimony and "correct" an error in her original description of the email at issue. Although Ms. Jackson maintains that her previous "statement was substantially correct," it now "requires clarification" because "[t]he inquiry in question"—namely, CoA Institute's blog post—"was not 'from the GAO,' but was, as indicated in the *Vaughn Index* (item 35), 'regarding the GAO report.'" Suppl. Decl. of Lennell Jackson ⁋ 5, ECF No. 31-2. This fundamentally changes Ex-Im's argument for use of the privilege. It is not a "distinction without a difference," *see* Def.'s Opp'n at 19 n.7, but a fundamental modification of the agency's legal argument.

Ms. Jackson's declaration is now internally inconsistent because other descriptions about the record identified in Row 35 contradict her "clarification."  The record at once reflects legal advice "regarding the GAO report," *see* Suppl. Jackson Decl. ⁋ 5, as well as internal deliberations about "the best way to respond to GAO requests."  Jackson Decl. ⁋ 39b.  Ex-Im cannot have it both ways.  Internal discussions about an embarrassing situation—such as CoA Institute's blog post describing potential mismanagement uncovered by a GAO audit—are no more protected by the attorney-client privilege than they are by the deliberative-process privilege.

**D.    Ex-Im's Exemption 5 claims do not satisfy its burden under the "foreseeable harm" standard.**

Under the "foreseeable harm" standard, is it not enough that an agency make a case for the technical application of a statutory exemption; it must articulate *precise* reasons why *specific* records, or portions thereof, could be reasonably foreseen to harm an interest protected by an exemption.  *See* Pl.'s Cross-Mot. at 31–32.  Ex-Im protests that CoA Institute seeks to "create an elevated standard" that requires an unjustified level of "precision."  Def.'s Opp'n at 19.  But Ex-Im misreads the relevant caselaw.

Courts have repeatedly recognized the added burden the "foreseeable harm" standard places on an agency.  *See, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  Even when an agency employs a "categorical approach"—as Ex-Im insists it may do, *see* Def.'s Opp'n at 20—it "must provide more than 'nearly identical boilerplate statements' and 'generic and nebulous articulations of harm[.]'"  *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (citation omitted).

Here, Ex-Im insists it met its burden under the foreseeable harm standard, but it merely reiterates many of the same grounds for applying Exemption 5 and its attendant privileges in the first place.  Ex-Im has failed to provide any reasonable basis to expect the actual records at issue

would harm an interest protected by Exemption 5, regardless of whether they are technically exempt.  An agency cannot rely on its "justifications for withholding the information . . . but rather [must] describe[] the specific harms to the [interests protected by the asserted exemption] that would result from disclosure[.]"  *Judicial Watch, Inc. v. Dep't of Commerce*, No. 17-1283, 2020 WL 6939807, at *6 (D.D.C. Nov. 25, 2020).  Ex-Im has not done so.

Consider Ex-Im's discussion of "Senior Staff Reports."  To the extent disclosure of such records would "chill" internal deliberations, they may technically qualify for Exemption 5, assuming their predecisional nature were established.  But the "foreseeable harm" standard requires Ex-Im to take the additional step of explaining how disclosure of the *particular* reports at issue would, *in fact*, reasonably be expected to harm an interest protected by the deliberative-process privilege.  That may require the agency to address, *inter alia*, the age of the documents, whether they pertain to ongoing decision-making (as opposed to closed or finalized matters), or the extent to which they reveal high-level versus subordinate levels of deliberations.  "[G]eneric and nebulous articulations of harm" are "insufficient."  *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019).

Ex-Im recycles general language from the Jackson Declaration.  It has "failed to identify specific harms"—beyond generic "chill"—"to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld material."  *Id.*  It has not "connected the harms in any meaningful way to the information withheld, such as by providing context or insight into the specific decision-making processes or deliberations at issue[.]"  *Id.*[4]

---

[4] Ex-Im has finally provided an argument for how it satisfied the "foreseeable harm" standard when applying Exemption 6.  *See* Def.'s Opp'n at 22.  The argument is inadequate.  Ex-Im provides no evidence for its suggestion that White House employees and others would be "subject to unsolicited communications and direct harassment."  *Id.*  The Jackson Declaration does not even address "foreseeable harm" vis-à-vis Exemption 6.

### III.  Exemption 4 does not protect the records at issue.

As part of its cross-motion, CoA Institute raised various concerns over Ex-Im's invocation of Exemption 4.  CoA Institute established Ex-Im (1) failed to demonstrate the information at issue is "actually" and "customarily" kept "confidential" by relevant parties, *see* Pl.'s Cross-Mot. at 29; (2) confused agency-created information with that "obtained from a person," *see id.* at 30; (3) did not adequately demonstrate its supposed assurances of confidentiality, *see id.* at 30–31; and (4) refused to explain how its use of Exemption 4 complied with the "foreseeable harm" standard.  *See id.* at 33–34.  Ex-Im's responses are unavailing.  Its counterarguments largely confuse the relevant caselaw or attempt to recharacterize Ms. Jackson's deficient declaration.  The Court should reject Ex-Im use of Exemption 4.

*First*, the Supreme Court's test for "confidential" could not be clearer: it requires an agency to demonstrate that "commercial or financial information is both customarily and actually treated as private *by its owner* and provided to the government under an assurance of privacy[.]" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) [hereinafter *Argus Leader*] (emphasis added).  "Conclusory statements by an agency official about how the agency official may believe about how a submitter customarily treats the information at issue are simply insufficient." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 111.  Ex-Im argues, to the contrary, that it need only "demonstrate that its transaction participants or borrowers are of the type who do not publicly disclose the financial information provided."  Def.'s Opp'n at 2; *see id.* at 2–3.  But this position is undercut by the very sentence that the agency cites.  The *Argus Leader* court specifically referred to record evidence *provided by the submitters at issue*, who offered "uncontested testimony" during a trial proceeding that they "customarily" kept information at issue "confidential." *Argus Leader*, 139 S. Ct. at 2363 (citing Joint Appendix).

18

If there were any doubt on this point, post-*Argus Leader* decisions clarify the matter. "'[T]he agency invoking Exemption 4 must meet the burden of proving the *provider's* custom,'" and "'in assessing customary disclosure, the court will consider how the *particular party* customarily treats the information, not how the industry as a whole treats [it].'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 110 (emphasis added and citation omitted). Although an agency may satisfy its burden by proffering declarations from a submitter, it could only proceed on its own sworn affidavits if they were made on personal knowledge. An agency declarant would need at least to aver that he or she had communicated with the submitters in question to discuss their practices. *Id.* at 110–11. That never happened here. None of the paragraphs from Ms. Jackson's declaration addresses or attempts to confirm the "customary" or "actual" confidential treatment of *any* information by *any* bank customers. The sole relevant sentence is entirely conclusory and does not address the information at issue, the relevant submitters, or any "customary" or "actual" practices of confidentiality. Jackson Decl. ⁋ 31 ("EXIM also withholds from production, or redacts, information which businesses do not customarily publicize."). Such lack of specificity is fatal to Ex-Im's Exemption 4 claim.

Relatedly, Ex-Im's reliance on *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000), is misplaced. That case predates *Argus Leader* by roughly ten years and is a district-court decision with little persuasive value for applying the current standard for "confidential." The case also did not involve the same *types* of commercial or financial information at issue here.[5] Exemption 4 requires a case-based, fact-intensive inquiry. If anything,

---

[5] Ex-Im's use of *Comstock International (U.S.A.), Inc. v. Export-Import Bank*, 464 F. Supp. 804, 809–10 (D.D.C. 2010), is similarly infirm because that case involved both prongs of the old *National Parks* test for confidentiality. In *Comstock*, the agency also identified the submitters at issue and explained, in relevant part, why disclosure of their information would be economically harmful, even going so far as to proffer affidavits from the submitters. *See id.* at 810.

*Judicial Watch* cuts against Ex-Im because it involved a *Vaughn* index and declarations that provided intimate detail about the records being withheld. In that case, Ex-Im described the "28 types of information" on "standardized forms" that were at issue, including product descriptions, insurance premium payment amounts, and bank account numbers. It also "provided a description of each type of document and a separate index which list[ed] each document by number," describing how they implicated:

> 1) contracts, 2) sales figures, 3) lists of customers, 4) financial statements, 5) credit reports, 6) audit analyses, 7) bad debt write-offs, 8) audits of financial statements, 9) letters to and from insurance brokers who represent the exporters, 10) advice of credits, 11) wire transfers of funds, and 12) political risk worksheets prepared by one of the outside parties to the transaction.

*Id.* at 31. Here, Ms. Jackson's declaration merely describes unspecified information that supposedly exists in Portfolio Risk Management Reports, senior staff reports, and agency risk registers. *See* Jackson Decl. ⁋ 34.

Ex-Im suggests, in passing, that it would "defeat the entire purpose of the exemption" if it were required "to disclose the identity of all customers who apply for loans, credit, or financial relief," presumably as part of providing a more detail supporting declaration. Def.'s Opp'n at 2. Yet the agency provides no authority for this proposition, and it is difficult to lend it any credence. Assuming the disclosure of the identity of the relevant submitters were necessary, such information would not be protected by Exemption 4. A company name is not "actually" and "customarily" treated as confidential. *WP Co. LLC v. U.S. Small Bus. Admin.*, No. 20-1240, 2020 WL 6504534, at *9 (D.D.C. Nov. 5, 2020) (mandating disclosure of Paycheck Protection Program borrowers' "names, addresses, and loan amounts . . . as disclosure would not reveal any commercial information that is 'customarily and actually treated as private'"). And fact-specific consideration of how identified submitters treat information is standard in Exemption 4 cases, even to the point

of involving the participation of those submitters.  *See, e.g.*, *Besson v. Dep't of Commerce*, No. 18-2527, 2020 WL 4500894, at *3–5 (D.D.C. Aug. 5, 2020); *see generally* Mot. for Leave to Intervene, *Besson v. Dep't of Commerce*, No. 18-2527 (D.D.C. filed Oct. 23, 2020).

*Second*, Ex-Im fundamentally misunderstands the principle that government-generated data cannot categorically qualify as "obtained" from a "person" for Exemption 4 purposes.  As a preliminary matter, Ex-Im argues that *Board of Trade v. Commodity Futures Trading Commission*, 627 F.2d 392 (D.C. Cir. 1980), has been abrogated.  This is misleading.  *Board of Trade* has only been abrogated with respect to its interpretation of Exemption 6.  *See generally Dep't of State v. Wash. Post Co.*, 456 U.S. 595 (1982).  Other aspects of its holding are still controlling.  The D.C. Circuit and other courts in this district have acknowledged as much.  *See Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027–28 (D.C. Cir. 1999) (discussing duty to segregate non-exempt material); *see also Edelman v. Sec. & Exch. Comm'n*, 239 F. Supp. 3d 45, 56 (D.D.C. 2017) (discussing other aspects of Exemption 6).  Indeed, *Board of Trade* continues to be cited as good authority for the rule that "information generated within the Government" cannot be treated as "obtained from a person."  *Ctr. for Auto Safety v. Dep't of the Treasury*, 133 F. Supp. 3d 109, 119 (D.D.C. 2015) (cleaned up and citation omitted).  The Supreme Court's decision in *Argus Leader* did not address this aspect of Exemption 4.

When an agency goes beyond a mere "summary or reformulation of information supplied" by outside parties and injects its own "analysis," that information is no longer "obtained from a person" for Exemption 4 purposes.  *Phila. Newspapers, Inc. v. Dep't of Health & Human Servs.*, 69 F. Supp. 2d 63, 66–67 (D.D.C 1999).  Ex-Im's attempts to wave away the clear caselaw on this point must be rejected.  *See Bd. of Trade*, 627 F.2d at 403–04, 405; *see also Judicial Watch, Inc.*

*v. Food & Drug Admin.*, 449 F.3d 141, 148 (D.C. Cir. 2006) ("[M]aterials implicating Exemption 4 are generally not developed within the agency.").

The agency continues to insist the documents it has withheld fall squarely within the ambit of Exemption 4, but the record shows otherwise. Ms. Jackson, for example, indicated that "[c]onfidential business information is often woven throughout inter-agency and intra-agency EXIM communications," and "[s]uch information may come from documents that EXIM has received, or it may be oral information EXIM collects by phone or in meetings." Jackson Decl. ¶ 34. But Ex-Im must do better than this. The agency has reviewed the records at issue; it should know where the allegedly exempt information came from, and why it qualifies as "obtained from a person." In light of the contradictory statements that CoA Institute identified in its cross-motion, *see* Pl.'s Cross-Mot. at 30 (citing Jackson Decl. ¶¶ 34a, 34b, 34c); *id.* at 30 n.15, Ex-Im had the opportunity to provide additional context. It failed to do so.[6]

*Third*, Ex-Im suggests CoA Institute has "misconstrued EXIM Bank's Memorandum promising confidentiality." Def.'s Opp'n at 3. Not so. The deficiency with the memorandum is not that it reflects an improper application of the *National Parks* "substantial harm" standard— although that may still be the case. Rather, "Ex-Im offers *no* evidence that the relevant submitters received the document." Pl.'s Mot. at 30. The template memorandum attached to Ex-Im's motion for summary judgment is undated, unsigned, addressed to unidentified "Interested Parties," and contains unexplained highlighting. *See* ECF No. 27-5. Ms. Jackson's declaration merely describes

---

[6] Ex-Im's cites to *Gulf & Western Industries, Inc. v. United States*, 615 F.2d 527 (D.C. Cir. 1979). That case in inapt. There, the agency carefully reviewed a Defense Contract Audit Agency Report to segregate out that information that "contained information supplied [by an outside party] or from which information supplied . . . could be extrapolated." *Id.* at 530. The agency provided a detail description of the exempt portions. *Id.* at 529 & n.6. Ex-Im made no similar effort here to segregate the records at issue or provide a detailed *Vaughn* index for the Court's consideration.

the exhibit provided to this Court as "[a] copy of the standard communication to transaction applicants and other transaction participants regarding the treatment of confidential material[.]" Jackson Decl. ⁋ 29. Ms. Jackson never averred that this "standard communication" had, in fact, been given to the relevant submitters whose supposed confidential commercial or financial information is inextricably intertwined with the withheld Portfolio Risk Management Reports, senior staff reports, and agency risk registers. Indeed, it may be difficult for her to do so because, as argued above, Ex-Im has not established the information was indeed "obtained from a person." Broad generalities about implied or explicit assurances of confidentiality are inadequate. Ex-Im must meet its burden of demonstrating that the particular records at issue were, *in fact*, submitted under such conditions. *See* Pl.'s Mot. at 28 n.14 ("Courts in [the D.C. Circuit] . . . have tended to treat an assurance of privacy as an element of the Exemption 4 test.") (citing relevant cases).

     *Fourth*, and finally, Ex-Im has failed to explain how its Exemption 4 withholdings comply with the "foreseeable harm" standard. "[T]he foreseeable harm standard applies to all exemptions, and is not restricted to Exemption 4." *Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019), *appeal and cross-appeal docketed sub nom. Evans v. Dep't of Labor*, Nos. 20-16416 & 20-16538 (9th Cir. 2019). Courts in multiple jurisdictions—including this one—have acknowledged as much. *See Seife v. Food & Drug Admin.*, No. 17-3960, 2020 WL 5913525, at *5 (S.D.N.Y. Oct. 6, 2020); *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113–14. CoA Institute has explained that "Ex-Im refuses to acknowledge that the foreseeable harm standard applies to Exemption 4" and failed to provide any "basis for the Court to determining whether the release of the records at issue could" be reasonably expected to cause "genuine harm to submitters' economic or business interests," or to "chill[] future submission of confidential commercial or financial information." Pl.'s Cross-Mot. at 33–34. Ex-Im has not

responded to these arguments.  The Court "'may fairly view the unacknowledged arguments as conceded.'"  *Pinson*, 177 F. Supp. 3d at 81.

## IV.    Ex-Im did not segregate and release non-exempt portions of responsive records.

Ex-Im offers two points in response to CoA Institute's segregation arguments.  Both are unpersuasive.  *First*, Ex-Im suggests that CoA Institute has misread the agency's inaccurate *Vaughn* index, which describes records that were withheld in full as "Redacted in Part," because "many documents contained multiple exemptions."  Def.'s Opp'n at 23–24.  Although this could be a plausible argument for *some* of the records at issue, it does not explain why the records identified in Rows 4, 3, 6, 10, 11, and 28 were mislabeled.  Each of these records were withheld under Exemption 5 alone.  *See* Def.'s *Vaughn* Index at 1–2, 4.  And even when Ex-Im applied two exemptions to different portions of the same record—such as the Risk Management Reports—it is unclear why that would result in the entire document being withheld in full.

*Second*, Ex-Im suggests the remainder of CoA Institute's segregation argument "should be deemed waived because it gives no indication of where in the brief Plaintiff shows such inconsistent or blanket redactions or why the redactions are insufficient."  Def.'s Opp'n. at 24.  But CoA Institute addressed Ex-Im's troubling redactions throughout its brief and in detail.  It hardly offered the Court a "bare-bones argument" in "cursory fashion" but rather explained why portions of almost every category of record withheld under Exemption 5 could have contained non-exempt material.  *See* Pl.'s Cross-Mot. at 22 ("Although it is conceivable that *some* content in [Risk Management Reports] . . . could be privileged[.]"); *id.* ("But all these [Cyber Security Dashboard and Cyber Risk records] have been *withheld in full* . . . .  It is likely that there is some factual portion of the records that may be released."); *id.* at 24–25 ("Large block redactions in the

[Senior Staff Reports] . . . are likewise troubling and suggest that Ex-Im failed to take reasonable efforts to segregate and disclose non-exempt portions of the Staff Reports.").

## CONCLUSION

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: December 14, 2020                          Respectfully submitted,

                                                  */s/ Ryan P. Mulvey*
                                                  Ryan P. Mulvey
                                                  (D.C. Bar No. 1024362)
                                                  Lee A. Steven
                                                  (D.C. Bar No. 468543)

                                                  CAUSE OF ACTION INSTITUTE
                                                  1310 North Courthouse Road, Suite 700
                                                  Arlington, VA 22201
                                                  Telephone: (571) 482-4182
                                                  ryan.mulvey@causeofaction.org
                                                  lee.steven@causeofaction.org

                                                  *Counsel for Plaintiff CoA Institute*