**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAUSE OF ACTION INSTITUTE,

    Plaintiff,

       v.

EXPORT-IMPORT BANK OF THE
UNITED STATES,

    Defendant.

Civil Action No. 19-1915 (JEB)

<u>**MEMORANDUM OPINION**</u>

This case involves two Freedom of Information Act requests submitted by Plaintiff Cause

of Action Institute, a self-styled non-partisan government-oversight organization, to Defendant

Export-Import Bank of the United States, an independent agency tasked with fostering economic

growth by financing exports of various goods and services.  In competing Motions for Summary

Judgment, the parties focus on the Bank's redactions to several hundred pages of responsive

records, most of which it withheld under the deliberative-process privilege.  Although the Court

had hoped to settle the propriety of all such withholdings in one fell swoop, an array of

unfortunate shortcomings in the Government's current record renders swift resolution

impracticable.  The Court, accordingly, delivers a mixed bag of results: it will affirm the

agency's nondisclosure of some records, order the release of another group, and require it to go

back and further show its work should it wish to continue withholding still others.

I.      **Background**

     As the procedural history undergirding the present Motions is relatively straightforward,

the Court need only briefly summarize it before turning to the merits of the parties' various

disputes.  Plaintiff filed a FOIA request on September 20, 2018, for records reflecting communications involving four senior EXIM officials regarding a series of individuals and business entities.  See ECF No. 1-1 (FOIA Request # 201800076F).  It followed up that initial entreaty with another on May 24, 2019, this time seeking additional records from agency officials pursuant to a handful of new search terms.  See ECF No. 1-3 (FOIA Request # 201900047F).  Although the Institute's proposed keywords resist concise summary, it describes its requests as seeking communications among EXIM employees during congressional hearings for Kimberly Reed's nomination to be the Bank's President, as well as information relating to certain Government Accountability Office oversight activities.  See ECF No. 1 (Complaint), ¶ 1.  After EXIM failed to immediately respond, Plaintiff brought this suit on June 26, 2019.

The agency eventually issued full and final responses to both requests, producing non-exempt portions of a combined 783 responsive records totaling 7,633 pages between August 2019 and February 2020.  See ECF No. 27-3 (Declaration of Lennell Jackson), ¶ 47; ECF No. 22 (3/3/20 Joint Status Rep.) at 1–2.  In so doing, EXIM fully or partially redacted a number of documents, largely citing FOIA Exemptions 5 and 6 as its bases for nondisclosure.  Dissatisfied with certain of those withholdings, Plaintiff informed the Bank of its intention to challenge them.  See ECF No. 28-4 (Declaration of Ryan P. Mulvey), ¶ 6; see also id. at ECF pp. 30–474 (disputed redacted records).  That notice eventually prompted Defendant to move for summary judgment, see ECF No. 27-2 (Def. MSJ), which the Institute opposed with its own Cross-Motion.  See ECF No. 28-1 (Pl. MSJ & Opp.).

Following the completion of briefing, the Court, in an effort to better understand the withholdings at issue, requested EXIM to submit clean and redacted copies of all disputed

documents for *in camera* review.  See ECF No. 35 (Notice).  Having now reviewed such

submissions, the Court is ready to rule.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell,

433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at

895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion"

by "citing to particular parts of materials in the record" or "showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

FOIA cases typically and appropriately are decided on motions for summary judgment.

See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).  In a

FOIA case, a court may grant summary judgment based solely on information provided in an

agency's affidavits or declarations when they "describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)

(citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith,

which cannot be rebutted by 'purely speculative claims about the existence and discoverability of

other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting

Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).  "FOIA expressly

places the burden 'on the agency to sustain its action' and directs the district courts to 'determine

the matter de novo.'"  U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S.

749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III.    Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency

action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976)

(citation omitted).  The statute promotes these aims by providing that "each agency, upon any

request for records which (i) reasonably describes such records and (ii) is made in accordance

with published rules[,] . . . shall make the records promptly available to any person."  5 U.S.C.

§ 552(a)(3)(A).  The Government need not, however, turn over requested information that falls

into one of nine statutorily created exemptions from FOIA's broad directive.  See id.

§ 552(b)(1)–(9).  "While those exemptions must be narrowly construed, they still must be given

meaningful reach and application."  DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015)

(internal quotation marks and citations omitted).  This Court can compel the release of any

records that do not satisfy the requirements of at least one exemption.  See Reporters Comm.,

489 U.S. at 755.

A "veritable avalanche of FOIA-related precedent" guides this Court's determination of

whether the Government has carried its burden of establishing that a given exemption applies.

Ullah v. CIA, 435 F. Supp. 3d 177, 182 (D.D.C. 2020).  In order to show that certain information

is exempt from FOIA, "an agency may file 'affidavits describing the material withheld and the

manner in which it falls within the exemption claimed.'"  Bin Ali Jaber v. U.S. Dep't of Def.,

293 F. Supp. 3d 218, 224 (D.D.C. 2018) (quoting <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210,

217 (D.C. Cir. 1987)).  Ultimately, "when an agency seeks to withhold information, it must

provide a relatively detailed justification, specifically identifying the reasons why a particular

exemption is relevant."  <u>Morley v. CIA</u>, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting <u>King</u>,

830 F.2d at 219).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it

appears 'logical' or 'plausible.'"  <u>Larson</u>, 565 F.3d at 862 (quoting <u>Wolf v. CIA</u>, 473 F.3d 370,

374–75 (D.C. Cir. 2007)).

 Although Plaintiff does not contest the adequacy of EXIM's search for responsive

records, its varied challenges to a bevy of the agency's withholdings ensure no paucity of knots

for the Court to untangle.  As the Bank predicates nearly all of its redactions on Exemption 5, the

Court will spend most of its time there.  It then shifts to Exemption 6 before briefly concluding

with the agency's claim that select portions of one record are not subject to FOIA at all.  The

Court, thankfully, need not tackle EXIM's separate argument that Exemption 4 independently

justifies certain overlapping withholdings for which it also cites Exemption 5, <u>see</u> Jackson Decl.,

¶ 26; as will soon become clear, the Court's resolution of the application of the latter exemption

renders unnecessary any discussion of the former, at least for now.  <u>See</u> <u>Ctr. for Nat'l Sec.</u>

<u>Studies v. U.S. Dep't of Justice</u>, 331 F.3d 918, 925 (D.C. Cir. 2003) (explaining that court "need

not address [any] other exemptions invoked" for particular withholding justified by a single

exemption).

 A.  <u>Exemption 5</u>

 Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would

not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

§ 552(b)(5).  Withholdings are restricted to "those documents, and only those documents,

normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S.

132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 798–99 (1984).

The exemption encompasses three distinct components — namely, the deliberative-process

privilege (sometimes referred to as "executive privilege"), the attorney-client privilege, and the

attorney-work-product privilege.  See Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 905

F. Supp. 2d 206, 216 (D.D.C. 2012).  Here, the Court need only concern itself with the first, save

for a fleeting foray into the attorney-client privilege for a single record.

The deliberative-process privilege shields internal agency "advisory opinions,

recommendations and deliberations" in order to "protect[] the decision making processes of

government agencies."  Sears, 421 U.S. at 150 (citations and internal quotation marks omitted).

It "rests on the obvious realization that officials will not communicate candidly among

themselves if each remark is a potential item of discovery and front page news."  Dep't of

Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8–9 (2001).  In other words, "if

agencies were forced to 'operate in a fishbowl,'" the "quality of administrative decision-making

would be seriously undermined . . . because the full and frank exchange of ideas on legal or

policy matters would be impossible."  Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566

F.2d 242, 256 (D.C. Cir. 1977).

To qualify under the privilege, a record must meet two requirements.  First, it must be

predecisional — i.e., "generated before the adoption of an agency policy."  Judicial Watch, Inc.

v. U.S. Dep't of Def., 847 F.3d 735, 739 (D.C. Cir. 2017) (citation omitted).  Second, a record

must be deliberative, meaning that it "reflect[s] the give-and-take of the consultative process."

Id. (citation omitted).  In this way, Exemption 5 focuses on documents containing information

that composes "part of a process by which governmental decisions and policies are formulated." Sears, 421 U.S. at 150 (citation omitted).

Additionally, in the context of Exemption 5, "an agency may withhold information — even if it falls within the four corners of the exemption — 'only if . . . the agency reasonably foresees that disclosure would harm an interest protected by' [that] exemption." Rosenberg v. U.S. Dep't of Def., 442 F. Supp. 3d 240, 256 (D.D.C. 2020) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)); see also S. Rep. No. 114-4 at 8 (2015). To satisfy this standard, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials," and it must "connect [such] harms in a meaningful way to the information withheld." Ctr. for Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up) (citation omitted). While "boilerplate" articulations of harm are insufficient, id. (citation omitted), the government need not "identify harm likely to result from disclosure of each of its Exemption 5 withholdings." Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 79 (D.D.C. 2018). Rather, it "may take a categorical approach" and "group together like records," explaining "the foreseeable harm of disclosure for each category." Id. at 78.

According to Defendant, the deliberative-process privilege protects the overwhelming majority of disputed documents from disclosure. Plaintiff, unsurprisingly, disagrees. Guided by the agency's declaration, its Vaughn Index, and in camera review, the Court must determine whether the records at issue qualify as inter- or intra-agency materials, may be considered both predecisional and deliberative, and will result in foreseeable harm if disclosed. For ease of analysis, the Court sorts the documents withheld under this exemption into the following broad categories: 1) internal EXIM documents; 2) communications regarding political nominees; and

7

3) productions and responses to the Government Accountability Office.  (When citing individual pages, the Court will follow Plaintiff's lead and refer to the records by their production set and page number — *i.e.*, 201800076F0007 — which generally tracks the agency's pagination in its Vaughn Index and *in camera* submission.  See Mulvey Decl. at ECF pp. 30–474; ECF No. 27-4 (Vaughn Index) at 1–4.

       1.   *Internal EXIM Documents*

EXIM withheld an array of internal agency materials from its production, which, at the risk of excessive sub-categorization, both parties generally describe as follows: portfolio risk-management reports, cybersecurity recommendations, senior staff reports, and several miscellaneous documents.  See Def. MSJ at 13–16; Pl. MSJ & Opp. at 21–22, 24, 26; Vaughn Index at 1–3.  Plaintiff does not dispute that all of these documents satisfy Exemption 5's threshold requirement of "inter-agency or intra-agency memorandums or letters."  5 U.S.C. § 552(b)(5).  The parties' disagreement instead turns on whether they are both predecisional and deliberative, as well as whether the agency has established the requisite foreseeable harm from their potential disclosure.  Because that analysis differs according to the precise record at issue, the Court will consider each of the above categories *seriatim*.

       a.   Portfolio Risk-Management Reports

Start with EXIM's portfolio risk-management reports.  The Bank withheld two of these documents, see Vaughn Index at 1, which contain "staff analysis" of numerous Bank transactions that "have developed credit issues since they were approved."  Jackson Decl., ¶ 38a.  The Court finds that both were properly reserved.

As discussed above, in order for a record to qualify as "predecisional," it must predate a particular agency decision or policy.  Judicial Watch, 847 F.3d at 739 (citation omitted).  An

agency may properly make that showing by "pinpoint[ing]" such later "decision or policy to which the document contributed." Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) (citation omitted). There is more than one way, however, to skin this cat. Because not all deliberative discussions culminate in a "single, discrete decision," an agency may also satisfy its burden by "identifying the decisionmaking process" in which the record played a role. Access Reports v. Dep't of Justice, 926 F.2d 1192, 1196 (D.C. Cir. 1991); see also Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011) ("[E]ven if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process.").

Here, Defendant has satisfactorily established the "decisionmaking process" to which the reports contribute. Access Reports, 926 F.2d at 1196. Marshaling both quantitative and qualitative data, and addressing the Bank's vulnerable transactions both individually and collectively, the reports examine in considerable detail various "risks presented by these transactions," identify potential "remedies to address" such risks, and assess the likelihood of full and partial recovery. See Jackson Decl., ¶ 38a. EXIM's Enterprise Risk Committee (ERC), in turn, uses these reports as a key source of information as it engages in the ongoing work of monitoring credit risks across scores of transactions and minimizing exposure when appropriate. See Def. MSJ at 13; ECF No. 31 (Def. Reply & Opp.) at 15. The Bank's account of the relevant decisionmaking process in which the documents play a role plainly establishes their predecisional nature. See Access Reports, 926 F.2d at 1196 (document predecisional where it contributed to agency's "study of how to shepherd [a] bill through Congress"); Leopold v. CIA, 89 F. Supp. 3d 12, 19–20 (D.D.C. 2015) (documents predecisional where they "were created to

aid senior agency officials' deliberations about how to respond to" various issues as part of ongoing, multi-year process).

In response, Plaintiff musters only that these reports "may no longer [be] predecisional to the extent [EXIM] decided to finalize action and rely on [the] agency staff's recommendations and analysis."  Pl. MSJ & Opp. at 21.  It is true that predecisional documents "can lose that status if [they are] adopted, formally or informally, as the agency position on an issue."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  "To adopt a deliberative document," however, "it is not enough for an agency to make vague or equivocal statements implying that a position presented in a deliberative document has merit."  Judicial Watch, 847 F.3d at 739.  Nor can an agency simply reference a report's conclusions.  Access Reports, 926 F.2d at 1197.  Instead, "the agency must make an 'express[]' choice to use a deliberative document as a source of agency guidance."  Judicial Watch, 847 F.3d at 739 (quoting Sears, 421 U.S. at 161) (emphasis and alteration in original).

No such adoption occurred here.  As EXIM explains, the reports do not become the agency's official or unofficial position on a particular issue; rather, the ERC uses them "on a continual basis to analyze and monitor the risks of different loans, debt or loan portfolios, and other financial transactions that have developed credit issues since they were approved."  Def. Reply & Opp. at 15.  Put differently, rather than "reflect[ing] the [agency's] policy 'itself,'" the reports simply "reflect[] the ideas, theories, or suggestions that 'go into the making of' policy."  Canning v. U.S. Dep't of State, 346 F. Supp. 3d 1, 28 (D.D.C. 2018) (quoting Elec. Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 8 (D.C. Cir. 2014)).  Under these circumstances, the privilege is fully applicable.  See id. (explaining that privilege "protect[s] 'all papers which reflect the agency's group thinking in the process of working out its policy' . . . — even if

portions of that 'thinking' are ultimately persuasive" to final decisionmakers) (quoting Elec. Frontier Found., 739 F.3d at 7); Am. Ctr. for Law & Justice v. U.S. Dep't of Justice, 392 F. Supp. 3d 100, 107 (D.D.C. 2019) (holding that Attorney General's "ultimate reliance on the proposals from her subordinates . . . d[id] not amount to such an express and unequivocal choice" to use document as source of agency guidance, as required for adoption).  Contrary to Plaintiff's unsupported suggestions, see Pl. MSJ & Opp. at 21, moreover, the mere fact that the reports are at times attached to ERC meeting minutes does nothing to alter that conclusion.

The deliberative nature of the reports can be established far more quickly.  Their "case by case" analyses of "each troubled transaction" distill "a range of opinions . . . widely discussed at various levels of the agency," Jackson Decl., ¶ 38a, thus plainly "reflect[ing] the give-and-take of the consultative process."  Judicial Watch, 847 F.3d at 739 (citation omitted); see also Sears, 421 U.S. at 150 (explaining that privilege focuses on documents that compose "part of a process by which governmental decisions and policies are formulated") (citation and internal quotation marks omitted).  The Institute essentially makes no argument to the contrary, and the Court's *in camera* review confirms the reports' deliberative character.

One point bears further comment.  Although some of the discussion in the reports may be characterized as "factual," the agency properly withheld such material, as well.  As this Court has previously explained:

> While it is true that "[p]urely factual material usually cannot be withheld under Exemption 5," it can be where "it reflects an 'exercise of discretion and judgment calls'" and where its exposure would enable the public to probe an agency's deliberative processes. Ancient Coin Collectors Guild v. Dep't of State, 641 F.3d 504, 513 (D.C. Cir. 2011) (quoting Mapother v. Dep't of Justice, 3 F.3d 1533, 1539 (D.C. Cir. 1993)).  This is because "the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." Id. at 1537.  "[T]he legitimacy of withholding" thus "does not turn on whether the material is purely

11

> factual in nature or whether it is already in the public domain, but
> rather on whether the selection or organization of facts is part of an
> agency's deliberative process."  Id. (citing Montrose Chem. Corp.
> of Cal. v. Train, 491 F.2d 63, 71 (D.C. Cir. 1974)).

Leopold, 89 F. Supp. 3d at 21.  Here, the factual material contained in the reports reflects their

drafters' discretionary judgment regarding the particular information that would be relevant to

the ERC's decisionmaking process.  Especially where such material was "assembled . . . for

purely internal deliberative purposes," Elec. Privacy Info. Ctr. v. Transp. Sec. Admin., 928 F.

Supp. 2d 156, 168 (D.D.C. 2013), its disclosure would enable onlookers to "prob[e] the

[agency's] decision-making process itself."  Montrose Chem., 491 F.2d at 68.  Since that is

precisely what the privilege safeguards, it falls under the umbrella of Exemption 5.

        In addition, the Bank easily carries its burden to show reasonably foreseeable harm from

disclosure of the reports.  As its declarant explains, EXIM's ability to manage complex, evolving

transactions depends on "agency staff be[ing] able to openly both discuss and debate analysis of

the facts, and proposed action plans.  Publication of [the reports] would have a direct and

deleterious impact on staff's ability to openly discuss their views of the facts and their ideas on

plans to address the recovery of the maximum amount of money for the U.S. taxpayer in each

matter."  Jackson Decl., ¶ 38a.  "Such chilling of candid advice is exactly what the privilege

seeks to prevent."  Machado Amadis v. U.S. Dep't of State, 971 F.3d 364, 371 (D.C. Cir. 2020);

see also Rosenberg, 442 F. Supp. 3d at 260–61 (finding agency adequately established

foreseeable harm where declarant stated disclosure would inhibit "frank discussions" and impair

efforts to furnish leadership with "the full and necessary understanding" required for effective

decisionmaking).  The Bank also notes the distinct risk that various parties to its transactions

might use the report "to find out the thinking underlying EXIM's positions," which would

"undermine EXIM's negotiating position."  Jackson Decl., ¶ 38a.  In these circumstances, the

harm from disclosure is not only reasonably foreseeable, but indeed manifestly evident.  The
reports, accordingly, were properly withheld.

b.  Cybersecurity Documents

The Court cannot yet say the same for this next category of withholdings, which
comprises three documents totaling 24 pages: two internal EXIM cybersecurity-related
memoranda and one "cybersecurity dashboard."  Vaughn Index at 1–2; Mulvey Decl. at
201800076F0057–61.  This is because the Bank's submissions — at least as they currently stand
— are insufficient to establish either the predecisional or deliberative character of these
documents.

As an initial matter, the agency's Vaughn Index omits all mention of one of the two
withheld memoranda.  The Court only became privy to its existence by way of *in camera* review,
finding it tucked within a different record marked for other purposes.  See Mulvey Decl. at
201800076F0057–61 (memorandum redacted in full).  It need scarcely be said that the Court
cannot affirm Defendant's withholding of a record it never even acknowledges.  Indeed, it is
painful enough for the Court to laboriously pore over all of these *in camera* records even without
errors.  As the D.C. Circuit has emphasized, "There is no excuse for submitting a Vaughn index
that contains errors, even minor ones.  We expect agencies to ensure that their submissions in
FOIA cases are absolutely accurate."  Schiller v. NLRB, 964 F.2d 1205, 1209 (D.C. Cir. 1992),
abrogated on other grounds, Milner v. Dep't of Navy, 562 U.S. 562 (2011).

As for the remaining two documents, the agency's treatment of them is far too cursory.
All its declarant says is that they "present analysis by EXIM's Chief Information Officer to the
Enterprise Risk Committee of issues related to cybersecurity risks EXIM faces."  Jackson Decl.,
¶ 38b.  Notably lacking from this ephemeral account, as well as Defendant's accompanying

13

briefing, is any explanation of the relationship between the CIO and ERC, their respective responsibilities for formulating cybersecurity policy, and — most critically — the documents' role in any such agency decisional process.  See SafeCard, 926 F.2d at 1204 (explaining that, to qualify for privilege, agency needed to explain "how decisions . . . are reached; the role that [the documents] play in such decisions; [and] the manner in which such decisions are memorialized and explained").  It will not do, moreover, to simply lump the memorandum and "cybersecurity dashboard" together without differentiation, as even a brief glance at the unredacted documents suggests that they likely play distinct roles in any (undefined) decisionmaking process.  Finally, although the memorandum suggests that the ERC either accepts or rejects the CIO's risk-mitigation recommendations, Defendant never addresses the potential for agency "adoption" of those proposals, such that some of the document's contents might lose their predecisional status.

To be sure, it may well be the case that these documents are predecisional and deliberative, and that their disclosure "would expose [EXIM's] decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine [its] ability to perform its functions."  Dudman Communications Corp. v. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  The Court's *in camera* review reveals that they contain sensitive information — namely, the CIO's description of numerous cybersecurity risks, his assessment of their potential impact on the Bank's activities, and his recommendations for how the agency might mitigate them while concurrently accounting for operational efficiency.  They also survey trends in digital threats, evaluate the state of EXIM's defenses, and outline areas for continued improvement.  As such internal analysis and counsel are hallmarks of records to which the deliberative-process privilege often applies, the Court will provide Defendant another opportunity to explain "with reasonably specific detail" how the information at hand "logically

14

falls within" Exemption 5.  Elec. Frontier Found., 739 F.3d at 7 (quoting Miller v. Casey, 730

F.2d 773, 776 (D.C. Cir. 1984)); see also Citizens for Responsibility & Ethics in Wash. v. U.S.

Dep't of Justice, 955 F. Supp. 2d 4, 18–19, 24 (D.D.C. 2013) (requiring agency to provide more

robust explanations for withholdings in comparable circumstances).  It expects that any renewed

effort to do so will account for the various shortcomings identified here.

### c.   Senior Staff Reports

Moving right along, the parties next clash over Defendant's partial withholding of four

internal senior staff reports, along with one duplicate report.  See Vaughn Index at 2–3.  These

are, as their name suggests, weekly reports compiling updates from various groups and teams

across EXIM's many divisions for the benefit of the agency's upper-level staff.  See Jackson

Decl., ¶ 38d.  The recurring digests — which traverse from legislative and regulatory strategy, to

fraud-risk assessments, to more mundane matters such as upcoming event schedules — contain

"staff analysis and recommendations," thus enabling senior management "to see both what has

happened in other groups in the agency," as well as "what is proposed to happen."  Id.

As a general matter, Defendant starts off on the right foot, as it is well established that

"[t]he identity of the parties" to the document at issue "is important" when assessing

deliberative-process claims.  Coastal States, 617 F.2d at 868.  More specifically, "a document

from a subordinate to a superior official is more likely" to be both predecisional and deliberative

than one moving in the opposite direction.  Id.; Schlefer v. United States, 702 F.2d 233, 238

(D.C. Cir. 1983); see also Leopold, 89 F. Supp. 3d at 20–21 (finding documents predecisional in

part because they "were written by lower-level employees for use by senior [agency] officials");

Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 899 (D.C. Cir. 2015) ("A

recommendation to a supervisor on a matter pending before the supervisor is a classic example

of a deliberative document.").  The senior staff reports, however, do not fit squarely within this framework, as the Court's *in camera* review reveals that most of the material therein cannot be characterized as "evaluations" or "analysis . . . prepared for senior-level review and decisionmaking."  Machado Amadis, 971 F.3d at 370 (citation omitted).  At the same time, the documents are plainly written by subordinates for the benefit of superiors, and select portions contain internal staff discussion that falls within the confines of the privilege.

For instance, the reports include information of the type withheld in the portfolio risk-management reports regarding EXIM's ongoing transactions; these selections reflect the agency's continuing monitoring of, decisionmaking process surrounding, and distilled analysis regarding its many financing ventures.  See, e.g., Mulvey Decl. at 201800076F1067; see also Jackson Decl., ¶ 38d (explaining that "the risks and concerns of publicizing such information would be the same" as for portfolio risk-management reports).  Other sections convey similar details concerning the Bank's rolling efforts to monitor, manage, and conduct due diligence on certain of its existing, pending, and prospective transactions and broader portfolio alike.  See, e.g., Mulvey Decl. at 201800076F1058–59.  In addition, the reports relay aspects of the agency's continued endeavor to update its credit-risk policy and anti-fraud controls, see, e.g., id. at 201800076F1069–70, 201800076F1080, as well as internal analyses regarding financing risks triggered by developments in various foreign countries.  See, e.g., id. at 201800076F1070.  These discussions are both predecisional and deliberative.  Disclosure, moreover, "would cause agency staff to be much more cautious in staff analysis and proposals regarding a wide array of issues the agency confronts on a regular basis."  Jackson Decl., ¶ 38d; see also Machado Amadis, 971 F.3d at 371 (foreseeable-harm requirement satisfied where agency stated that disclosure would "chill future internal discussions").

On the other hand, much material in the reports hardly qualifies as "advisory opinions, recommendations and deliberations," nondisclosure of which is necessary to "protect[] the decision making processes of government agencies." Sears, 421 U.S. at 150 (citations omitted). That is, considerable portions — which Defendant never even acknowledges — play no discernible role in any "continuing process of agency decision-making," Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 384 F. Supp. 2d 100, 112 (D.D.C. 2005), let alone "reflect[] the give-and-take of the consultative process." Judicial Watch, 847 F.3d at 739 (alteration in original) (citation omitted). Take, for example, a one-page graphic, redacted in full, containing digital metrics tracking engagement with EXIM's website and social-media pages. See Mulvey Decl. at 201800076F1062. It does not appear that these figures were compiled "to aid future policy-oriented decisions," Leopold, 89 F. Supp. 3d at 20, and they certainly are not deliberative. Similarly, consider several fully withheld tables containing high-level data pertaining to small businesses, as well as single- and multi-buyer transactions. See Mulvey Decl. at 201800076F1072–74. The Government never attempts to establish any link between these figures and ongoing policy formation; the charts simply relate recent statistical snapshots that seemingly function as factual updates devoid of any relation to a consultative process. Related difficulties surround the Bank's redactions of other selections, too. The following are examples that fall outside the scope of the deliberative-process privilege:

- a list of recent media outreach and marketing efforts, id. at 201800076F1060;

- registers of confirmed speaking events and upcoming conferences, including those featuring EXIM personnel, id. at 201800076F1063, 201800076F1075, 201800076F1079; and

- high-level statistics regarding public financial disclosure reporting forms and unidentified data-analytics processing, id. at 201800076F1077, 201800076F1082.

Instead of discussing (or even alluding to) these parts of the senior staff reports, Defendant simply approaches the documents from a generic, 30,000-foot view while ever so briefly narrowing in on a few unrepresentative portions, some of which do clear the Exemption 5 bar.  See Jackson Decl., ¶ 38d; Def. MSJ at 15; Def. Reply & Opp. at 17–18.  That will not do, particularly given the wide variety of content contained in the lengthy reports.  See Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 240 (D.D.C. 2013) (rejecting agency's "vague and categorical" descriptions of documents as insufficient).  After all, even if some fragments of an agency record may be properly withheld, the government must turn over other portions that do not qualify for an exemption and are reasonably segregable.  See Roth v. U.S. Dep't of Justice, 642 F.3d 1161, 1167 (D.C. Cir. 2011).  It is not this Court's place, moreover, to hypothesize forms of upper-level decisionmaking that the reports are intended to serve, especially when EXIM does not itself identify any.  See Jackson Decl., ¶ 38d (stating only that "primary purpose" of reports is for senior staff "to see both what has happened in other groups in the agency and what is proposed to happen").  As a reminder, the agency bears the burden of establishing that the withheld information is both predecisional and deliberative, such that it comes within the privilege.  Access Reports, 926 F.2d at 1194.  It has not discharged that obligation with respect to the excerpts examined here.

In sum, while certain of Defendant's redactions within the reports were appropriate, much of the withheld material does not qualify for protection under Exemption 5 and must be released.  Should EXIM desire to continue withholding particular pieces of the reports not explicitly discussed here — see, e.g., Mulvey Decl. at 201800076F1055–57, 201800076F1075, 201800076F1081–82 — it must more fully justify its reasons for nondisclosure in a supplemental submission following a renewed review of the documents.  Finally, the Court notes

that the above-cited pages derive only from the first of five senior status reports at issue in this litigation.  See Vaughn Index at 2–3.  Since the reports are substantially similar (and at times nearly indistinguishable) in form, length, and content, the Court expects that the Government will have little difficulty applying the determinations herein to the latter four reports, releasing and withholding material in accordance with this Opinion.

### d.  Miscellaneous Documents

The Court now turns to the potpourri of additional internal documents Defendant withheld pursuant to Exemption 5: 1) ERC meeting minutes and agendas, as well as an associated email; 2) slides from an April 2018 presentation; and 3) one June 2019 email authored by EXIM's Assistant General Counsel.  It will take each in turn.  (For housekeeping purposes, the Court notes that Plaintiff no longer contests the Bank's partial redaction of the emails contained in Rows 34 and 36–39 of its Vaughn Index.  See Pl. MSJ & Opp. at 26 n.12.)

### i.  Meeting Documents

EXIM redacted essentially in full three sets of ERC meeting minutes, two ERC meeting agendas, and a single-page email listing various documents to be discussed at one such meeting.  See Vaughn Index at 1.  There are two problems here, each troubling in its own right.  First, reprising its earlier oversight, Defendant neglects to include in its Vaughn Index one of the three sets of meeting minutes, as well as one of the two meeting agendas.  The Court, once again, only discovered their existence during its *in camera* review.  See Mulvey Decl. at 201800076F0055–56, 201800076F0068–69.  Such repeated carelessness only undermines the Court's confidence in the attention the Government has devoted to its responsibilities here.

The second problem is perhaps worse: notwithstanding its near-complete withholdings, Defendant in its submissions completely ignores all six records, declining even to mention them

in its declaration and briefing.  That lapse is all the more glaring where Plaintiff explicitly

flagged the deficiency in its Cross-Motion.  See Pl. MSJ & Opp. at 21 n.10, 22.  It is especially

puzzling, moreover, where even a brief *in camera* review suggests that several of the meeting

minutes contain presumably sensitive information of the very type EXIM strove to withhold in

the aforementioned portfolio risk-management reports.

Notwithstanding the Bank's sloppiness, given the potential sensitivity of the material, the

Court will permit EXIM to renew its submissions if it does in fact seek to defend the

withholdings identified here.  It nonetheless cautions Defendant that its current redactions appear

overbroad.  It is doubtful, for instance, that dates, attendees, titles, and subject-matter

descriptions in meeting minutes and agendas properly qualify as predecisional and deliberative.

See Ctr. for Pub. Integrity v. U.S. Dep't of Commerce, 401 F. Supp. 3d 108, 120–21 (D.D.C.

2019) (ordering disclosure of such information); Judicial Watch, Inc. v. U.S. Dep't of Treasury,

796 F. Supp. 2d 13, 29 (D.D.C. 2011) (similar).  The Court expects that the Bank will revisit its

redactions with such guidance in mind, releasing to Plaintiff reasonably segregable information

where appropriate.

ii.     Presentation Slides

Next record, similar story.  The agency's Vaughn Index describes these presentation

slides as follows: "Power Point – Intersection of Export Finance and National Defense Strategy"

authored by the "Office of COO" for the "CEO and DOD."  Vaughn Index at 2.  That paltry,

relatively unhelpful summation, unfortunately, is all Defendant has to say on the subject.  Its

various submissions offer no additional detail on the context of the presentation, its intended

purpose, or its role in any agency (or broader governmental) decisionmaking process.  Indeed, its

briefing does not even discuss the slideshow.  The record before the Court, accordingly, is simply insufficient to support any conclusion that the redacted content was properly withheld.

Once again, however, given the nature of the information in the slide deck, the Court will provide the Government another opportunity to more fully explain how these documents come within Exemption 5 (or Exemption 4, should EXIM wish to pursue it, as several markings on the redacted slides suggest).  Although the Bank has released certain portions of the presentation, id. at 5 n.2, the Court expects that it will focus on the select pages it continues to redact.  See Mulvey Decl. at 201800076F0508–14.

### iii.    Assistant General Counsel Email

There is no need for Defendant to go back to the drawing board on the final record, an internal email from an EXIM Assistant General Counsel to the agency's Chief Risk Officer focusing on "questions regarding [the] [GAO] report."  Vaughn Index at 4.  For context, that report followed a GAO audit of the Bank's anti-fraud controls, which will feature prominently later in this Opinion.  The Court's independent examination confirms that the withheld email does in fact pertain to the GAO report and, more pertinently, offers details potentially informing how senior management might "respond to inquiries regarding" such report.  See ECF No. 32-1 (Supplemental Declaration of Lennell Jackson), ¶ 5; see also Mulvey Decl. at 201900047F262Interim (email subject line suggesting that article published by Plaintiff in response to GAO report prompted internal discussion).

It is true that the deliberative-process privilege often "cover[s] . . . discussions about press coverage of existing agency policies," as well as "determinations about how to respond to statements or inquiries made by public interest groups."  Bloche v. Dep't of Def., 370 F. Supp. 3d 40, 51–52 (D.D.C. 2019).  Here, however, while the agency's submissions establish that the

email at hand is predecisional, it cannot satisfy the deliberative prong.  The Court's review reveals that the message contains no "advisory opinions, recommendations[, or] deliberations" regarding the agency process at issue.  Sears, 421 U.S. at 150 (citation omitted); see also Public Citizen, Inc. v. Off. of Mgmt. & Budget, 598 F.3d 865, 876 (D.C. Cir. 2010) ("Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld.").  The redacted material features nothing "that can even be construed as a personal opinion of an agency official."  Cause of Action Inst. v. U.S. Dep't of Justice, 330 F. Supp. 3d 336, 353 (D.D.C. 2018).  Indeed, the email "offers no commentary whatsoever," Public Citizen, 598 F.3d at 876, instead simply providing a several-sentence recounting of factual information from an already public report.  Neither would disclosure reveal "the deliberative process itself" so as to "expose an agency's policy deliberations to unwarranted scrutiny." Mapother, 3 F.3d at 1537–38.  As this Court has previously explained in a similar situation, the email does not "distill[] voluminous records into factual summaries for higher-ups," "reveal the outcome of the deliberative process," or offer "insight into the agency's position or anything else that 'clearly involves the formulation or exercise of . . . policy-oriented judgment or the process by which policy is formulated.'"  Cause of Action, 330 F. Supp. 3d at 353 (cleaned up) (quoting Mapother, 3 F.3d at 1539).  In these circumstances, the deliberative-process privilege offers no shelter.

EXIM alternatively seeks to withhold the email under the attorney-client privilege, which, the attentive reader will recall, provides an independent ground on which a record may be reserved under Exemption 5.  Am. Immigr. Council, 905 F. Supp. 2d at 216.  This effort encounters its own problems.

This privilege extends to, among other things, communications from attorneys to their clients containing confidential information supplied by the client.  See Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997).  As relevant here, however, the privilege "protects only those disclosures necessary to obtain informed legal advice."  Coastal States, 617 F.2d at 862–63 (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)); see also In re Kellogg Brown & Root, Inc., 756 F.3d 754, 759–60 (D.C. Cir. 2014) (explaining that obtaining or providing legal advice must be a "primary purpose of the communication").  That critical element is lacking when it comes to the email in question.  Nowhere does the message — which, as explained above, accomplishes the ministerial task of tracking down and relaying information from a public report — purport to impart, or respond to a request for, legal advice.  Nor does the agency ever so contend, despite its burden to prove this element.  See Cause of Action, 330 F. Supp. 3d at 348.  The Court could go on — for instance, Defendant never establishes, as similarly required, that the underlying information was kept confidential.  See Am. Immigr. Council, 950 F. Supp. 2d at 243.  This record must see the light of day.

### 2.  *Communications Regarding Political Nominees*

The next category of Exemption 5 withholdings is relatively narrow in scope, comprising just a single record spanning ten pages.  See Vaughn Index at 2; Mulvey Decl. at 201800076F0358–67.  In reality, that single record is actually five distinct two-page documents, each a different "strategic plan[]" aimed at securing a particular individual's Senate confirmation to a position at EXIM.  See Mulvey Decl. at 201800076F0357 (email attaching five reports and naming nominees).  Having authored these "planning documents," Bank officials passed them along to the Executive Office of the President (EOP), intending for them to serve as a source of

guidance for administration officials throughout the relevant confirmation processes.  See Jackson Decl., ¶ 38c; Def. MSJ at 14.

Plaintiff contests the agency's complete withholding of these ten pages.  In so doing, it makes two arguments: 1) the documents are not "inter-agency or intra-agency memorandums or letters," as required to qualify for Exemption 5 protection in the first place; and 2) even if they were, they do not satisfy the elements of deliberative process.  Disagreeing on both counts, the Court finds that EXIM properly withheld the strategic plans.

### a.   Inter- or Intra-Agency Record

Regardless of whether a document is predecisional and deliberative, it may not be withheld under Exemption 5 unless it is an "inter-agency or intra-agency" record.  See 5 U.S.C. § 552(b)(5); Klamath Water Users, 532 U.S. at 9.  Because that threshold requirement has "independent vitality," Klamath Water Users, 532 U.S. at 12, the Court begins there.  Binding D.C. Circuit precedent confirms that the agency clears that bar.

FOIA, as a reminder, requires an "agency" to make "agency records" available upon request.  See 5 U.S.C. § 552(a)(3).  Not all government entities, however, are "agencies" subject to FOIA.  As relevant here, "Congress did not intend the word 'agency' to include the President, his 'immediate personal staff[,] or units in the Executive Office whose sole function is to advise and assist the President.'"  Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 216 (D.C. Cir. 2013) (alteration in original) (quoting Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 156 (1980)).  Although Defendant does not provide much detail regarding the identities of the recipients of the strategic plans, it explains that the plans were transmitted to a unit within the Executive Office "whose sole function is to advise and assist the President."  Def. Reply & Opp. at 6–7.  The Court therefore assumes, as Plaintiff also contends, that EXIM sent

24

the records to an entity that does not qualify as an agency under FOIA — namely, a unit of

advisors to the President.

The game is not up, however.  The D.C. Circuit has squarely held that documents

exchanged between an agency and a non-agency entity within the Executive Branch may still

qualify for protection under Exemption 5.  In Judicial Watch, Inc. v. Department of Energy

(Judicial Watch I), 412 F.3d 125 (D.C. Cir. 2005), the Court of Appeals considered certain

agency communications with a non-agency government entity — there, the National Energy

Policy Development Group, a body established for the sole purpose of advising the President.

Id. at 129–31.  It concluded, over the requester's objection, that those records were "inter-agency

or intra-agency" communications, even though NEPDG and the President were not "agencies"

within the meaning of FOIA, and even though the records reflected the deliberations of NEPDG.

Id.  As the Court made clear, "Neither Exemption 5 nor the cases interpreting it distinguish

between the decision-making activities of an 'agency' subject to the FOIA and those of the

President and his staff, who are not subject to the FOIA."  Id. at 129.  "[W]hat matters," instead,

"is whether a document will expose the pre-decisional and deliberative processes of the

Executive Branch."  Id. at 131.

Drawing from this precedent, numerous courts in this district have explained that

Exemption 5's "threshold requirement is satisfied for communications exchanged between

agencies and the Office of the President, even though that office is not an agency for the

purposes of FOIA."  Judicial Watch, Inc. v. Dep't of State, 306 F. Supp. 3d 97, 109 (D.D.C.

2018) (quoting Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau, 60 F. Supp. 3d. 1, 10

(D.D.C. 2014)).  This case is no different.  As in Judicial Watch I, the documents produced here

by EXIM, an agency subject to FOIA, were exchanged with a unit of the President's staff not

covered by FOIA.  So long as the records would "expose the pre-decisional and deliberative processes of the Executive Branch," therefore, they are protected from disclosure under Exemption 5.  See Judicial Watch I, 412 F.3d at 131; see also EPA v. Mink, 410 U.S. 73, 85 (1973).  That result, it bears noting, also tracks a decision from just last month — involving the very same Plaintiff as here — in which a court found that a report prepared by an agency for the President and his close advisors satisfied Exemption 5's threshold demand.  See Cause of Action Inst. v. U.S. Dep't of Commerce, No. 19-778, 2021 WL 148386, at *5 (D.D.C. Jan. 14, 2021); see also Buzzfeed, Inc. v. FBI, No. 18-2567, 2020 WL 2219246, at *5–7 (D.D.C. May 7, 2020) (holding that documents created by agency and sent to White House Counsel's Office, a non-agency government entity, fulfilled Exemption 5's initial requirement).

The Institute acknowledges this binding caselaw, but urges the Court to disregard such authority, arguing that "[t]he prefixes 'inter-' and 'intra-' . . . limit" the scope of Exemption 5 "to 'memorandums or letters' exchanged within or among entities subject to the FOIA."  Pl. MSJ & Opp. at 16–17 (emphasis removed).  Plaintiff does not, however, explain how this district court may properly ignore Circuit precedent.  Indeed, Judicial Watch I itself rejected the view that its interpretation was "inconsistent with [Exemption 5's] textual limitation to 'intra-agency' or 'inter-agency' communications," as the plaintiffs in the case suggested.  See 412 F.3d at 130; see also Buzzfeed, 2020 WL 2219246, at *5–6 (rejecting similar argument from plaintiffs); Cause of Action, 2021 WL 148386, at *5 (same).  No more need be said here.

### b.  Application of Privilege

As to the remaining question of whether the records at hand are predecisional and deliberative, EXIM's submissions, coupled with the Court's in camera review, readily answer in the affirmative.  The agency's declarant explains that the "planning documents . . . present

proposals back and forth between EXIM officials and the Executive Office of the President of

the United States discussing plans how to get high-level political nominees confirmed by the

U.S. Senate."  Jackson Decl., ¶ 38c.  Defendant has thus adequately "identif[ied] the

decisionmaking process to which [the documents] contributed" — namely, the Executive

Branch's "study of how to shepherd" the President's nominees through to confirmation.  Access

Reports, 926 F.2d at 1196.  The memoranda are also clearly deliberative inasmuch as they reflect

the Executive Branch's priorities surrounding the nominees and evolving, potential strategies for

how each might attain confirmation.  By their very nature, these "plans" and "proposals,"

Jackson Decl., ¶ 38c, "reflect[] the give-and-take" of an Executive Branch "consultative

process."  Judicial Watch, 847 F.3d at 739 (alteration in original) (citation omitted).

 Plaintiff's sole response largely retreads ground the Court has already covered.

According to the Institute, documents withheld under this privilege must further agency

decisionmaking, not that of, say, the President or his immediate advisory staff.  See Pl. MSJ &

Opp. at 23 (arguing that fact that "the relevant decisionmaker at hand is the President, not [EXIM

,] . . . is fatal to any privilege claim") (emphasis removed).  As explained above, however, the

D.C. Circuit has reversed a district court for embracing precisely that misguided proposition —

i.e., that Exemption 5 does not protect documents that further only the decisionmaking processes

of an Executive Branch entity not subject to FOIA.  See Judicial Watch I, 412 F.3d at 129.  The

records that the Court of Appeals found properly withheld in Judicial Watch I, like those here,

"pertain[ed] not to [the agencies'] own deliberations but to those of the" non-agency unit

established to advise the President.  Id. at 127–28; see also Shurtleff v. EPA, 991 F. Supp. 2d 1,

14–15 (D.D.C. 2013) (determining that deliberative-process privilege protected documents

reflecting decisionmaking process not of individual agency, but rather of Executive Branch at

large).  That Exemption 5 extends to such records is a feature, not a bug, of FOIA.  Much like the

D.C. Circuit, this Court finds it "inconceivable" that "Congress intended Exemption 5 to protect

the decision-making processes of the Executive Branch when the decision is to be made by

'agency' officials subject to oversight by the President and not when the decision is to be made

by the President himself and those same agency officials are acting in aid of his decision-making

processes."  Judicial Watch I, 412 F.3d at 130.

Finally, EXIM has discharged its duty to establish reasonably foreseeable harm from the

release of the planning documents.  Disclosure of an aspect of the Executive Branch's strategic

playbook for helping its nominees attain confirmation would, naturally, "significant[ly] chill"

any future "written discussion of such plans."  Jackson Decl., ¶ 38c.  Release would also

undercut the very ends the memoranda were drafted to achieve.  As the agency's declarant

explains, certain individuals who "oppose all Senate-confirmed nominees for EXIM positions"

could draw upon the plans to "strengthen their own strategies for opposing . . . nominees," a

result that "would only add to [EXIM's] difficulties in getting nominees approved."  Id.  The

planning documents, accordingly, were properly withheld.

### 3. *Records Surrounding GAO Audit*

The Court's Exemption 5 journey concludes with yet another distinct set of records:

EXIM's various productions and responses to GAO in connection with its aforementioned audit

of the Bank's anti-fraud controls.  See Vaughn Index at 3–4 (Rows 32, 33, and 41).

Notwithstanding Defendant's suggestion that these materials were only redacted in part, id., they

appear to have been reserved in full — and, according to Plaintiff, improperly so.  In keeping

with the general result of this Opinion, the Court renders a split decision.  Finding that the

records are best analyzed as five different sets of documents, it concludes that EXIM properly

withheld one and must release one.  As to the remaining three, the Court once again holds — as will come as little surprise to the diligent reader who has toiled along thus far — that the Government has not furnished a record adequate to support a *de novo* review of its withholdings.

Plaintiff begins by mounting an argument that rings familiar: because GAO is concededly not an "agency" subject to FOIA, see Jackson Decl., ¶ 39a, documents exchanged between EXIM and GAO cannot qualify as inter- or intra-agency records under Exemption 5.  See Pl. MSJ & Opp. at 16.  As GAO is a unit within the Legislative Branch that exists to provide services for Congress, however, the operable legal framework does not wholly track that pertaining to documents funneled between FOIA-subject agencies and FOIA-exempt units within the Executive Branch, as discussed above.  Fortunately, the parties essentially agree as to the relevant legal test, which the Court will now lay out.

In Dow Jones & Co., Inc. v. Department of Justice, 917 F.2d 571 (D.C. Cir. 1990), the D.C. Circuit considered whether a letter sent by an Executive Branch agency covered by FOIA to Congress was properly withheld under Exemption 5.  Id. at 572, 574.  It held not, explaining that the statutory text "inter-agency or intra-agency" records "will not stretch to cover this situation, because Congress is simply not an agency."  Id. at 574.  The court acknowledged that such external communications from a FOIA-subject agency may qualify for protection when they "are part and parcel of the agency's deliberative process."  Id. at 575.  But because the letter in question was drafted for the purpose of aiding the "deliberations of a non-agency" — *i.e.*, Congress — it could not qualify as either an intra- or inter-agency record.  Id. at 572, 575.

The Circuit clarified the scope of this holding a decade later in Rockwell International Corp. v. U.S. Department of Justice, 235 F.3d 598 (D.C. Cir. 2001), when it considered an agency's Exemption 5 withholding of several documents that the agency had, once more, sent to

Congress.  Id. at 603–04.  This time, however, the court reached the opposite outcome.  Even though the files "were sent to assist" a congressional subcommittee "in its deliberations," they enjoyed protection under Exemption 5.  Id. at 604.  That was because the documents had been "created [earlier] as part of the [agency's] deliberative process," thus making them "precisely the kind of inter- and intra-agency memoranda Exemption 5 protects."  Id.  The agency did not "waive[] Exemption 5 protection" for documents that were drafted to serve the agency's decisionmaking process, as opposed to that of Congress, simply by later sending them to the legislature.  Id. at 603–04.

In sum, documents exchanged "between an agency and Congress . . . receive protection as intra-agency memoranda if they were 'part and parcel of the agency's deliberative process,'" but not if they were "created specifically to assist" or for the "sole purpose of assisting" Congress "with its deliberations."  Id. at 604 (quoting Dow Jones, 917 F.2d at 575); see also Pl. MSJ & Opp. at 19–20 (largely reciting this test); Def. Reply & Opp. at 14 (similar); Elec. Privacy Info. Ctr., 928 F. Supp. 2d at 164–65 (finding no Exemption 5 protection for document "prepared to assist with Congressional deliberations rather than agency deliberations").

The relevant framework thus expounded, the Court now applies it, which, as usual, is more easily said than done.  Defendant, unfortunately, has substantially contributed to this difficulty.  Although the withheld documents from EXIM's production to GAO vary in type and subject matter, its declarant simply lumps them together, describing them as "all pertain[ing] to different frauds that had been committed against the agency over a period of years," and "discuss[ing] the particulars of the fraud, as well as the agency's manner of addressing the fraud."  Jackson Decl., ¶ 39a.  Even the briefest *in camera* review reveals that this description is plainly overbroad and — at least with respect to some of the withheld documents — seemingly

inaccurate, as their content has nothing to do with "fraud[] that had been committed against the agency."  Id.  Without at minimum a general description of each of the reserved documents, including how and why it was created, a reviewing court will often be hard pressed to determine whether it was aimed at serving "'the agency's deliberative process,'" rather than "created specifically to assist Congress."  Rockwell, 235 F.3d at 604 (quoting Dow Jones, 917 F.2d at 575).

        Indeed, for three of these five sets of documents, the present record is inadequate for the Court to pronounce on the propriety of the agency's withholding, even assuming they satisfy Exemption 5's threshold requirement.  One appears to be a 20-page "risk register" identifying EXIM's top perceived risks for the 2018 fiscal year.  See Mulvey Decl. at 201900047F032Interim–52Interim.  The vast majority of this document, however, plainly has nothing to do with "fraud[] . . . committed against the agency," Jackson Decl., ¶ 39a, and the Bank never explains what role it plays in its deliberative process such that it could be properly withheld under Exemption 5.  Another is an "Enterprise Risk Assessment" report produced by an external consulting firm for EXIM's 2016 fiscal year.  See Mulvey Decl. at 201900047F127Interim–54Interim.  This document may well ultimately fall within the privilege, but Defendant has neither acknowledged it nor accurately summarized its content, let alone established its predecisional and deliberative nature.

        The Court will also require further development on a third set of documents, see Mulvey Decl. at 201900047F053Interim–79Interim, 201900047F107Interim–22Interim, but for different reasons.  Although these records (at last) do revolve around fraudulent conduct committed against EXIM, the Court's *in camera* review makes clear that they were created in response to questions submitted by GAO as it conducted its audit — in other words, "specifically to assist

Congress," such that they generally would not fulfill Exemption 5's initial "intra-agency" condition. Rockwell, 235 F.3d at 604.  In response, Defendant fleetingly suggests in its briefing — but not its declaration — that GAO's audit was "just one more step in the process by which EXIM Bank makes a decision/policy on how to respond to fraud."  Def. Reply & Opp. at 14. Notwithstanding the fact that the documents were created for Congress, then, Defendant seems to contend that they were nonetheless "part and parcel of the agency's deliberative process" because the audit to which they contributed was in turn a component of a broader agency review of its anti-fraud controls. Dow Jones, 917 F.2d at 575 (emphasis removed).  The Court has its doubts as to the viability of this tack.  In light of its disposition on other issues, however, it will provide the Bank another opportunity to more precisely explain how the GAO audit served its own decisionmaking process, as well as how the documents qualify as both predecisional and deliberative in any event.

No delay, by contrast, attends the final two withholdings.  One is a 2007 internal memorandum from EXIM's Office of General Counsel regarding the agency's preliminary investigation into a specific set of fraudulent transactions.  See Mulvey Decl. at 201900047F080Interim–106Interim.  Produced for the express purpose of enabling the Bank to make decisions regarding credit, debarment, and criminal referrals, the document maintains a deliberative character that follows immediately from its predecisional nature, as it evinces an "inten[t] to facilitate or assist development of the agency's final position on the relevant issue[s]."  Nat'l Sec. Archive v. CIA, 752 F.3d 460, 463 (D.C. Cir. 2014).  The memo, consequently, was plainly "part and parcel of the agency's deliberative process," and it did not forfeit its protection upon EXIM's mere submission to Congress a decade after its creation. Rockwell, 235 F.3d at 603–04 (quoting Dow Jones, 917 F.2d at 575); cf. Buzzfeed, 2020 WL

2219246 at *9–11 (holding that privileged agency document did not forfeit Exemption 5

protection when agency shared it with Congress).  While hefty chunks of information within the

memo may be characterized as factual, its author's "selection of the facts thought to be relevant"

to the decision at hand constitutes a core part of the agency's deliberative process.  Mapother, 3

F.3d at 1539; see also Reinhard v. Dep't of Homeland Sec., No. 18-1449, 2019 WL 3037827, at

*7 (D.D.C. July 11, 2019) ("When final decisionmakers rely on others to condense a mass of

available information into a summary or set of factual findings that the staff thinks important to

the final decisionmaker, the deliberative-process privilege applies.").  Disclosure of this initial

investigatory document, moreover, would expose aspects of the Bank's anti-fraud strategies to

the public eye, thus "deterr[ing] [agency staff] from frankly assessing individual fraud matters[]

and openly proposing plans to address such fraud."  Jackson Decl., ¶ 39a.  This document was

properly withheld.

The story is different for the final record, which spans but a single page.  Defendant says

nothing about it, other than the fact that it contains an "EXIM response to GAO questions."

Vaughn Index at 4 (Row 41).  In addition to thus appearing to flunk Exemption 5's threshold

requirement, see Elec. Privacy Info. Ctr., 928 F. Supp. 2d at 165, in no fashion may the

document be deemed deliberative.  It simply reports the dollar amount of a particular restitution

award identified from a court order, in response to a GAO inquiry.  Because withholding this

record seemingly does nothing to "protect[]" EXIM's "decision making processes," Sears, 421

U.S. at 150 (citations omitted), and because Defendant has pointed to no foreseeable harm from

its disclosure, the agency must release it to Plaintiff.

Before bringing this section to a close, the Court briefly addresses a perplexing assertion

made in passing by the Bank's declarant that "GAO requests and inquiries are the property of

GAO and not subject to FOIA."  Jackson Decl., ¶ 39a.  To the extent this position is intended to cover the reserved documents themselves, it is wholly inconsistent with Defendant's treatment of them throughout this litigation.  EXIM, after all, explicitly withheld the documents pursuant to specific FOIA exemptions, see Vaughn Index at 3–4, thus treating them as agency records.  Its Motion followed the same path, see Def. MSJ at 15–16, never once suggesting that they were "not subject to FOIA" altogether.  See Jackson Decl., ¶ 39a.  To the extent the declarant's statement is instead meant to embrace the specific "requests and inquiries" GAO made to EXIM, id., as opposed to the latter's subsequent production, the relevance to the present litigation is unclear; such "requests and inquiries" are not presently at issue, and Defendant never identifies any information as property of GAO not subject to FOIA.

B.  Exemption 6

With Exemption 5 (finally) out of the way, the Court now turns to a point of contention that is comparatively minor: whether EXIM properly withheld the email addresses of a handful of personnel from the Executive Office of the President under Exemption 6.  See Pl. MSJ & Opp. at 12–15 (limiting challenge to redactions of email addresses); Vaughn Index at 2–3 (relevant records at Rows 13, 28–30).  The Court confesses that Plaintiff's fixation on this issue is puzzling, for although the EOP staffers' email addresses are redacted from the responsive records, the Bank fully disclosed their names.  The instant *contretemps*, therefore, is limited to a grand total of four withheld email addresses across five pages where the identities of all senders and recipients are known.  Heeding the parties' summons to duty, the Court will nonetheless plow ahead and determine whether redaction was proper.

It bears noting, at the outset, that EXIM claims that the email addresses in question are both protected by Exemption 6 and not subject to FOIA at all on account of their being the

property of the EOP.  See Jackson Decl., ¶ 46 (explaining that Government withheld "email addresses on grounds that such information belongs to the EOP, as well as on privacy grounds under Exemption 6").  The agency never explains how this information could be at once outside the scope of FOIA and also subject to withholding under Exemption 6.  To the extent it intends to make such alternative arguments — unusual in this context — it never so clarifies.  No matter, as even assuming the email addresses are properly subject to FOIA, Exemption 6 provides a sufficient basis for the Bank's nondisclosure.

That exemption protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  There is no dispute that the withheld email addresses qualify as "similar files" under the statute.  Id.; see also U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982) (explaining that information that "applies to a particular individual" qualifies as "similar files" under Exemption 6); Gov't Accountability Project v. U.S. Dep't of State, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) ("Because . . . email addresses can be identified as applying to particular individuals, they qualify as 'similar files' under Exemption 6 . . . .") (citation omitted).

With the first hurdle thus easily cleared, the Court turns to the parties' true point of disagreement: whether disclosure of the email addresses "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  That inquiry, in turn, involves a "balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information."  U.S. Dep't of Def. Dep't of Mil. Affs. v. FLRA, 964 F.2d 26, 29 (D.C. Cir. 1992) (quoting Rose, 425 U.S. at 372); see also Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (requiring courts to "balance the privacy interests that would be compromised by disclosure against the public

interest in release of the requested information") (quoting Davis v. Dep't of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

The Court begins with the familiar inquiry into "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest," for "if no significant privacy interest is implicated FOIA demands disclosure." Multi Ag Media LLC v. Dep't of Agriculture, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (cleaned up). "A substantial privacy interest is anything greater than a *de minimis* privacy interest." Id. at 1229–30. "Finding a substantial privacy interest does not conclude the inquiry; it only moves it along to the point where [the Court] can address the question whether the public interest in disclosure outweighs the individual privacy concerns." Id. at 1230 (citation and internal quotation marks omitted).

Here, the Court agrees with EXIM that the identified EOP personnel enjoy a "substantial privacy interest" in their email addresses. Id. According to the Bank, disclosure of the withheld contact information could cause those individuals to experience "harassment, unwanted attention, and unsolicited communications." Jackson Decl., ¶ 44. Courts in this district have looked favorably upon such concerns, concluding on numerous occasions for reasons similar to those identified here that government employees — and, in one case, EOP staff — have a substantial privacy interest in their email addresses. See, e.g., Shurtleff, 991 F. Supp. 2d at 18–19 (affirming withholding of work email addresses of EOP staff, given their "significant personal interest in preventing the burden of unsolicited emails and harassment") (citation omitted); Hall & Assocs. v. EPA, No. 19-1095, 2020 WL 4673411, at *5 (D.D.C. Aug. 12, 2020) (explaining that "[c]ourts have . . . upheld the withholding of email addresses used for work purposes where they are not publicly available," and recognizing the "interest individuals have in keeping their email addresses private and controlling the dissemination of that information"); Ctr. for Pub.

Integrity v. U.S. Dep't of Energy, No. 18-1173, 2020 WL 1695083, at *8 (D.D.C. Apr. 6, 2020)
(similar).  These decisions, which the Court finds persuasive, accord with the broader principle
that "[t]he privacy interest of civilian federal employees includes the right to control information
related to themselves and to avoid disclosures that 'could conceivably subject them to annoyance
or harassment in either their official or private lives.'"  Elec. Privacy Info. Ctr., 384 F. Supp. 2d
at 116 (quoting Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 487 (D.C. Cir. 1980)).

Instead of acknowledging this line of adverse caselaw, Plaintiff primarily argues that
EXIM has not established with the requisite specificity why disclosure of the withheld email
addresses would threaten any privacy interest in these particular circumstances.  See MSJ &
Opp. at 14.  It is no doubt true, as the Institute points out, that "the disclosure of names and
contact information is not inherently and always a significant threat to . . . privacy."  Id. (cleaned
up) (quoting Sai v. Transp. Sec. Admin., 315 F. Supp. 3d 218, 262 (D.D.C. 2018)).  Here,
however, the "threat to privacy" is "real rather than speculative."  Smith v. Dep't of Lab., 798 F.
Supp. 2d 274, 284 (D.D.C. 2011).  For one, the withheld addresses are retained by high-ranking
executive-branch staffers, not lower-level agency line employees far removed from any
substantive policy role or the key events at issue.  For another, the Institute has indicated that it
will "make the results of [its FOIA] request available to a reasonably broad public audience
through various media," thus raising the potential for broad dissemination of the email addresses
in question.  See ECF No. 1-1 (9/20/18 FOIA Request) at 2; see also Elec. Privacy Info. Ctr., 384
F. Supp. 2d at 117 (noting, as evidence of privacy interest, possibility that plaintiff would publish
released documents online and that readers would contact named employees).  These
considerations, moreover, readily discharge the Bank's obligation to establish reasonably

foreseeable harm from disclosure of the reserved email addresses.  See Reporters Comm. for Freedom of Press v. FBI, No. 15-1392, 2020 WL 1324397, at *9 (D.D.C. Mar. 20, 2020).

In these circumstances, the Court has little difficulty concluding that Defendant has established a "substantial privacy interest" in the withheld information.  Prison Legal News v. Samuels, 787 F.3d 1142, 1147 (D.C. Cir. 2015).  That is so even if the agency's somewhat cursory declaration could have offered more in support of that interest, and even if the threat posed by disclosure is less evident than in other cases where an agency successfully withheld government email addresses.  The standard to determine whether a privacy interest is "substantial," after all, "is not very demanding."  Multi Ag Media, 515 F.3d at 1230.  EXIM has cleared that relatively low bar here; while the privacy interest at hand may well be "rather modest," it is nonetheless "more than de minimis," and that is all that is required.  Hall & Assocs., 2020 WL 4673411, at *5.

Looking to the other side of the scale, the "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government."  Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (cleaned up).  The task is simple, since Plaintiff has identified no public interest whatsoever in the withheld email addresses.  Critically, as explained above, EXIM has already released the names of the particular EOP staffers involved in the communications at issue; it has only withheld, and the Institute only seeks, their email addresses.  It remains a mystery to the Court how disclosure of the employees' email addresses — when their identities are already out in the open — would enhance "public understanding of the operations or activities of the government," id., or otherwise shed light on EXIM's workings with EOP.  See Shurtleff, 991 F. Supp. 2d at 18–19 (determining that privacy

interest in official EOP email addresses outweighed public interest in disclosure because records already revealed identities of individuals whose email addresses were redacted).

In sum, the identified privacy interest — regardless of its precise magnitude — prevails over a non-existent public interest in disclosure. In other words, "something, even a modest privacy interest, outweighs nothing every time." Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989); see also U.S. Dep't of Def., 510 U.S. at 500 (explaining that "a very slight privacy interest would suffice to outweigh" the "virtually nonexistent . . . public interest in disclosure"). Disclosure of the withheld email addresses, accordingly, "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

C.  Record Not Subject to FOIA

The parties' final clash centers around a one-page document, a seemingly innocuous email chain setting up a call between an EXIM employee and an official within the Executive Office of the President. See Mulvey Decl. at 201800076F1729–30. While the Bank produced the individual messages from its own staffer, it redacted three others from the EOP correspondent as property of the EOP "not subject to FOIA." Jackson Decl., ¶ 46; Def. MSJ at 20. Plaintiff challenges those withholdings.

The Court, however, finds that it cannot presently resolve this quarrel, as both parties' submissions leave certain critical elements wanting. For all of Defendant's insistence that the relevant portions of the email chain are not subject to FOIA, it insufficiently identifies the source of such material while overstating the entities not covered by the statute's broad disclosure mandate. The Government at times suggests, for instance, that "all individuals employed in the Executive Office of the President and its supporting offices" are not subject to FOIA. See Def. MSJ at 20; see also Jackson Decl., ¶ 46 ("The Executive Office of the President is not subject to

FOIA.").  On the contrary, FOIA makes clear that the EOP is within its reach.  See 5 U.S.C. § 552(f)(1).  It is only the President's "immediate personal staff," as well as Executive Office units "whose sole function is to advise and assist the President," that are excluded from the statute's coverage.  Judicial Watch, 726 F.3d at 216 (quoting Kissinger, 445 U.S. at 156). Defendant has made no effort to establish that the sender of the redacted emails falls into that latter group.  See Def. MSJ at 20 (stating only that it "withheld information from the Executive Office of the President").  To be sure, it may well be the case that he does, but it is not this Court's place to so speculate where the Government offers no information about him or his precise unit.  While the Court was willing to assume earlier that distinct officials worked in the sole capacity of advising and assisting the President where it made no difference to the ultimate outcome, see supra at 24, here the Bank's withholdings rest on its ability to demonstrate those very circumstances.

In addition, the parties exchange several pages of argument as to whether Defendant properly segregated or improperly segmented the record at issue.  See Pl. MSJ & Opp. at 5–9; Def. Reply & Opp. at 22–23; ECF No. 33 (Pl. Reply) at 2–4.  Yet, for all their discussion, they never acknowledge the D.C. Circuit's instruction that agencies may redact information not subject to FOIA from documents that otherwise qualify as agency records.  See United We Stand Am., Inc. v. IRS, 359 F.3d 595, 603–04 (D.C. Cir. 2004) (rejecting argument that documents cannot be "part-agency records"); Judicial Watch, 726 F.3d at 233 (summarizing United We Stand as "holding that portions of agency records may be redacted as non-agency records"). That guidance seemingly renders irrelevant, as well as inapt, any debate over whether EXIM improperly "divide[d]" a single agency record "into multiple so-called 'records.'"  Pl. MSJ & Opp. at 6.

That is all the Court need say for now.  To the extent the Government desires to continue withholding — and Plaintiff wishes to continue pursuing — isolated snippets from what EXIM's production has already revealed to be a simple email conversation aimed at scheduling a phone call, the Court expects the parties' renewed submissions to account for the above.

\* \* \*

The Court concludes with a brief word on segregability, along with Plaintiff's claim that Defendant has failed to release all non-exempt, reasonably segregable information from the withheld records.  See Pl. MSJ & Opp. at 34–35 (citing 5 U.S.C. § 552(b)).  All EXIM offers on the matter is its conclusory assertion that it "has conducted a line-by-line review of all of the foregoing documents and has segregated and released all reasonably segregable, non-exempt information."  Jackson Decl., ¶ 47.  That alone will not discharge the agency's "obligation to carry its evidentiary burden and fully explain its decisions on segregability."  Am. Immigr. Council, 950 F. Supp. 2d at 248; see also Mead Data, 566 F.2d at 261 ("[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts.").  Indeed, Plaintiff has highlighted several red flags undermining the "presumption" that Defendant has disclosed all reasonably segregable material, see Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013), including the basic reality that a number of the records the Government claims were only redacted in part appear to have been redacted in full.  See, e.g., Vaughn Index at 1–2 (Rows 4, 7, 9, 10, 11).

The Court's own *in camera* review, moreover, causes it to further question whether the Bank has adequately complied with FOIA's segregability mandate.  As Defendant conducts its renewed review of the documents in accordance with this Opinion, the Court trusts that it will

carefully determine whether any reasonably segregable, non-exempt information can be released

— including, for example, document headers, title pages, straightforward timelines and

chronologies, and, most crucially and most broadly, other non-deliberative text that does not

qualify for protection under Exemption 5.

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Motions for

Summary Judgment.  A separate Order so stating shall issue this day.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 23, 2021