**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
CAUSE OF ACTION INSTITUTE,     )
                                          )
            Plaintiff,                 )
                                          )
      v.                                )        Civil Action No. 19-1915 (JEB)
                                          )
EXPORT-IMPORT BANK             )
OF THE UNITED STATES,          )
                                          )
            Defendant.                )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT AND**
**IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

_Counsel for Plaintiff CoA Institute_

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Introduction ................................................................................................................... 1

Factual and Procedural Background ............................................................................. 2

Standard of Review ....................................................................................................... 2

Argument ....................................................................................................................... 4

    I.    Ex-Im cannot segment portions of an e-mail chain as distinct non-agency records........... 4

        A.    Ex-Im may not subdivide its e-mail correspondence with the White House............. 5

        B.    Mr. Calabria's status as an employee of the Office of the Vice President is not dispositive and older case law concerning the "modified control test" is inapt. ....... 8

        C.    Ex-Im maintains legal control over its correspondence with the White House....... 11

            1.    Ex-Im "created or obtained" the McGarry-Calabria e-mail chain................. 11

            2.    Ex-Im exercises "control" over the McGarry-Calabria e-mail chain. ........... 11

    II.    Ex-Im cannot rely on Exemption 4 to withhold responsive records................................ 14

    III.    Ex-Im cannot rely on Exemption 5 to withhold responsive records................................ 19

        A.    Ex-Im has not established that all relevant records meet Exemption 5's threshold "inter-agency or intra-agency" requirement. ........................................... 20

        B.    Ex-Im cannot use the deliberative-process privilege to withhold records. ............. 23

            1.    Enterprise Risk Committee Meeting Minutes.................................................. 24

            2.    Cyber Risk Acceptance Recommendations ..................................................... 25

            3.    Presentation Slides ......................................................................................... 27

            4.    Weekly Reports............................................................................................... 28

            5.    Document Productions to GAO and Responses to GAO Audit ..................... 29

    IV.    Ex-Im has not satisfied its burden under the "foreseeable harm" standard. .................... 31

    V.    Ex-Im did not segregate and release non-exempt portions of responsive records........... 37

    VI.    The Court should conduct another *in camera* review........................................................ 39

Conclusion ................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Immigration Lawyers Ass'n v.*
*Executive Office for Immigration Review*,
   830 F.3d 667 (D.C. Cir. 2016) ..............................................................................5

*American Oversight v. Department of Health & Human Services*,
   380 F. Supp. 3d 45 (D.D.C. 2019) ........................................................................8

*Ancient Coin Collectors Guild v. Department of State*,
   641 F.3d 504 (D.C. Cir. 2011) .......................................................................23, 30

*Besson v. Department of Commerce*,
   480 F. Supp. 3d 105 (D.D.C. 2020) ....................................................................15

*Bloomberg, L.P. v. Board of Governors of the Federal Reserve System*,
   601 F.3d 143 (2d Cir. 2010) ................................................................................14

*Board of Trade v. Commodity Futures Trading Commission*,
   627 F.2d 392 (D.C. Cir. 1980) ............................................................................14

*Bureau of National Affairs, Inc. v. Department of Justice*,
   742 F.2d 1484 (D.C. Cir. 1984) ............................................................................9

*Burka v. Department of Health & Human Services*,
   87 F.3d 508 (D.C. Cir. 1996) ..............................................................................12

*Carter v. Department of Commerce*,
   830 F.2d 388 (D.C. Cir. 1987) ............................................................................40

*Cause of Action Institute v. Department of the Army*,
   No. 16-1020, 2019 WL 4750213 (D.D.C. Sept. 29, 2019) ..................................12

*Cause of Action Institute v. Department of Justice*,
   999 F.3d 696 (D.C. Cir. 2021) ..........................................................................5, 7

*Center for Investigative Reporting v. Department of Labor*,
   424 F. Supp. 3d 771 (N.D. Cal. 2019) ................................................................36

*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ..........................................................15, 17, 36

*Coastal States Gas Corp. v. Department of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ......................................................................24, 27

*Competitive Enterprise Institute v.*
  *Office of Science & Technology Policy,*
  827 F.3d 145 (D.C. Cir. 2016) ...................................................................7

*Competitive Enterprise Institute v. Environmental Protection Agency,*
  232 F. Supp. 3d 172 (D.D.C. 2017) ...........................................................4

*Defenders of Wildlife v. U.S. Border Patrol,*
  623 F. Supp. 2d 83 (D.D.C. 2009) ............................................................3

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001) ...............................................................................19, 31

*Department of Justice v. Tax Analysts,*
  492 U.S. 136 (1989) .................................................................3, 6, 11, 12

*Dow Jones & Co. v. Department of Justice,*
  917 F.2d 571 (D.C. Cir. 1990) ..........................................................21, 29

*Doyle v. Department of Homeland Security,*
  331 F. Supp. 3d 27 (S.D.N.Y. 2018) ......................................................13

*Edmonds Institute v. Department of the Interior,*
  383 F. Supp. 2d 105 (D.D.C. 2005) ........................................................38

*Food Martketing Institute v. Argus Leader Media,*
  139 S. Ct. 2356 (2019) ...............................................................15, 17, 20

*Forsham v. Harris,*
  445 U.S. 169 (1980) .................................................................................5

*Gellman v. Department of Homeland Security,*
  No. 16-0635, 2020 WL 1323896 (D.D.C. Mar. 20, 2020) ......................7

*Goland v. Central Intelligence Agency,*
  607 F.2d 339 (D.C. Cir. 1978) .................................................................6

*Holy Spirit Ass'n for the Unification of World Christianity v.*
  *Central Intelligence Agency,*
  636 F.2d 838 (D.C. Cir. 1980) ...............................................................13

*Huffman v. Western Nuclear, Inc.,*
  486 U.S. 663 (1988) .................................................................................4

*Humane Society International v. U.S. Fish & Wildlife Service,*
  No. 16-720, 2021 WL 1197726 (D.D.C. Mar. 29, 2021) ......................17

*Ibrahim v. Department of State*,
  311 F. Supp. 3d 134 (D.D.C. 2018) ...................................................................31

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) .............................................................................................3

*Judicial Watch, Inc. v. Department of Commerce*,
  375 F. Supp. 3d 93 (D.D.C. 2019) .....................................................................32

*Judicial Watch, Inc. v. Department of Justice*,
  No. 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019) ................................36

*Judicial Watch, Inc. v. Department of the Treasury*,
  796 F. Supp. 2d 13 (D.D.C. 2011) .....................................................................38

*Judicial Watch, Inc. v. Food & Drug Administration*,
  449 F.3d 141 (D.C. Cir. 2006) .....................................................................14, 28

*Judicial Watch, Inc. v. U.S. Secret Service*,
  726 F.3d 208 (D.C. Cir. 2013) ................................................................. *passim*

*Kissinger v. Reporters Committee for Freedom of the Press*,
  445 U.S. 136 (1980) .............................................................................................7

*Krikorian v. Department of State*,
  984 F.2d 461 (D.C. Cir. 1993) ...........................................................................37

*Loving v. Department of Defense*,
  550 F.3d 32 (D.C. Cir. 2008) .............................................................................39

*Machado Amadis v. Department of State*,
  971 F.3d 364 (D.C. Cir. 2020) ...........................................................................32

*Mapother v. Department of Justice*,
  3 F.3d 1533 (D.C. Cir. 1993) .............................................................................23

*Mead Data Central, Inc. v. Department of the Air Force*,
  566 F.2d 242 (D.C. Cir. 1977) ...........................................................................38

*Military Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981) .............................................................................4

*Milner v. Department of the Navy*,
  562 U.S. 562 (2011)............................................................................................20

*Multi Ag Media LLC v. Department of Agriculture*,
  515 F.3d 1224 (D.C. Cir. 2008) ...........................................................................3

*N.Y. Times Co. v. National Aeronautics & Space Administration*,
920 F.2d 1002 (D.C. Cir. 1990) ............................................................................................ 6

*National Archives & Records Administration v. Favish*,
541 U.S. 157 (2004) .............................................................................................................. 2

*National Ass'n of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002) ............................................................................................. 14

*National Labor Relations Board v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1989) .............................................................................................................. 3

*National Labor Relations Board v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ............................................................................................................ 19

*National Security Archive Fund, Inc. v. Central Intelligence Agency*,
402 F. Supp. 2d 211 (D.D.C. 2005) ................................................................................... 38

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) .......................................................................................................... 20

*People for the American Way Foundation v. National Park Service*,
503 F. Supp. 2d 284 (D.D.C. 2007) .............................................................................. 24, 39

*Philadelphia Newspapers, Inc. v.*
*Department of Health & Human Services*,
69 F. Supp. 2d 63 (D.D.C. 1999) .................................................................................. 15, 18

*Public Citizen, Inc. v. Office of Management & Budget*,
598 F.3d 865 (D.C. Cir. 2010) ........................................................................................... 24

*Quick v. Department of Commerce*,
775 F. Supp. 2d 174 (D.D.C. 2011) ..................................................................................... 2

*Quiñon v. Federal Bureau of Investigation*,
86 F.3d 1222 (D.C. Cir. 1996) ........................................................................................... 39

*Reporters Committee for Freedom of the Press v.*
*Federal Bureau of Investigation*,
3 F.4th 350 (D.C. Cir. 2021) .............................................................................................. 32

*Rockwell International Corp. v. Department of Justice*,
235 F.3d 598 (D.C. Cir. 2001) .................................................................................. 21, 23, 29

*Rosenberg v. Department of Defense*,
342 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................................... 32

*Save the Dolphins v. Department of Commerce*,
   404 F. Supp. 407 (N.D. Cal. 1975) .................................................................6

*Schiller v. National Labor Relations Board*,
   964 F.2d 1205 (D.C. Cir. 1992) ............................................................25, 26

*Schoenman v. Federal Bureau of Investigation*,
   575 F. Supp. 2d 136 (D.D.C. 2008) ..............................................................4

*Senate of Puerto Rico v. Department of Justice*,
   823 F.2d 574 (D.C. Cir. 1987) .....................................................................29

*Spirko v. U.S. Postal Service*,
   147 F.3d 992 (D.C. Cir. 1997) .....................................................................39

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
   177 F.3d 1022 (D.C. Cir. 1999) ...................................................................37

*United States v. Weber Aircraft Corp.*,
   465 U.S. 792 (1984) ......................................................................................19

*United We Stand America, Inc. v. Internal Revenue Service*,
   359 F.3d 595 (D.C. Cir. 2004) ........................................................10, 11, 13

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ...................................................................24

*WP Co. LLC v. U.S. Small Business Administration*,
   No. 20-1240, 2021 WL 2982173 (D.D.C. July 15, 2021) ............................17

**Statutes**

5 U.S.C. § 552(a)(4)(B) ....................................................................................3, 39

5 U.S.C. § 552(a)(8)(A)(i)(I) ................................................................................31

5 U.S.C. § 552(a)(8)(A)(i)(II) .........................................................................36, 37

5 U.S.C. § 552(b) ..................................................................................................37

5 U.S.C. § 552(b)(4) .............................................................................................14

5 U.S.C. § 552(b)(5) ................................................................................19, 20, 33

5 U.S.C. § 552(f)(2)(A) ..........................................................................................6

**Rules**

Federal Rule of Civil Procedure 56(a) ...................................................................3

## Legislative Materials

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) ...........................................................31

S. Rep. 104-272 (1996)...................................................................................................6

## Other Authorities

"Belarus," Country Limitation Schedule, *Export-Import Bank of the U.S.*,
    https://bit.ly/3sE4CP8 (last visited Aug. 22, 2021) .........................................25

Export-Import Bank of the U.S., Evaluation of EXIM's Portfolio Risk
    Management Procedures and CRO Responsibilities, No. OIG-EV-20-01 (Dec.
    2019) ...............................................................................................................35

Export-Import Bank of the U.S., Evaluation of Risk Management Procedures and
    Chief Risk Officer Responsibilities, No. OIG-EV-17-01
    (rev. Aug. 2019)...............................................................................................35

Press Release, *Exporter Pleads Guilty to Conspiring to Defraud the U.S. Export-*
    *Import Bank of More Than $24 Million*, Department of Justice, June 23, 2010,
    https://bit.ly/3y5R401 .....................................................................................35

Press Release, *Loan Broker Charged in $15 Million Scheme to Defraud the*
    *Export-Import Bank of the United States*, Export-Import Bank of the U.S.,
    Oct. 6, 2008, https://bit.ly/3D9sHST ...............................................................35

Ryan P. Mulvey & R. James Valvo, III, *Towards a Definition of a FOIA 'Record':*
    *The D.C. Circuit's Decision in* Cause of Action Institute v. Department of
    Justice, Yale J. on Reg. Notice & Comment Blog,
    June 3, 2021, https://bit.ly/3z38VWO ................................................................5

U.S. Government Accountability Office, Export-Import Bank: The Bank Needs to
    Continue to Improve Fraud Risk Management,
    No. GAO-18-492 (July 2018)........................................................................23, 35

U.S. Government Accountability Office, Export-Import Bank: EXIM Should
    Explore Using Available Data to Identify Applications with Delinquent
    Federal Debt, No. GAO-19-337 (May 2019)........................................................23

Webster's Third New International Dictionary (1961)....................................................21

**INTRODUCTION**

This is a "relatively straightforward" case, albeit one whose adjudication has been frustrated by "an array of unfortunate shortcomings" on the part of the government.  Mem. Op. at 1 (Feb. 23, 2021), ECF No. 37.[1]  Plaintiff Cause of Action Institute ("CoA Institute") submitted a pair of Freedom of Information Act ("FOIA") requests to Defendant Export-Import Bank of the United States ("Ex-Im").  Those requests sought records of communications between several senior officials on a variety of topics, including congressional hearings and matters involving the Government Accountability Office ("GAO").

Over the course of a year, Ex-Im produced several thousand pages of records and withheld various items under Exemptions 4, 5, and 6.  The agency also segmented e-mail correspondence with the White House and withheld portions of an e-mail chain as distinct non-agency "records."  Upon consideration of the parties' initial cross-motions for summary judgment, the Court provided partial relief to each side, "affirm[ing] the agency's nondisclosure of some records, order[ing] the release of another group, and requir[ing] [Ex-Im] to go back and further show its work" on the remaining documents.  Mem. Op. at 1.  The parties are now before the Court a second time.

Unfortunately, Ex-Im continues to misuse Exemptions 4 and 5 and ignore its burden under the FOIA's "foreseeable harm" standard.  The agency also misinterprets prevailing Circuit precedent on the segmentation of records.  CoA Institute requests the Court deny Ex-Im's renewed motion for summary judgment and grant CoA Institute's cross-motion.

---

[1] The Court's February 2021 opinion is reported in electronic database format as *Cause of Action Institute v. Export-Import Bank of the United States*, No. 19-1915, 2021 WL 706612 (D.D.C. Feb. 23, 2021).  For ease of reference, CoA Institute cites to the slip opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

CoA Institute incorporates its previous recitation of the factual and procedural background of this case. *See* Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. at 1–2 [hereinafter "Pl's Initial MSJ"], ECF No. 28-1.

Following the Court's February 23, 2021 Memorandum Opinion, Ex-Im proceeded to reprocess and disclose records; it also provided CoA Institute with a revised draft *Vaughn* index. *See* Pl.'s Renewed Statement of Undisputed Material Facts ¶¶ 8–10 [hereinafter "Pl.'s Renewed SUMF"]; *see also* Second Decl. of Ryan P. Mulvey Ex. A (April 13, 2021 Draft *Vaughn* Index). The parties then narrowed the records in dispute. CoA Institute advised Ex-Im it would continue to challenge the treatment of forty-one "documents" responsive to FOIA Request 201800076F and three "documents" responsive to FOIA Request 201900047F. *See* Pl.'s Renewed SUMF ¶ 11; *see generally* Second Mulvey Decl. Ex. B (attachment prepared by Ex-Im with Bates-stamped copies of the records still at issue).

Ex-Im has (1) continued to improperly redact records under Exemptions 4 and 5; (2) failed to meet its burden under the FOIA's "foreseeable harm" standard; (3) failed to undertake reasonable efforts to segregate and disclose non-exempt portions of records; and (4) incorrectly segmented White House correspondence to exclude portions of records it claims are non-agency "records." *See* Pl.'s Renewed SUMF ¶ 12.

## STANDARD OF REVIEW

"Congress enacted the FOIA to introduce transparency into government activities." *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citing *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984)). The statute allows "citizens to know what the Government is up to" and is "a structural necessity in a real democracy." *Nat'l Archives & Records*

*Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted);

*see Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1989) ("The basic

purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society,

needed to check against corruption and to hold the governors accountable to the governed.").  The

rights afforded under the FOIA are a bulwark to the "fundamental principle of public access" to

records of the administrative state, which can often be "shielded unnecessarily from public view

. . . [by] possibly unwilling official hands."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146,

151 (1989) (cleaned up and citation omitted).

     Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]  "FOIA cases

typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v.

U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In a FOIA case, "the burden is on the

agency to sustain its action[.]"  5 U.S.C. § 552(a)(4)(B).  The district court must determine *de novo*

"'whether the agency has sustained its burden of demonstrating that the documents requested . . .

are exempt from disclosure[.]'"  *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227

(D.C. Cir. 2008) (citation omitted).  Similarly, with respect to the particular question of whether a

record is subject to the FOIA—or, put differently, whether a record is under agency control—

"[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials

sought are not 'agency records[.]'"  *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).

     An agency meets its burden on summary judgment by proffering affidavits that "describe

the documents and the justifications for nondisclosure with reasonably specific detail" that is "not

controverted by either contrary evidence in the record nor by evidence of agency bad faith."

---

[2] Ex-Im failed to address the standard of review in its renewed motion for summary judgment.

*Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency "must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed[.]" *Competitive Enter. Inst. v. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). Courts should analyze "all underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

## ARGUMENT

### I.    Ex-Im cannot segment portions of an e-mail chain as distinct non-agency records.

Ex-Im continues to redact a portion of an e-mail chain (the "McGarry-Calabria e-mail chain") reflecting correspondence between a senior agency official and the White House about a pending nominee in the U.S. Senate. *See* Mem. of P. & A. in Supp. of Def.'s Renewed Mot. for Summ. J. at 7–8 [hereinafter "Def.'s Renewed Mot."], ECF No. 40. Ex-Im maintains that certain incoming messages in the chain—sent by Mark Calabria, a "chief economist" within the Office of the Vice President, *see* Second Decl. of Lennell Jackson ¶ 33, ECF No. 40-2—qualify as distinct records outside of agency control. *See* Mulvey Decl. Ex. B at 000067–68; *see also* Def.'s Renewed *Vaughn* Index at Line 15, ECF No. 40-5.[3] But Ex-Im's arguments must be rejected. The Court should order the relevant e-mail chain released in its entirety.

---

[3] Ex-Im's Renewed *Vaughn* Index indicates Mr. Calabria's e-mail address is redacted under Exemption 6 and also not subject to the FOIA. The Court has expressed confusion over Ex-Im's failure to "explain[] how this information could be at once outside the scope of FOIA and also subject to withholding under Exemption 6." Mem. Op. at 35. The agency has not addressed the matter in its renewed motion. Because the Court has already upheld Ex-Im's use of Exemption 6, CoA Institute does not challenge the purported alternative grounds for redacting the e-mail address and merely restates the objections set out in its initial cross-motion. *See* Pl.'s Initial MSJ at 5–15.

4

**A.      Ex-Im may not subdivide its e-mail correspondence with the White House.**

The FOIA provides requesters with access to records, "not information in the abstract."

*Forsham v. Harris*, 445 U.S. 169, 185 (1980).  Consequently, agencies may not subdivide existing

records—such as e-mail messages or e-mail chains—into multiple so-called "records" to withhold

information.  *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Rev.*, 830 F.3d 667,

677 (D.C. Cir. 2016) [hereinafter "*AILA*"].  The D.C. Circuit recently reaffirmed this principle in

*Cause of Action Institute v. Department of Justice*:

> *AILA* made clear that "once the government concludes that a particular record is
> responsive to a disclosure request, the sole basis on which it may withhold
> particular information within that record is if the information falls within one of the
> statutory exemptions from FOIA's disclosure mandate." . . .  [Once an agency
> identifies a document] as responsive . . . it [is] not permitted to redact information
> from th[at] document[], except as permitted by FOIA's statutory exemptions.

999 F.3d 696, 703 (D.C. Cir. 2021) [hereinafter "*Cause of Action Institute*"].

"[T]he maintenance of a 'record' and the agency's treatment of it *prior to submission* of a

FOIA request is the key consideration for whether records can be segmented into discrete units (or

separate 'records') for the sole purpose of bypassing FOIA's disclosure obligations."  Ryan P.

Mulvey & R. James Valvo, III, *Towards a Definition of a FOIA 'Record': The D.C. Circuit's

Decision in* Cause of Action Institute v. Department of Justice, Yale J. on Reg. Notice & Comment

Blog, June 3, 2021, https://bit.ly/3z38VWO.  An agency cannot reverse engineer its segmentation

of a record and claim it was always comprised of *multiple* "records," at least so long as the

document in question was stored and managed *as a unitary whole* and identified as such during

the agency's search and initial processing of a request.

The D.C. Circuit's recent strengthening of its central holding in *AILA* complements the

statutory-construction argument previously presented by CoA Institute in this case.  *See.* Pl.'s

Initial MSJ at 5–9.  The FOIA defines a "record" as "any information that would be an agency

5

record subject to the requirements of this section when maintained by an agency in any format, including an electronic format[.]"  5 U.S.C. § 552(f)(2)(A).  This straightforward, two-part definition provides an important framework for understanding an agency's disclosure obligations.

The first clause—"any information that would be an agency record subject to the requirements of this section"—describes the *type of material* that qualifies as a "record."  *Id.*  It incorporates the concept of an "agency record" as defined by the Supreme Court's decision in *Tax Analysts*, which requires that in order for a record to be subject to the FOIA an agency must (1) "create or obtain the requested materials" and (2) "be in control of the requested materials at the time the FOIA request is made."  492 U.S. at 144–45.[4]

The second clause—"when maintained by an agency in any format, including an electronic format"—describes the *status of informational material* in an agency's hands before a requester submits its request.  *See* 5 U.S.C. § 552(f)(2)(A).  Congress added this language to ensure that electronic records, in addition to paper documents and other tangible objects, were covered by the statute.  *See* S. Rep. 104-272 at 27 (1996).  In other words, Congress intended to grant access to informational materials in the form or format an agency currently maintains them at the time it receives a FOIA request.  This focus is important because a requester may not ask an agency to create or manipulate an existing record.  An "agency is not required to reorganize its files in response to a plaintiff's request[.]"  *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978) (citation and internal quotation marks omitted).  Indeed, the FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it

---

[4] This first clause also clarifies how the FOIA covers informational material generally, not just documents.  *See N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1005 (D.C. Cir. 1990); *Save the Dolphins v. Dep't of Commerce*, 404 F. Supp. 407, 411 (N.D. Cal. 1975) (finding video recordings covered because in "common parlance ['record'] includes various means of storing information for future reference").

in fact has created and retained." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980).  As a corollary, an agency should be required to process and disclose *any* responsive informational material, which meets the *Tax Analyst* test, *in the form or format in which it maintains* such records.

Turning to the purported "records" at issue here—a series of White House-originated messages in a single e-mail chain—Ex-Im's segmentation is unreasonable and contrary to the FOIA for at least three reasons.  *First*, Ex-Im offers no factual basis to conclude its e-mail records are not stored as unified, stand-alone files on its computer systems.  In other words, there is no evidence to suggest the McGarry-Calabria e-mail chain is not maintained by Ex-Im as, say, a single Outlook MSG (.msg) file, which should be the default assumption.  *Cf. Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 151 (D.C. Cir. 2016) (Srinivasan, J., concurring).  Ex-Im also does not explain whether the McGarry-Calabria e-mail chain was "pre-segmented" into distinct records prior to the submission of CoA Institute's requests—a key consideration under *Cause of Action Institute*.  *See* 999 F.3d at 703.

*Second*, Ex-Im does not describe the McGarry-Calabria e-mail chain as a series of separate "records" in its *Vaughn* index or supporting declarations.  *See* Def.'s Renewed *Vaughn* Index at Line 15; Second Jackson Decl. ¶ 33.  Prior to *Cause of Action Institute*, when courts allowed the segmentation of an e-mail or e-mail chain, they required the agency to show both the reasonableness of its segmentation *and* the consistency of its position throughout the lawsuit, as evidenced by its *Vaughn* index.  *See Gellman v. Dep't of Homeland Sec.*, No. 16-0635, 2020 WL 1323896, at *3–4 (D.D.C. Mar. 20, 2020).  That reasonableness and consistency is lacking here.

*Third*, Ex-Im's segmentation of the McGarry-Calabria e-mail chain violates common sense and denies the very nature of e-mail.  As the district court in *American Oversight v. Department*

*of Health & Human Services* explained, "[i]t is commonly understood that an *email chain operates as a single record*." 380 F. Supp. 3d 45, 50–51 (D.D.C. 2019) (emphasis added). A reply in the chain "incorporates what came before, and the two [messages] form a unified exchange" and "[w]hether that was a conscious or subconscious choice is irrelevant; what matters is that the emails sent by agency personnel did in fact contain the prior exchanges with [non-agency] staff." *Id.* at 51.

Here, the McGarry-Calabria e-mail chain begins and ends with a message *from* an Ex-Im official (Natalie McGarry, Acting Senior Vice President, Office of Congressional & Intergovernmental Affairs) *to* an economist in the Office of the Vice President (Mark Calabria). *See* Mulvey Decl. Ex. B at 000067–68. Ms. McGarry's final reply—found at the top of the chain—incorporates into a single file all earlier correspondence, including messages originating outside Ex-Im, thus creating a single distinct "record" maintained in an official Ex-Im e-mail account. Ex-Im cannot treat the unified chain as a series of distinct records—let alone a series of distinct records, *only some of which fall under agency control*. Ex-Im has failed to offer any persuasive or legally coherent reason to conclude otherwise.

> **B.    Mr. Calabria's status as an employee of the Office of the Vice President is not dispositive and older case law concerning the "modified control test" is inapt.**

In its February 2021 Memorandum Opinion, this Court made two observations worth contemplating. *First*, the Court explained it could not resolve the parties' dispute over the McGarry-Calabria e-mail chain because Ex-Im had failed to state whether "the sender of the redacted emails" qualified as a member of the "President's 'immediate personal staff'" or had the "'sole function . . . to advise and assist the President.'" Mem. Op. at 40. Ex-Im has now identified that "sender" as Mr. Calabria, a "chief economist" in the Office of the Vice President—a component of the Executive Office of the President ("EOP") not subject to the FOIA. Second

Jackson Decl. ¶ 33.  Ex-Im also argues—for the first time—the e-mail chain, "[i]n any event," contains "non-substantive, quasi-personal information."  Second Jackson Decl. ¶ 33.  It is unclear what this means.  *See infra* note 9.  Ex-Im has never argued Mr. Calabria's correspondence qualifies as "personal records."  *See Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484, 1492–93 (D.C. Cir. 1984).  If the substance of the messages were truly "non-substantive," Mr. Calabria's precise role within the EOP would be even more irrelevant to Ex-Im's segmentation of the chain and the control inquiry.

In any event, Mr. Calabria's employment status is *not* dispositive to the parties' dispute. Records do not automatically fall outside of agency control merely because they reflect an agency's interaction with an official who works for an entity not subject to the FOIA.  Neither *Kissinger v. Reporters Committee for Freedom of the Press* nor *Judicial Watch, Inc. v. U.S. Secret Service* stand for that proposition.[5]  Taken to its logical conclusion, such a principle would sweep a wide swath of material outside the reach of disclosure, including various communications between agencies and the Executive and Legislative Branches, private businesses, and members of the public.  When faced with ostensible non-agency records that originate either with the White House or Congress, courts properly apply the so-called "modified control test."  *See infra* at pp. 11–14.  Ex-Im, however, has not offered any argument for why the White House maintains control over Mr. Calabria's correspondence—assuming, of course, the McGarry-Calabria e-mail chain could be segmented in the first place.

---

[5] In this respect, the Court's reference to its earlier discussion of Exemption 5's threshold requirement is revealing.  *See* Mem. Op. at 40.  The Office of the Vice President may not qualify as an "agency" for purposes of the FOIA, but Ex-Im is an "agency" and its dealings with the Vice President should be fair game for disclosure, assuming they are not statutorily exempt.  Ex-Im has not invoked the presidential-communications privilege, which would hinge in large part on whether Mr. Calabria was a high-level advisor to the President.

*Second*, and relatedly, the Court suggested controlling precedent "instruct[s] that agencies may redact information not subject to the FOIA from documents that otherwise qualify as agency records." Mem. Op. at 40. But in *Judicial Watch, Inc. v. U.S. Secret Service*, the D.C. Circuit merely opined that, to the extent compiled White House visitor logs reveal appointments at non-FOIA-subject offices, those specific portions might not qualify as "agency records." 726 F.3d 208, 233 (D.C. Cir. 2013) [hereinafter "*Judicial Watch I*"]. This opinion must be understood in the unique context of how visitor logs are maintained by the Secret Service.[6] And insofar as the Circuit ever suggested "documents" can be "part-agency records," *United We Stand Am., Inc. v. Internal Revenue Serv.*, 359 F.3d 595, 603–04 (D.C. Cir. 2004) [hereinafter "*United We Stand*"], that holding—which was specifically about *control*—is distinguishable in light of the Circuit's more recent decision in *Cause of Action Institute*, which addressed the foundational question of what a "record" *is* (and not an "agency record").[7]

Whether a series of "records" that compose an agency "response" to a congressional inquiry are only "partly" under agency control is distinct from the question presented here: May an agency segment a single e-mail chain into separate "records" for the sole purpose of responding

---

[6] Individual entries in the White House visitor logs could have conceivably qualified as distinct "records." Their disclosure as a single document may have been a consequence of the technical process for exporting information from Secret Service databases and servers. The FOIA's definition of a "record" has to be conceptually distinct from its definition of an "agency record." Such precision is lacking in cases decided before *AILA* and *Cause of Action Institute*.

[7] The Court's treatment of the 2007 Ex-Im Office of General Counsel memorandum is relevant. The Court assumed that memo was a distinct "record" (and "agency record") and accepted its withholding in full under Exemption 5. *See* Mem. Op. at 32–33. It appears, however, the memo was incorporated into Ex-Im's response to a GAO inquiry. *See* Def.'s Renewed *Vaughn* Index at 46; *see also* Mulvey Decl. Ex. B at 000188, 000189–215. Because these records were always withheld in full, and are still substantially redacted, CoA Institute never had a chance to assess whether Ex-Im (or the Court) properly segmented them. The Court itself only learned of the content of the records after conducting an *in camera* review. CoA Institute therefore reserves the right to challenge the segmentation of the memo from the rest of the GAO response on appeal.

to a FOIA request? This question must be resolved prior to the control inquiry. *United We Stand* is thus inapt, assuming it was rightly decided. If anything, Judge Henderson's dissent in *United We Stand* more accurately describes prevailing precedent: "There is only one way to 'subdivide' under FOIA . . . and that is by first determining that the entire document is an 'agency record' and then analyzing whether any portion of that agency record is nonetheless protected from disclosure by one of the nine statutory exemptions listed in 5 U.S.C. § 552(b)." *Id.* at 607–08.

### C.    Ex-Im maintains legal control over its correspondence with the White House.

Regardless of the propriety of segmenting the McGarry-Calabria e-mail chain into "part-agency" and non-agency records, Ex-Im controls the *entirety* of the chain, including any segregable portions. Whether a record qualifies as an "agency record" depends upon two facts. *First*, an agency must have "'create[d] or obtain[ed]'" the record. *Tax Analysts*, 492 U.S. at 144 (citation omitted). *Second*, it must have "control" of it "at the time [a] FOIA request is made." *Id.* at 145. Both prongs of the *Tax Analysts* test are satisfied here.

#### 1.    Ex-Im "created or obtained" the McGarry-Calabria e-mail chain.

The McGarry-Calabria e-mail chain originated with a senior Ex-Im official. *See* Mulvey Decl. Ex. B at 000067–68. The agency's Renewed *Vaughn* Index confirms as much. *See* Def.'s Renewed *Vaughn* Index at Line 15. The creation of the e-mail chain is attributable to Ex-Im. If there were any doubt Ex-Im "created" this correspondence, it incontrovertibly "obtained" a copy in the legitimate course of business. *See Judicial Watch I*, 726 F.3d at 217.

#### 2.    Ex-Im exercises "control" over the McGarry-Calabria e-mail chain.

In most cases, "control" is analyzed through the four-fact *Burka* test, which takes into account "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which

11

agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record systems of files." *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (citation and internal quotation marks omitted). With purported presidential records, the first two *Burka* factors are typically dispositive as part of the so-called "modified control test."[8]  Any uncertainty as to whether a record is subject to FOIA "redound[s] to the benefit of" the requester. *Judicial Watch I*, 726 F.3d at 220.

Here, regardless of the test applied, Ex-Im has failed to meet its "burden . . . to demonstrate . . . that the materials sought are not 'agency records.'" *Tax Analysts*, 492 U.S. at 142 n.3 (citation omitted).  The agency's argument is entirely conclusory and amounts to little more than averring that it "withheld email from the Vice President's chief economist, whose sole function is to advise the Vice President and President on economic issues."  Def.'s Renewed Mot. at 7; *see* Second Jackson Decl. ¶ 33.  That sort of generalized argument cannot carry the day.  The control inquiry is "fact-intensive," and "judicial sensitivity to the important separation-of-powers considerations that animate the special considerations test" precludes courts from deferring to an unsupported determination that records fall under presidential control.  *Cause of Action Inst. v. Dep't of the Army*, No. 16-1020, 2019 WL 4750213, at *7 (D.D.C. Sept. 29, 2019).  The record here cuts in favor of treating the McGarry-Calabria e-mail chain as an "agency record."

*First*, there is no evidence the White House manifested a clear intent to maintain control over the e-mail exchange—let alone portions of an e-mail chain.  That requisite intent may "not merely [be] 'general,'" but must "explicitly extend[] to each of the 'particular records' at issue."

---

[8] Ex-Im does not provide any control argument in its renewed motion.  Because Mr. Calabria was a high-ranking official in a non-FOIA-subject EOP component, CoA Institute assumes Ex-Im intends its "EOP not subject to FOIA" redaction label to mean portions of the e-mail chain are "presidential records."

*Judicial Watch I*, 726 F.3d at 223 (citations omitted).  Neither the White House nor Ex-Im can rely on far-reaching arrangements, let alone a "consistent course of dealing," to prove such intent. *United We Stand Am., Inc.*, 259 F.3d at 601–02; *see Holy Spirit Ass'n for the Unification of World Christianity v. Cent. Intelligence Agency*, 636 F.2d 838, 841 (D.C. Cir. 1980).

The D.C. Circuit's decision in *Judicial Watch I* provides a helpful illustration of the level of detail required in proving White House intent to retain control over records.  In that case, the government relied upon a "Memorandum of Understanding" governing the management of White House visitor logs, which were in the physical possession of the Secret Service.  *See* 726 F.3d at 212–13, 215, 222–23.  The agreement provided that "the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all [visitor log] records.'"  *Id.* at 218 (citation omitted); *accord Doyle v. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27 (S.D.N.Y. 2018).  Similar specificity is nonexistent here, and Ex-Im offers no factual basis for excluding correspondence with the White House as outside agency control.

*Second*, with respect to Ex-Im's ability to use and dispose of the McGarry-Calabria e-mail chain, the agency's argument again lacks the required specificity to conclude that its correspondence with the White House falls under presidential control.  In *Judicial Watch I*, the agency was able to point to a memorandum that explicitly delimited its use of visitor logs, described the way in which they were to be created and received into agency systems, and which set forth the process by which they were to be regularly purged from agency servers.  *See* 726 F.3d at 218–19.  Ex-Im fails to offer any proof that it lacks the ability to use and dispose of its own e-mail records.

*Finally*, assuming the remaining *Burka* factors were relevant, Ex-Im still has not met its burden.  The McGarry-Calabria e-mail chain reflects Ex-Im's collaboration with the White House

for the preparation of an Ex-Im nominee for Senate confirmation.[9]  So long as Ex-Im's use of the records, as opposed to its disposal authority, was relatively unrestricted, the third *Burka* factor is satisfied.  *See Judicial Watch I*, 726 F.3d at 219.  As for integration of the records into agency systems, Ex-Im offers nothing to rebut the reasonable assumption that its e-mail is retained in official recordkeeping systems.  That Ex-Im searched for, retrieved, processed, and produced the records means that the fourth *Burka* factor favors CoA Institute.

## II.    Ex-Im cannot rely on Exemption 4 to withhold responsive records.

Exemption 4, in relevant part, protects from disclosure information that is "[(1)] commercial or financial . . .  [(2)] obtained from a person and [(3)] privileged or confidential[.]" 5 U.S.C. § 552(b)(4).  The terms "commercial or financial" are given their "ordinary meanings." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  Thus, "information is commercial . . . if, in and of itself, it serves a commercial function or is of a commercial nature." *Id.*  Turning to the second requirement that information be "obtained from a person," courts have consistently held that Exemption 4 only applies to "data which have not been generated within the [federal] Government." *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 403–04 (D.C. Cir. 1980); *see Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 148 (D.C. Cir. 2006).  Although some courts have extended the scope of Exemption 4 to cover data "collected and slightly reprocessed by the government," *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 148 (2d Cir. 2010), when an agency goes beyond "a summary or reformulation of information supplied" from outside parties, and injects its own "analysis," the

---

[9] Although Ex-Im's declarant claims the substance of this interaction was "non-substantive" and "quasi-personal," Second Jackson Decl. ¶ 33, that contradicts her earlier testimony.  Ms. Jackson previously explained the e-mail exchange concerned "strategic plans related to nominees for political positions within EXIM, and as such were clearly deliberative and pre-decisional."  Decl. of Lennell Jackson ¶ 44, ECF No. 27-3.

underlying information is no longer "obtained from a person." *Phila. Newspapers, Inc. v. Dep't of Health & Human Servs.*, 69 F. Supp. 2d 63, 66–67 (D.D.C. 1999). Finally, with respect to whether information is "confidential," the Supreme Court has clarified this requires an agency to demonstrate that information "is both customarily and actually treated as private by its owner." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).[10]

Ex-Im has withheld many pages of responsive records under Exemption 4. *See* Def.'s Renewed *Vaughn* Index at Lines 3–5, 9–10, 12–14, 17–18, 20, 22, 24, 25, 27–30, 32, 34, 37, 39, 41, 46. In several instances, Exemption 4 is the sole asserted grounds for withholding. *See* Def.'s Renewed *Vaughn* Index at Lines 12–13, 20, 27–28, 34. The agency broadly claims these records, which include "Enterprise Risk Committee Minutes, Senior Staff Reports and Answers to the GAO questions" all "contain private/confidential commercial or financial information of EXIM customers and applicants." Def.'s Renewed Mot. at 2; *see* Jackson Decl. ¶ 34 (arguing the records reflect "[c]onfidential business information" that "come[s] from documents" the agency received, or "oral information . . . collect[ed] by phone or in meetings"). But once again, Ex-Im does little to demonstrate *what* sort of information is at issue or *whence* it was obtained. Without laying that foundation, the agency cannot—and does not—show how the information at hand is "both customarily and actually treated as private by its owner[s]." *Food Mktg. Inst.*, 139 S. Ct. at 2366.

For example, with respect to Weekly Senior Staff Reports, Ex-Im argues these records "regularly have information about the specific countries in which exporters intend to or do concentrate their sales[.]" Second Jackson Decl. ¶ 22. But high-level information such as the

---

[10] The Supreme Court did not resolve the question of whether information must be submitted to the government with an assurance it will be kept private. Courts in this Circuit have tended to treat an assurance of privacy as an element of the Exemption 4 test. *See Besson v. Dep't of Commerce*, 480 F. Supp. 3d 105, 114 n.1 (D.D.C. 2020); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019).

identity of an intended foreign market is unlikely to be customarily and actually treated as confidential as "competitively valuable information" absent any further detail. Second Jackson Decl. ¶ 22. Ex-Im bears the burden of proving this and has not attempted to do so.

Mere conjecture seems to be Ex-Im's general approach to assessing "confidentiality." *See, e.g.*, Second Jackson Decl. ¶ 23 ("Generally, borrowers do not want competitors knowing how much money they are borrowing for specific projects."). When discussing the records identified on Lines 14, 22, and 29 of the Renewed *Vaughn* Index, one of Ex-Im's declarants suggests that details about "infrastructure protests" are "inherently confidential because they contain trade secrets and confidential commercial or financial information obtained from bidders." Decl. of Howard Spira ¶ 11(2)(b), ECF No. 40-4. Such a sweeping claim—especially as it pertains to trade secrets, which Ex-Im has not otherwise claimed are implicated in this case—is conclusory. Ex-Im's other declarants offer similarly conclusory claims about "confidential business information" in Enterprise Risk Committee Meeting Minutes, *see* Decl. of Kenneth Tinsley ¶ 5(a), ECF No. 40-03; Senior Staff Reports, *see* Tinsley Decl. ¶ 8(b)–8(c), 8(e); and certain "loan information" in records related to the GAO "Fraud Audit." *See* Tinsley Decl. ¶ 10(b).[11]

Ex-Im claims to withhold "information which businesses do not customarily publicize." Second Jackson Decl. ¶ 19; *see, e.g.*, Def.'s Renewed *Vaughn* Index at Line 12 ("Information regarding the percentage of a customer's business in specificfic [*sic*] countries is also redacted . . . [because] in EXIM's experience [it] is not generally shared publicly."). But this deeply confuses the relevant test for "customarily." It is not that an entire industry or set of businesses

---

[11] The Court upheld Ex-Im's application of Exemption 5 with the 2007 Ex-Im Office of General Counsel memorandum. *See* Mem. Op. at 32–33; *see also supra* note 7. Ex-Im's Renewed *Vaughn* Index and declarations are unclear whether there is any content at issue under Exemption 4 in the GAO-related records aside from the 2007 memo. *See* Tinsley Decl. ¶ 10(b); *see also* Def.'s Renewed *Vaughn* Index at Line 46.

tends to keep certain information secret.  Nor does the test depend on an agency's "experience" in assuming as much.  Rather, the correct inquiry is whether "information communicated to [an agency] . . . remains confidential whenever it is customarily kept private . . . *by the person imparting it*[.]"  *Food Mktg. Inst.*, 139 S. Ct. at 2363 (emphasis added).

"Conclusory statements by an agency official about what the agency official may believe about how a submitter customarily treats the information at issue are simply insufficient." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 111.  Particularity and a well-developed evidentiary foundation are essential.  *See id.* at 110–14.  This may require the agency to contact the submitters. *See Humane Society Int'l v. U.S. Fish & Wildlife Serv.*, No. 16-720, 2021 WL 1197726, at *2–4 (D.D.C. Mar. 29, 2021).  Here, Ex-Im implied it was perfectly capable of undertaking that effort but chose instead to rely on ambiguous declarations.  *Cf.* Second Jackson Decl. ¶ 22 ("Where EXIM was able to discover that a specific exporter does, in fact, publicize such information, then EXIM did not redact the information.").  As this Court recently explained in another case, more is needed: "At bottom, the Government must do <u>something</u> to establish how the *particular information-providers* customarily and actually treat the relevant material."  *WP Co. LLC v. U.S. Small Bus. Admin.*, No. 20-1240, 2021 WL 2982173, at *6 (D.D.C. July 15, 2021) (emphasis added) (citing *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 112).

A great deal of the information withheld under Exemption 4 appears not to be "obtained from a person."  Ex-Im does not directly address the sources of any confidential business information and merely suggests in passing that it "may come from documents that EXIM has received, or it may be oral information EXIM collects by phone on in meetings."  Second Jackson Decl. ¶ 22.  Ms. Jackson previously detailed how business information was incorporated with extensive "analy[sis] . . . in various ways and from various angles."  Jackson Decl. ¶ 34a.  And

once again she refers to how it is "woven into staff analysis," Second Jackson Decl. ¶ 22, or other "inherently analytical" deliberative materials like staff reports.   Jackson Decl. ¶ 34b.   The information may also be added to "living" documents of an "inherently analytical natural" to track "specific confidential business information which poses risks to the agency." Jackson Decl. ¶ 34c. But it is unclear how *any* commercial information repurposed for internal "analytical" purposes can meet the relevant Exemption 4 standard.  Ex-Im is not "summar[izing] or reformulati[ng] . . . information supplied by a source outside the government"; it is conducting "analysis" on its own initiative.  *Phila. Newspapers, Inc.*, 69 F. Supp. 2d at 66–67.   That sort of independent transformation of commercial or financial information precludes the use of Exemption 4.

Relatedly, Ex-Im admits to withholding "aggregate" information that it created, and which could not have been "obtained from a person."  *See* Second Jackson Decl. ¶ 23 (discussing "aggregate" information in OBAF Senior Staff Weekly Reports, as well as "pipeline" information "aggregated by industrial sector"); *see also* Jackson Decl. ¶ 34b ("[A]t times these Senior Staff Reports set forth aggregate information that does not directly reveal information about a specific transaction or specific borrower, but is nonetheless withheld or redacted because of the potential for this information to be analyzed over time and thus to indirectly reveal non-public confidential information about specific parties.").  The agency's Renewed *Vaughn* Index likewise identifies an Ex-Im-created record that has been withheld under Exemption 4.   *See* Tinsley Decl. ¶ 8(f)(i) ("specific terms of a guarantee issued by EXIM to the Private Export Finance Corporation"); Def.'s Renewed *Vaughn* Index at Line 13 ("The terms of EXIM transactions with private parties are not customarily publicized."); Second Mulvey Decl. Ex. B at 000064.

Finally, with respect to Ex-Im's supposed assurance of confidentiality to unidentified submitters of commercial or financial information, *see* Second Jackson Decl. ¶¶ 17–18, the agency

does little beyond proffering (yet again) an undated and unsigned "Memorandum" addressed to unknown "Interested Parties" that still incorporates language echoing the "substantial harm" test eliminated by the Supreme Court in *Food Marketing Institute*. *See* ECF No. 40-6; *see also* ECF No. 27-5 (identical document provided in the last round of summary judgment). Ex-Im offers *no* evidence that relevant submitters received this document. Assuming that could be shown, Ex-Im's assurances of confidentiality cannot cure its failure to establish a basis for demonstrating how information was "obtained from a person" and "actually and customarily kept secret."

For these reasons, the Court should reject Ex-Im's use of Exemption 4.

### III. Ex-Im cannot rely on Exemption 5 to withhold responsive records.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed Exemption 5 to cover "only those documents that are normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (footnote omitted); *see Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) [hereinafter "*Klamath*"]. Although Exemption 5 encompasses various statutory and common law privileges, *see United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800–01 (1984), one of the most invoked is the deliberative-process privilege. *See Sears, Roebuck & Co.*, 421 U.S. at 149–50.

Ex-Im again argues the deliberative-process privilege shields records from disclosure. *See* Def.'s Renewed Mot. at 5–7.[12] But the agency has failed to justify its reliance on the privilege

---

[12] Before filing its renewed motion, Ex-Im re-released several pages of records in full. *See* Def.'s Renewed *Vaughn* Index at Lines 8, 16, 23; Mulvey Decl. Ex. B at 000049–52, 000069–72, 000089–92; *see also* Mulvey Decl. Ex. A at Lines 55, 92, 104. These records are no longer at issue. It is worth highlighting how the content initially withheld in these records was purely factual and hardly deserving of protection under the deliberative-process privilege. *See, e.g.*, Mulvey

with the requisite specificity.  Moreover, with respect to its correspondence with GAO, Ex-Im has not shown how those materials qualify as "inter-agency or intra-agency" records.

> A.    **Ex-Im has not established that all relevant records meet Exemption 5's threshold "inter-agency or intra-agency" requirement.**

Among the records withheld in full or in part under Exemption 5 are several reflecting Ex-Im's interactions with GAO during an audit.  *See* Def.'s Renewed *Vaughn* Index at Lines 45–47.[13] These GAO-related records do not meet Exemption 5's threshold "inter-agency or intra-agency memorandum or letter" requirement.  5 U.S.C. § 552(b)(5).[14]

It is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted).  The Supreme Court has confirmed this canon applies with no less force in the FOIA context.  *See Food Mktg. Inst.*, 139 S. Ct. at 2362–63 ("[A]s usual, we ask what [a statutory] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966." (citation omitted)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 569 (2011) ("Our consideration of Exemption 2's scope starts with its text.").

---

Decl. Ex. B at 000049 ("Offsetting collections are $30.3 million as of July close. . . .  OCS and OGC waiting GAO decision related to the infrastructure and help desk protest.").

[13] The have parties agreed not to re-litigate the withholding of an internal Ex-Im memo that is part of the "EXIM Reponses to GAO Question[s]," as identified on Line 46 of the Renewed *Vaughn* Index.  The Court upheld the withholding of this twenty-six-page document, *see* Mem. Op. at 32–33; *see also* Mulvey Decl. Ex. B at 00189–215.  *But see supra* at notes 7 & 11.  The agency also discretionarily released another four pages.  *See* Mulvey Decl. Ex. B at 000232–35.

[14] CoA Institute has recognized that "courts in this jurisdiction . . . tend[] to read the threshold requirement in an expansive way—most often to include the President and non-agency components of [EOP][.]" Pl.'s Initial MSJ at 16 (citing *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005)).  But "[t]hat expansion conflicts with textual limitations imposed by Congress and the plain meaning of Exemption 5."  *Id.*  In this sense, prevailing Circuit caselaw has improvidently drifted from the statutory language.

As far as Exemption 5 is concerned, the prefixes "inter-" and "intra-" have ordinary meanings that work in tandem with the term "agency" to define the scope of the provision. These prefixes limit attendant privileges to "memorandums or letters" exchanged *within* or *among* entities subject to the FOIA. *See, e.g.*, Webster's Third New International Dictionary 440 (1961) (defining "inter" to mean "between" or "among"); *id.* at 444 (defining "intra" to mean "within"). Ex-Im previously conceded that GAO is part of the Legislative Branch and "not subject to FOIA." Jackson Decl. ¶ 36a. Ex-Im also claimed the records at issue were "property of GAO." Jackson Decl. ¶ 36a. Any records exchanged between Ex-Im and GAO cannot automatically be "inter-agency or intra-agency" communications protected by Exemption 5.

Despite the clear language of Exemption 5, courts have been willing to deviate from the statutory text when faced with records of an agency's dealings with the Legislative Branch. Although the D.C. Circuit recognizes "Congress . . . [could] have drafted [Exemption 5] more broadly to include Executive Branch communications to Congress" but "did not," *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 574 (D.C. Cir. 1990), it still permits an agency to withhold records exchanged with a legislative entity so long as they "are part and parcel of *the agency's* deliberative process." *Id.* at 575 (emphasis added and cleaned up). Exemption 5 is only unavailable if an agency's records were "created specifically to assist Congress," or shared "for the sole purpose of assisting [the legislature] . . . with *its* deliberations." *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001) (emphasis added).

Here, Ex-Im initially explained these records reflected responses to GAO for the purposes of an audit. *See, e.g.*, Jackson Decl. ¶ 39a. Ex-Im now takes a different tact and downplays references to GAO. The agency instead emphasizes how the Risk Register and Enterprise Risk Assessment ("ERA") were "pre-existing documents," and any content in other documents created

21

in response to GAO's audit depended on information "previously put together by EXIM over a considerable period." Tinsley Decl. ¶ 10. This strategic shift in Ex-Im's argument is unsurprising. As the Court observed in the last round of summary judgment, Ex-Im's declarant "simply lump[ed] [all the records] together" and applied a "plainly overbroad" description that, in some instances, was "seemingly inaccurate." Mem. Op. at 30–31. The Court advised Ex-Im to provide further detail this time around. *See* Mem. Op. at 32. But Ex-Im does little to show how its unique responses to GAO (or its production of records as part of the audit process) also "served its own decisionmaking processes" and therefore qualified for withholding. Mere parroting of words that superficially suggest the GAO-related records played a significant role within Ex-Im is inadequate.

The deficiency of Ex-Im's argument is particularly obvious with the responses to "GAO Question No. 4." The Court has already expressed skepticism that these records relate to Ex-Im's own deliberative processes. *See* Mem. Op. at 32 ("The Court has its doubts as to the viability of this tack."). And the agency cannot avoid admitting the *sine qua non* of the records—the very reason for their existence—was GAO's audit into Ex-Im's "anti-fraud processes." Second Jackson Decl. ¶ 29(a); Tinsley Decl. ¶ 10. Although the content of the records may depend, at some level, on information or data already in the hands of the agency, that information was intentionally "reformatted for purposes of responding to the GAO[.]" Tinsley Decl. ¶ 10(b). In other words, it was uniquely prepared *for GAO decision-making*. To accept Ex-Im's position that any informed response to a congressional inquiry should be withheld because its content depends on "previously compiled and assessed" data would defeat the purpose of the Exemption 5 threshold inquiry. An agency's response to a GAO audit—or its reaction to *any* external inquiry—will always depend on pre-existing knowledge about the operations of the agency.

It is also worth noting that Ex-Im has provided precious little detail about the underlying GAO audit implicated by the records. Indeed, Ex-Im never identifies any specific audit. This is curious. Ex-Im's argument depends on demonstrating that GAO's efforts were "in turn a component of a broader *agency* review of its anti-fraud controls." Mem. Op. at 32 (emphasis added). If GAO had initiated an audit *at the behest* of Ex-Im, then Ex-Im's cooperation with GAO would seem "part and parcel" of its own deliberative processes. But it seems unlikely that this happened here, at least based two recent GAO audits into Ex-Im's fraud risk management. Reports published in July 2018 and May 2019 both show GAO investigated Ex-Im pursuant to a statutory directive and, therefore, on GAO's initiative. *See* U.S. Gov't Accountability Office, Export-Import Bank: EXIM Should Explore Using Available Data to Identify Applications with Delinquent Federal Debt, No. GAO-19-337 (May 2019), *available at* https://bit.ly/3gkNf0U ("The Export-Import Bank Reform Reauthorization Act of 2015 included a provision for GAO to review EXIM's antifraud controls."); U.S. Gov't Accountability Office, Export-Import Bank: The Bank Needs to Continue to Improve Fraud Risk Management, No. GAO-18-492 (July 2018), *available at* https://bit.ly/3D3aypV. The Court should thus conclude Ex-Im's responses to GAO were created "specifically to assist" that entity in its auditing processes. *Rockwell*, 235 F.3d at 604.

**B.    Ex-Im cannot use the deliberative-process privilege to withhold records.**

To withhold a record under the deliberative-process privilege, an agency must demonstrate the record is "both pre-decisional and deliberative." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A record is "predecisional" when it is generated "'[a]ntecedent to the adoption of an agency policy.'" *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (citation omitted). It is "deliberative" when it forms "a direct part of the deliberative process in that it makes recommendations or expresses opinion on legal or policy

23

matters," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), thereby reflecting the "give-and-take of the consultative process" typical of agency decision-making.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980); *see Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) ("To the extent the documents . . . neither make recommendations for policy change nor reflect internal deliberations on the advisability of any particular course of action, they are not predecisional and deliberative despite having been produced by an agency that generally has an advisory role.").  "The key question" is "whether disclosure would tend to diminish candor within an agency."  *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007).  In this case, Ex-Im's reliance on the deliberative process privilege fails.

### 1.    Enterprise Risk Committee Meeting Minutes

These records are identified in Rows 3–5 of Ex-Im's Renewed *Vaughn* Index and ostensibly concern "presentations regarding impaired transactions, cybersecurity risk, 'country cover,' and other risk areas."  Tinsley Decl. ¶ 5.  Ex-Im's declarants provide only high-level discussion of the underlying redactions, avoiding any sort of specificity.  This is damning.  In large part, the deficiency of the agency's analysis appears to lie in its failure to distinguish *deliberative* content from alleged *confidential business information* protected by Exemption 4.  *See* Tinsley Decl. ¶ 5(a) ("The redacted portions are a mix of confidential business information and analysis and proposals regarding what steps EXIM might take or how to approach these issues.").

On two pages of records, Ex-Im withholds its summary of discussions related to the Republic of Belarus.  *See* Mulvey Decl. Ex. B at 000006–07.[15]  The agency claims this content is

---

[15] Notably, although the agency also invokes Exemption 4 for these records, its declarant is seemingly silent as to the use of that exemption.  *See* Tinsley Decl. ¶ 10(d).

protected by the deliberative-process privilege because it is part of an "internal EXIM discussion regarding what approach to take with the country in question."  The agency does not identify the country in its briefing or supporting pleadings—but the records speak for themselves.  Ex-Im has elsewhere publicly disclosed its position on business with Belarus.  It is unwilling to engage.  The agency's website plainly states that Ex-Im relief is unavailable *tout court* in the former Soviet Republic.  *See* "Belarus," Country Limitation Schedule, *Export-Import Bank of the U.S.*, https://bit.ly/3sE4CP8 (last visited Aug. 22, 2021).  It is therefore difficult to countenance Mr. Tinsley's claim that disclosure would somehow damage the American government's relationship with "this particular country."  Tinsley Decl. ¶ 10(d).

As a final note, in records provided to CoA Institute, Ex-Im withheld some content under Exemption 6.  *See* Mulvey Decl. Ex. B at 000002.  Ex-Im does not provide an explanation for its use of this exemption in its *Vaughn* index, and it was not previously raised in the last round of summary judgment briefing.  *See* Def.'s Renewed *Vaughn* Index at Line 3; *see also* Mulvey Decl. Ex. A at Line 5 (no explanation for Exemption 6 in April 2021 draft *Vaughn* index).  "There is no excuse for submitting a *Vaughn* index that contains errors, even minor ones."  *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1209 (D.C. Cir. 1992).  Courts should "expect agencies to ensure that their submissions in FOIA cases are absolutely accurate."  *Id.*  This Court should therefore consider the use of Exemption 6 waived and, to the extent the information is not otherwise protected by a statutory exemption, order Ex-Im to reprocess the record.

### 2.    Cyber Risk Acceptance Recommendations

This record is identified in Row 6 of Ex-Im's Renewed *Vaughn* Index.  Although neither Ms. Jackson nor Mr. Tinsley address the importance of the "Cyber Risk Acceptance Recommendations" memorandum in any non-conclusory way, *see* Second Jackson Decl. ¶ 28(a);

Tinsley Decl. ¶ 6, Ex-Im's Chief Risk Officer, Howard Spira, attempts to fill in the gaps of their testimony.  Unfortunately, Mr. Spira's declaration is similarly inadequate.

As an initial matter, Mr. Spira discusses a "Cybersecurity Dashboard."  Although the Court considered Ex-Im's treatment of such a record in the previous round of summary judgment, *see* Mem. Op. at 13–14, that document is no longer at issue—or was not supposed to be.  Ex-Im provided an explanation for is treatment of the "Cybersecurity Dashboard" in a draft *Vaughn* index, *see* Mulvey Decl. Ex. A at Line 12, and CoA Institute chose not to pursue any further challenge. There is anyway no mention of a "Cybersecurity Dashboard" in the agency's Renewed *Vaughn* Index, and Mr. Tinsley likewise refers only to the Risk Acceptance Recommendations memo.  *See* Tinsley Decl. ¶ 6.  Finally, the Bates-stamped pages referenced by Mr. Spira, as well as the Renewed *Vaughn* Index Line, are inaccurate.  *Compare* Spira Decl. ¶ 9 *with* Mulvey Decl. Ex. B 000111–15 *and* Def.'s Renewed *Vaughn* Index at Line 10.  Such sloppiness is unacceptable and imposes an additional burden during briefing on an opposing party, to say nothing of the Court's ability to adjudicate the case.  *See* Mem. Op. 13; *see also Schiller*, 946 F.2d at 1209.

Turning to the Risk Acceptance Recommendations memo itself, Ex-Im's argument effectively boils down to Mr. Spira's claim that the Enterprise Risk Committee ("ERC") is "not itself a decision-making body."  Spira Decl. ¶ 10 ("Even if the ERC were a decision-making body, there is no final decision involved in the presentation of this document to the ERC.").  But this misses the central point the Court made in its February 2021 Memorandum Opinion.  Ex-Im has yet to explain the "distinct role" of the risk memo in Ex-Im's broader decision-making process, and the agency "never addresses the potential for agency 'adoption' of those proposals [in the memo], such that some of the document's contents might lose their predecisional status."  Mem.

Op. at 14; *see Coastal States Gas Corp.*, 617 F.2d at 866. That nearly all the memorandum has been withheld in full should be noted, too. *See* Mulvey Decl. Ex. B at 000010–23.

### 3.   Presentation Slides

These slides are identified on Line 7 of Ex-Im's Renewed *Vaughn* Index. *See* Mulvey Decl. Ex. B at 000024–48. The agency failed to discuss the records in any sort of detail in the last round of summary judgment briefing, yet the Court magnanimously offered Ex-Im another bite at the apple. *See* Mem. Op. at 20–21 (bemoaning Ex-Im's "paltry, relatively unhelpful summation"). Once again, however, the agency's argument leaves much to be desired.

Ex-Im's brief refers to the slides in a portion of a bullet point. *See* Def.'s Renewed Mot. at 6. One of the agency's three declarants attempts to provide a more detailed discussion. That discussion in inadequate. Mr. Tinsley explains the slides relate to "consider[ation] [of] EXIM's role in the broad concerns regarding national security" and do not otherwise "present a concrete proposal for decision[.]" Tinsley Decl. ¶ 7. This is hardly the sort of "additional detail on the context of the presentation, its intended purpose, or its role in any agency (or broader governmental) decisionmaking process" that the Court expected. Mem. Op. at 20.

Rather than explain which agencies are working with Ex-Im on topics at the intersection of export finance and national defense strategy, Mr. Tinsley refers only to "intra-government [discussions] in various fora." Tinsley Decl. ¶ 7. It is easy enough to surmise that the presentation could have implicated consultations with the Department of the Treasury or the Department of Defense, or even the Department of Commerce or Overseas Private Investment Corporation, both of which are explicitly mentioned in the slides. *See* Mulvey Decl. Ex. B at 000047. But there is no way to confirm this, or for the Court to review the use of Exemption 5. Ex-Im holds back the relevant details. This is particularly egregious considering the likely presence of segregable factual

material in the slides. *See* Mulvey Decl. Ex. B. at 000028 ("Three EXIM Responses to ECA Realities"), 000036–38 ("Key EXIM Facts").

### 4.    Weekly Reports

Ex-Im groups together a variety of "Staff Reports" in Rows 9–11, 14, 17–19, 21–22, 24–26, 29–33, and 35–43 of its Renewed *Vaughn* Index. The Court previously recognized that, while portions of the senior staff reports fall within the confines of the deliberative-process privilege, many did "not fit squarely within the[] framework" for the privilege because they were not "prepared for senior-level review and decisionmaking." Mem. Op. at 16. Indeed, there are "considerable portions—which [Ex-Im] never even acknowledge[d] [in the previous round of summary judgment]—[that] play no discernible role in any 'continuing process of agency decision-making.'" *Id.* at 17.

This time around, the agency has improved its discussion, at least as it pertains to Exemption 5, but it still has not met its burden. CoA Institute's ability to respond intelligibly to Ex-Im's withholdings is frustrated by the agency's heavy redaction of many of the records. *See Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d at 145–46 (recognizing "asymmetrical distribution of knowledge" in challenging agency action because the "agency alone possesses, reviews, discloses, and withholds the subject matter of the request"). Suffice it to say, as a general matter, it is unclear whether Ex-Im adequately disentangled purely factual material from deliberative content. For example, Ex-Im withholds in full under Exemptions 4 and 5 the content of an "Executive Summary" in a weekly Office of Board Authorized Finance report. *See* Mulvey Decl. Ex. B at 000054. The sole justification for that block redaction is Mr. Tinsley's claim that "the redacted information, even when purely factual, is chosen from an array of data to support the proposed approach EXIM is taking in these matters." Tinsley Decl. ¶ 8(b). On that sole conclusory

basis, Ex-Im has redacted other weekly reports. *See* Mulvey Decl. Ex. 000074, 94, 108, 125. Similarly significant redactions can be found throughout the rest of Ex-Im's re-released production. *See, e.g.*, Mulvey Decl. Ex. B at 000055, 58, 66, 75–76, 79, 85, 87–88, 95, 98, 106– 08, 112, 121–24, 129, 132–33, 138–39.

### 5.    Document Productions to GAO and Responses to GAO Audit

These records, which Ex-Im identifies in Rows 45, 46, and 47 of its Renewed *Vaughn* Index, reflect correspondence with GAO, including document productions and responses to GAO inquiries. As discussed above, these records do not categorically meet Exemption 5's threshold requirement as "inter-agency or intra-agency" records. *See supra* at pp. 20–23. Even if the Court disagrees, it should still reject Ex-Im's use of the deliberative-process privilege.

The caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making. *See, e.g.*, *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). A privileged record must be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]" *Id.* (emphases added and citations omitted). Even when courts have considered the possibility of the privilege applying to a record exchanged between an agency and Congress (or another legislative entity), they have made pains to distinguish *whose* decision-making was implicated and emphasized that the privilege only apples when an agency's interests are implicated. *See Dow Jones*, 917 F.2d at 575; *see Rockwell*, 235 F.3d at 604. None of the three categories of records at issue are properly privileged.

*First*, with respect to the responses to "GAO Question No. 4," Ex-Im admits the content of these records was intentionally created for the purpose of responding to the GAO audit. *See* Second Jackson Decl. ¶ 29(a). Although the responses draw on "information that EXIM had compiled over many years," *see* Second Jackson Decl. ¶ 29(a), the information was "reformatted"

based on different sources.  Tinsley Decl. ¶ 10(b); *see* Def.'s Renewed *Vaughn* Index at Line 46

("Responses to the GAO questions were compiled in this particular format for GAO[.]").  Ex-Im

has not otherwise shown how the *actual record* transmitted to GAO was used within the agency

for its own deliberative processes, either during the audit or to the present.  *See* Mem. Op. at 32

("The Court has its doubts as to the viability of this tack.").  Further, it is unclear why factual

information, such as "how much money has been recovered in each of the various transactions"

reported to GAO, Tinsley Decl. ¶ 10(b), should qualify as deliberative.  *See, e.g.*, Mulvey Decl.

Ex. B at 000164–65 (withholding monetary amounts for "Recoveries net of expenses," "Net

Loss(+)/Excess Recovery," and "Net recovery / claims paid").  This does not seem to be the type

of data that would either reflect an "'exercise of discretion'" on the part of the agency, or otherwise

"enable the public to probe an agency's deliberative processes."  *Ancient Coin Collectors Guild*,

641 F.3d at 513.  Ex-Im provides no other explanation in either its brief or supporting declarations.

　　　*Second*, turning to the ERA, the agency has provided seemingly contradictory descriptions

of what the record represents.  On the one hand, Ms. Jackson claims the ERA was "prepared by

Ernst & Young."  Second Jackson Decl. ¶ 29(b); *see* Def.'s Renewed *Vaughn* Index.  But Mr.

Tinsley avers the ERA "was prepared in conjunction with discussion with several EXIM staff

members" and fails to mention the involvement of any contractor.  Tinsley Decl. ¶ 10(c).  This is

a basic but fundamental disagreement.  Similarly, Ex-Im claims the ERA is "proprietary to Ernst

& Young" and "confidential business information."  *See* Def.'s Renewed *Vaughn* Index at 46.  But

that makes little sense.  Ex-Im seemingly concedes the ERA is an agency record, and it has not

included the ERA as part of its Exemption 4 argument.

　　　*Third*, as far as the Risk Register is concerned, Ex-Im's discussion of the deliberative

nature of the document is lacking.  Ms. Jackson provides a single-sentence argument, claiming the

record "is used as the basis for discussions about risk across the agency."  Second Jackson Decl. ¶ 29(b).  Mr. Tinsley provides little context for how the two-decades-old Risk Register was (or still is) used within Ex-Im.  *See* Tinsley Decl. ¶ 10(a).  Greater specificity is required.

## IV.  Ex-Im has not satisfied its burden under the "foreseeable harm" standard.

The FOIA mandates an agency release records unless they fall under a specifically enumerated exemption.  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant object of the Act[.]"  *Klamath*, 532 U.S. at 7–8 (internal citations omitted).  With the passage of the FOIA Improvement Act of 2016, Congress introduced significant amendments, including changes that raise the standard by which an agency must evaluate its withholdings.  As the law stands now, an agency may "withhold information" under the FOIA "only if [it] *reasonable foresees* that disclosure would harm an interest protected by an exemption[.]"  5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).

Under this "foreseeable harm" standard, is it not enough that an agency make a case for the *technical* application of a statutory exemption; it must articulate *precise* reasons why *specific* records, or portions thereof, could be reasonably foreseen to harm an interest protected by an exemption.  *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ("Importantly, codifying the presumption of openness will help reduce the perfunctory withholding of documents through the overuse of FOIA exemptions.  It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the application exemption is meant to protect.").  Congress did not merely codify existing policies or practices.  To construe the FOIA in such a way would offend the traditional canon against surplusage, which directs "courts 'to give effect, if possible, to every clause and word of a statute[.]'"  *Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 140 (D.D.C. 2018).  The unambiguous

language of the foreseeable harm standard manifests Congress's intent to require something more of an agency when it defends its withholdings.

Courts in this jurisdiction have recognized the impact of the new standard and the added burden it places on an agency. *See, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018). It is not enough that an agency merely recite "boiler plate language to justify [its] redactions." *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019). "[G]eneral explanations of the possibility of a 'chilling effect' fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'" *Id.* (citation omitted); *see Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) ("[A]gencies, to justify withholding records under FOIA's foreseeable-harm provision, cannot simply rely on 'generalized' assertions that disclosure 'could' chill deliberations. We have no quarrel with that proposition.").

Last month, the D.C. Circuit confirmed the requirement that an agency go beyond the technical requirements of the underlying exemption and "specifically and thoughtfully determine whether it 'reasonably foresees that disclosure' of *each particular record* 'would harm an interest protected by [an] exemption.'" *Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 372 (D.C. Cir. 2021) (emphasis added) (citing statute and congressional history). "[P]erfunctory, sweeping, and undifferentiated declaration[s] that release of every single record withheld would have," for example, "an 'inhibiting effect' by chill[ing] full and frank discussions," must be rejected. *Id.*

Here, with Exemption 5, Ex-Im's declarants have again provided non-specific bases for withholding records in anticipation of some nebulous sort of harm. Ex-Im fails to provide any sort of document-by-document analysis to explain why the disclosure of any *specific* document is likely

to lead to some harm, given the subject-matter of the record, its age, and the circumstances surrounding its use within the agency, both historically and presently.  Ms. Jackson broadly claims that disclosure of *any* "[s]ubstantial portions of the information withheld in this case" would "reasonably be expected to chill the open and frank exchange of comments and opinions that occurs among EXIM employees on a regular basis[.]"  Second Jackson Decl. ¶ 26; *see* Second Jackson Decl. ¶ 28 (discussing "[e]xamples of the types of documents at issue").

With respect to the Enterprise Risk Committee Meeting Minutes, Ex-Im's declarant was required to do more to establish the foreseeable harm of disclosure of what the agency conceded was otherwise "innocuous" data, such as the "number of 'top cross-cutting' risks" in Ex-Im's "enterprise risk profiles."  Tinsley Decl. ¶ 10(c).  Ex-Im has provided no *reasonable* explanation for *how* or *why* this "high-level datapoint" could be used by "bad actors" in mosaic-fashion to reverse engineer a way to take advantage of the agency's "vulnerabilities."  Tinsley Decl. ¶ 10(c).

Similarly, when addressing the set of presentation slides, Ex-Im's Renewed *Vaughn* Index implies that withholding could be permissible in perpetuity because "national security concerns are continual and prolonged, and there is no 'final decision' point with regard" to topics at issue.  Def.'s Renewed *Vaughn* Index at Line 7; *see* Tinsley Decl. ¶ 7.  But that position is incompatible with the "foreseeable harm" standard—to say nothing of the FOIA itself.  *See* 5 U.S.C. § 552(b)(5) (establishing 25-year "sunset" provision for the deliberative-process privilege).[16]

Rather than provide a detailed explanation of how different types of weekly reports from different components might harm some cognizable interest, Ex-Im's declarant instead painted with

---

[16] Ex-Im has not explained whether any of the records (or records attached to records, such as the responses to the GAO audit) are more than twenty-five years old.  At least some material dates from the early 2000s, by the agency's own admission.  *See* Second Jackson Decl. ¶ 29(a); *see also* Tinsley Decl. ¶ 10(b).  The agency should address this in its opposition and reply brief.

a broad brush: "[A]ll [the reports] contain similar types of information, the release of which would cause significant harm to the agency[.]"  Second Jackson Decl. ¶ 28.  At least three examples are worth highlighting to demonstrate the inadequacy of the agency's argument.

- In a weekly report from the Office of the General Counsel, Ex-Im redacted information pertaining to "Business Development Travel" undertaken by Kevin Turner, its former General Counsel.  *See* Def.'s Renewed *Vaughn* Index at Line 18; *see* Tinsley Decl. ¶ 8(c).  Assuming this content is protected by the deliberative-process privilege—and it is unclear why it should be—Mr. Turner has long departed Ex-Im, and the travel in question was undertaken over three years ago.  What continued value is there is in keeping details of this official agency travel secret?

- In a weekly report from the Office of Policy and International Relations, Ex-Im redacted a summary of negotiations in the "international arena."  There is a contradiction, however, in the agency's argument.  Although its declarant, Mr. Tinsley, suggested the redacted information pertains to "larger discussions with no particular end point" and disclosure could "harm the relations with the parties in question," Ex-Im's Renewed *Vaughn* Index indicates that "these specific negotiations have terminated."  Def.'s Renewed *Vaughn* Index at Line 21.  Thus, even if the deliberative-process privilege applied—which it should not—there seems to be little harm in present disclosure of the three-year-old summary.

- In a pair of weekly reports from the Office of Congressional and Intergovernmental Affairs, Ex-Im redacted "one line" concerning "an internal discussion regarding a potential reorganization within the agency, and whether that reorganization required a report to Congress."  Tinsley Decl. ¶ 8(h).  Although the agency claims the "reorganization . . . is still unresolved," Tinsley Decl. ¶ 8(h), it seems unlikely that anything so substantial could be contained in a single sentence.  The agency has done little to explain *what* statute is implicated—a fact that should be disclosed in its supporting declarations and *Vaughn* index.  Moreover, the purported harm—avoiding over-disclosure of potentially embarrassing "controversial topics"—is *precisely* the sort of excuse for secrecy that Congress sought to eliminate with the "foreseeable harm" standard.  *See supra* at p. 31.

As for Ex-Im's responses to GAO's audit, *see* Renewed *Vaughn* Index at Line 46, to the extent these records could be privileged there is no foreseeable harm in their disclosure.  The agency admits the information about "fraud events . . . mostly occurred in the early 2000s," roughly two decades ago.  Second Jackson Decl. ¶ 29(a).  It is unlikely release of the documents now would give "potential fraudsters a menu for how to commit fraud against the agency."  Second Jackson Decl. ¶ 29(a); *see* Tinsley Decl. ¶ 10(b).  A robust fraud risk management program should be

dynamic, and techniques that may have been successful twenty years ago, should be irrelevant as viable threats today, at least if Ex-Im were fixing identified vulnerabilities.[17]  *Cf.* Spira Decl. ¶ 5 ("Cyber risk is inherently dynamic and fast changing.").  Additionally, Ex-Im and other agencies already disclose information about frauds.  It is unclear how the withheld content of the audit responses is different in kind from information already publicly available.  *See, e.g.*, Press Release, *Loan Broker Charged in $15 Million Scheme to Defraud the Export-Import Bank of the United States*, Ex-Im, Oct. 6, 2008, https://bit.ly/3D9sHST; *see also* Press Release, *Exporter Pleads Guilty to Conspiring to Defraud the U.S. Export-Import Bank of More Than $24 Million*, Dep't of Justice, June 23, 2010, https://bit.ly/3y5R401.

Ex-Im similarly claims that release of the ERA "could provide bad actors with valuable insight into specific vulnerabilities, as well as EXIM's methods and capabilities of management risk."  Second Jackson Decl. ¶ 29(b); *see* Tinsley Decl. ¶ 10(c).  But the Ex-Im Office of the Inspector General regularly publishes reports about the agency's risk management procedures and vulnerabilities.  *See, e.g.*, Ex-Im, Evaluation of EXIM's Portfolio Risk Management Procedures and CRO Responsibilities, No. OIG-EV-20-01 (Dec. 2019), *available at* https://bit.ly/2W88IUd; Ex-Im, Evaluation of Risk Management Procedures and Chief Risk Officer Responsibilities, No. OIG-EV-17-01 (rev. Aug. 2019), *available at* https://bit.ly/3jaybVH.  As does GAO.  *See, e.g.*, U.S. Gov't Accountability Office, Export-Import Bank: The Bank Needs to Continue to Improve Fraud Risk Management, No. GAO-18-492 (July 2018).  It is unclear whether the ERA contains information that is qualitatively different.

---

[17] For the same reason, there is no foreseeable harm in disclosure of the Risk Register.  *See* Def.'s Renewed *Vaughn* Index at Line 45.

With all its Exemption 5 withholdings, Ex-Im has offered nothing but "generic and nebulous articulations of harm," which are "insufficient." *Judicial Watch, Inc. v. Dep't of Justice*, No. 17-0832, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). Ex-Im has "failed to identify specific harms"—beyond generic "chill"—"to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld material." *Id.* It has not "connected the harms in any meaningful way to the information withheld, such as by providing context or insight into the specific decision-making processes or deliberations at issue[.]" *Id.*

Ex-Im also has failed to describe how it satisfied the foreseeable harm standard when applying Exemption 4. There is nothing in the FOIA itself which precludes the standard from applying to this exemption. *See* 5 U.S.C. § 552(a)(8)(A)(i)(II). Courts in multiple jurisdictions have acknowledged as much. *See, e.g.*, *Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) ("Defendant argues that to impose the foreseeable harm standard would render *Argus Leader* meaningless. The Court disagrees. . . . [The FOIA Improvement Act of 2016] codifies the requirement that the agency articulate a foreseeable harm to an interest protected by an exemption," even Exemption 4.) (citation omitted), *appeal and cross-appeal docketed sub nom. Evans v. Dep't of Labor*, Nos. 20-16416 & 20-16538 (9th Cir. 2019).

This Court, in *Center for Investigative Reporting v. U.S. Customs & Border Protection*, explained the matter more directly:

> The FOIA Improvement Act's "foreseeable harm" requirement replaces to some extent the "substantial competitive harm" test that the Supreme Court overruled in *Food Marketing*. . . . The foreseeable-harm requirement, as applied to Exemption 4, enhances the useful "tool" of FOIA. To meet this requirement, the defendants must explain how disclosing . . . the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing "genuine harm to [the submitter's] economic or business interests," and thereby dissuading others from submitting similar information to the government[.]

436 F. Supp. 3d 90, 113 (D.D.C. 2019) (citations omitted).

Ex-Im apparently refuses to acknowledge that the foreseeable harm standard applies to Exemption 4 and does not provide a non-conclusory basis for the Court to determine whether the release of the records at issue could reasonably harm an interest protected by Exemption 4 by causing genuine harm to submitters' economic or business interests, or by chilling future submissions of confidential commercial or financial information.

For these reasons, the Court should reject Ex-Im's use of Exemptions 4 and 5 for failure to satisfy the FOIA's foreseeable harm standard.

## V.    Ex-Im did not segregate and release non-exempt portions of responsive records.

Regardless of whether Ex-Im can sustain its use of any exemptions, it has failed to show that it released all reasonably segregable portions of the records at issue.  The failure to carefully review responsive records conflicts with the explicit mandate of the FOIA, which requires an agency to release "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II).  An adequate segregability analysis is so vital to the FOIA's broad mandate of disclosure that a court has "an affirmative duty to consider the segregability issue *sua sponte.*"  *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs."  *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citation omitted).

As established above, there are various instances where Ex-Im appears to have over-redacted records.  A mere conclusory statement that the agency conducted a "line-by-line review" is inadequate.  *See* Second Jackson Decl. ¶ 34; *see also* Second Jackson Decl. ¶ 28(b) ("EXIM FOIA staff went through these reports and carefully redacted only those portions that contain confidential business information or deliberative process information.").  This is particularly true

considering the inadequate foundation Ex-Im provides for its use of Exemption 4, *see supra* at pp. 14–19, and the various issues raised with respect to the GAO audit responses. *See supra* at pp. 20–23, 29–31. "[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). Mere allegations of complying, absent an adequate showing that "explain[s] in detail which portions" of a record "are disclosable and which are allegedly exempt," are not enough to win the day. *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).

Ex-Im also appears to have misunderstood what it may overlook when conducting its segregability review. One of the agency's declarants attests that "EXIM . . . determined that no segregation of *meaningful information* in the documents could be made without disclosing information warranting protection under the law." Second Jackson Decl. ¶ 34 (emphasis added). Ex-Im is mistaken that it need not disclose segregable material that it finds "meaningless." This confuses the relevant standard, which addresses "non-exempt information so inextricable intertwined with . . . exempt information that [its] release . . . would produce only *incomplete, fragmented, unintelligible sentences* composed of *isolated meaningless words*." *Nat'l Sec. Archive Fund, Inc. v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (emphasis added). Ex-Im is not positioned to judge whether portions of records will be useful or informative to CoA Institute. Courts often require agencies to release certain information—such as names and dates, *see* Mem. Op. at 41–42 (discussing, *inter alia*, "document headers, title pages, straightforward timelines and chronologies")—even if their substantive content is exempt. *See, e.g.*, *Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011).

## VI.    The Court should conduct another *in camera* review.

The FOIA authorizes a district court to conduct *in camera* inspection of an agency's withholdings to determine whether it has met its burden in justifying the application of any statutory exemptions.  5 U.S.C. § 552(a)(4)(B).  Based on the arguments presented above, and considering the Court's previous *in camera* review, it would be appropriate for the Court again to conduct an *ex parte* and *in camera* inspection of the records at issue.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]").

*In camera* review of Ex-Im's withholdings would be particularly apt because the agency has again failed to offer satisfactory justifications for its use of Exemptions 4 and 5.  *See supra* at pp. 14–37.  Further, CoA Institute has identified points of contradiction between Ex-Im's declarants, its briefing, and the Renewed *Vaughn* Index.  *See, e.g.*, *supra* notes 9 & 15; *see also supra* at pp. 25–26, 30, 34.  Together with the fact of the Court's previous *in camera* review, direct review of the unredacted records now is warranted.  *See Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1997); *Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996).

*In camera* review would not be onerous.  *See Quiñon*, 86 F.3d at 1228 (the number of records to be inspected is "another . . . factor to be considered" when determining whether *in camera* review is appropriate); *see also People for the Am. Way Found.*, 503 F. Supp. 2d at 307 ("*In camera* review may be appropriate when . . . 'the number of records involved is relatively small[.]" (citation omitted)).  There are only 263 pages of records at issue, and CoA Institute has already provided the Court with a Bates-stamped redacted collection prepared by Ex-Im.  *See generally* Second Mulvey Decl. Ex. B.  The Court has the added benefit of previously reviewing the same records, albeit with a different level of redaction, during the last round of summary

judgment. *In camera* review would therefore serve judicial economy. *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents 'are few in number and of short length,' *in camera* review may save time and money." (citation omitted)).

The Court should order Ex-Im to submit unredacted versions of the records at issue for the Court's consideration.

## CONCLUSION

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's renewed motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: August 24, 2021                    Respectfully submitted,

                                          */s/ Ryan P. Mulvey*
                                          Ryan P. Mulvey
                                          (D.C. Bar No. 1024362)
                                          Lee A. Steven
                                          (D.C. Bar No. 468543)

                                          CAUSE OF ACTION INSTITUTE
                                          1310 North Courthouse Road, Suite 700
                                          Arlington, VA 22201
                                          Telephone: (571) 482-4182
                                          ryan.mulvey@causeofaction.org
                                          lee.steven@causeofaction.org

                                          *Counsel for Plaintiff CoA Institute*