**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CAUSE OF ACTION INSTITUTE,            )
                                                    )
            Plaintiff,                               )
                                                    )
    v.                                              )        Civil Action No. 19-1915 (JEB)
                                                    )
EXPORT-IMPORT BANK                     )
OF THE UNITED STATES,                   )
                                                    )
            Defendant.                            )
_____)


**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**


Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

_Counsel for Plaintiff CoA Institute_

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... iii

Introduction .............................................................................................................. 1

Argument .................................................................................................................. 1

I.  Ex-Im's submissions unfairly impede CoA Institute's prosecution and
    significantly burden the Court's efficient adjudication of this case. ................. 1

II.  Ex-Im cannot segment portions of an e-mail chain as distinct non-agency records ........... 3

    A.  Ex-Im confuses "scoping," "segmentation," and "segregation." .............................. 3

    B.  Ex-Im may not subdivide its e-mail correspondence with the White House ............. 6

    C.  Ex-Im continues to argue the wrong legal standard ................................................. 7

    D.  Ex-Im has control over the entirety of correspondence with the White House. ........ 8

III.  Ex-Im cannot rely on Exemption 4 to withhold responsive records .................................. 9

IV.  Ex-Im cannot rely on Exemption 5 to withhold responsive records ................................. 13

    A.  GAO Audit Responses and Document Productions ............................................... 13

    B.  Enterprise Risk Committee Meeting Minutes ....................................................... 17

    C.  Cyber Risk Acceptance Recommendations ........................................................... 18

    D.  Presentation Slides ............................................................................................. 18

    E.  Weekly Reports .................................................................................................. 19

V.  Ex-Im has not satisfied its burden under the "foreseeable harm" standard. ..................... 20

VI.  Ex-Im did not segregate and release non-exempt portions of responsive records ............ 22

VII.  The Court should conduct another *in camera* review ..................................................... 22

Conclusion ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Immigration Lawyers Ass'n v.*
  *Executive Office for Immigration Review*,
  830 F.3d 667 (D.C. Cir. 2016) ...................................................................................3, 4

*American Oversight v. Department of Health & Human Services*,
  380 F. Supp. 3d 45 (D.D.C. 2019) ...................................................................................7

*Board of Trade v. Commodity Futures Trading Commission*,
  627 F.2d 392 (D.C. Cir. 1980) ........................................................................................9

*Burkhart v. Washington Metropolitan Area Transit Authority*,
  112 F.3d 1207 (D.C. Cir. 1997) ......................................................................................2

*Cause of Action Institute v. Department of Justice*,
  999 F.3d 696 (D.C. Cir. 2021) ...............................................................................4, 5, 14

*Center for Investigative Reporting v. Department of Labor*,
  424 F. Supp. 3d 771 (N.D. Cal. 2019) ...........................................................................21

*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
  436 F. Supp. 3d 90 (D.D.C. 2019) .............................................................................11, 21

*Coastal States Gas Corp. v. Department of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ......................................................................................20

*Competitive Enterprise Institute v.*
  *Office of Science & Technology Policy*,
  827 F.3d 145 (D.C. Cir. 2016) ........................................................................................6

*Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank of the United States*,
  464 F. Supp. 804 (D.D.C. 1979) ...................................................................................13

*Davis v. Pension Benefit Guaranty Corp.*,
  734 F.3d 1161 (D.C. Cir. 2013) ......................................................................................2

*Department of Justice v. Tax Analysts*,
  492 U.S. 136 (1989) ........................................................................................................8

*Dow Jones & Co. v. Department of Justice*,
  917 F.2d 571 (D.C. Cir. 1990) ......................................................................................14

*Edmonds Institute v. Department of the Interior*,
  383 F. Supp. 2d 105 (D.D.C. 2005) ...............................................................................22

*Food Martketing Institute v. Argus Leader Media,*
   139 S. Ct. 2356 (2019).............................................................................11

*Gellman v. Department of Homeland Security,*
   No. 16-0635, 2020 WL 1323896 (D.D.C. Mar. 20, 2020) ......................................6

*Humane Society International v. U.S. Fish & Wildlife Service,*
   No. 16-720, 2021 WL 1197726 (D.D.C. Mar. 29, 2021) ......................................12

*Judicial Watch, Inc. v. Export-Import Bank of the United States,*
   108 F. Supp. 2d 19 (D.D.C. 2000).............................................................13

*Judicial Watch, Inc. v. Food & Drug Administration.*
   449 F.3d 141 (D.C. Cir. 2006).............................................................9, 10

*Judicial Watch, Inc. v. U.S. Secret Service,*
   726 F.3d 208 (D.C. Cir. 2013).................................................................8

*United States ex rel. Mossey v. Pal-Tech, Inc.,*
   231 F. Supp. 2d 94 (D.D.C. 2002).............................................................2

*Reporters Committee for Freedom of the Press v.*
   *Federal Bureau of Investigation,*
   3 F.4th 350 (D.C. Cir. 2021)................................................................21

*Vaughn v. Rosen,*
   523 F.2d 1136 (D.C. Cir. 1975)..............................................................20

*WP Co. LLC v. U.S. Small Business Administration,*
   No. 20-1240, 2021 WL 2982173 (D.D.C. July 15, 2021) ......................................12

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i)(II)...................................................................21

5 U.S.C. § 552(a)(8)(A)(ii)(II)...................................................................5

5 U.S.C. § 552(b).................................................................................5

**Other Authorities**

Dep't of Justice, Office of Info. Policy, FOIA Update: OIP Guidance: Applying
   the "Foreseeable Harm" Standard Under Exemption 5, FOIA Update vol. XV,
   No. 2 (Jan. 1, 1994).........................................................................21

## INTRODUCTION

In this Freedom of Information Act ("FOIA") case, the parties continue to disagree about the Export-Import Bank's ("Ex-Im") use of Exemptions 4 and 5, as well as its decision to segment out portions of e-mail correspondence as separate records under White House control.  Ex-Im has failed to meet its burden to justify its use of either exemption, it has omitted any argument about legal control of the White House correspondence, and it has failed to satisfy the FOIA's "foreseeable harm" standard.  The Court should deny Ex-Im's renewed motion for summary judgment and grant Cause of Action Institute's ("CoA Institute") cross-motion.

## ARGUMENT

**I.    Ex-Im's submissions unfairly impede CoA Institute's prosecution and significantly burden the Court's efficient adjudication of this case.**

As a preliminary matter, CoA Institute objects to Ex-Im's submission of a fifty-six page supplemental declaration with its combined reply brief and opposition.  *See generally* 2d Decl. of Kenneth Tinsley, ECF No. 44-2.  Ex-Im has previously relied on supporting submissions to an inordinate degree.  When filing its renewed motion for summary judgment, for example, Ex-Im's memorandum of points and authorities totaled only *eight* pages.  *See* Def.'s Renewed Mot. for Summ. J., ECF No. 40.  Yet the agency's accompanying declarations and *Vaughn* index totaled *fifty* pages.  *See* 2d Decl. of Lennell Jackson, ECF No. 40-2; Decl. of Kenneth Tinsley, ECF No. 40-3; Decl. of Howard Spira, ECF No. 40-4; Def.'s *Vaughn* Index, ECF No. 40-05.

The filing of a new, relatively lengthy, and detailed reply declaration—which Ex-Im avers is only needed to "ensure that the record is clear," Reply to Pl.'s Opp'n to Def.'s Renewed Motion for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. at 8 [hereinafter "Def.'s Opp'n"], ECF No. 44—unfairly impedes CoA Institute's prosecution of this case, insofar as it must parse arguments and factual details that should already have been before the Court when Ex-Im moved

1

for summary judgment.  The Second Tinsley Declaration also significantly burdens the Court's ability to adjudicate this case efficiently and without *in camera* review.[1]

Legal conclusions and legal arguments, as opposed to factual assessments, do not belong in supporting declarations because they "intrude upon the duties of, and effectively substitute for the judgment of, the trier of fact[.]"  *United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002).  Although a qualified witness "may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied," he or she "*may not testify as to whether the legal standard has been satisfied*."  *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212–13 (D.C. Cir. 1997) (emphasis added).  Yet Mr. Tinsley— who is "not a FOIA expert," 2d Tinsley Decl. ¶ 4—offers legal conclusions throughout his testimony, as well as pseudo-lawyerly (mis)characterization of CoA Institute's arguments.  *See, e.g.*, 2d Tinsley Decl. ¶ 11 ("Plaintiff suggests that once communications from the EOP are made part of an email chain that includes EXIM communications, then suddenly all EOP communications themselves become subject to FOIA.").

More importantly, Mr. Tinsley's inclusion of lengthy argument, and unnecessary, prolix repetition of previously proffered factual testimony,[2] suggests Ex-Im's intent to bypass the page limitations set out in the local rules, which limit the length of merits briefs.  *Cf. Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1167 (D.C. Cir. 2013) (a party may not "incorporat[e] argument . . . as this would circumvent the court's rules . . . regarding the length of briefs, where they fail, as here, to persuade the court that they could not have presented their challenge within the word limits for their briefs.").  Consider, for example, the twenty-page "paragraph ten" of the Second

---

[1] Given the inadequacy of Ex-Im's legal arguments and factual allegations about its withholdings, CoA Institute again requests the Court order *ex parte* submission of unredacted records for *in camera* review.  *See infra* at pp. 22–23.

[2] *See* 2d Tinsley Decl. ¶ 4 ("I apologize to the Court in advance that this may be somewhat repetitive[.]").

Tinsley Declaration, which Ex-Im incorporates by reference in its discussion of "Weekly Staff Reports." *See* Def.'s Opp'n at 25–27; 2d Tinsley Decl. ¶ 10.

It is shockingly prejudicial for Ex-Im to file nearly *sixty additional pages* of witness testimony, in the form of a single declaration, with its reply brief and expect that testimony to do the legwork for what should have been defense counsel's own argument. CoA Institute firmly objects, on these grounds, to the Second Tinsley Declaration.

## II. Ex-Im cannot segment portions of an e-mail chain as distinct non-agency records.

Ex-Im persists in withholding a portion of an e-mail chain (the "McGarry-Calabria e-mail chain") that reflects correspondence between a senior Ex-Im official and the White House. *See* Def.'s Opp'n at 1–4. But this e-mail chain cannot be divided up in such a fashion. And even if it could be segmented into distinct records, none of those new records would be subject to White House control. Ex-Im does not even attempt to argue its own position, and instead refers to inapplicable standards that pertain to the scope of the presidential-communications privilege. The agency fundamentally misunderstands the issues before the Court.

### A. Ex-Im confuses "scoping," "segmentation," and "segregation."

It is vital to establish a clear understanding of relevant terms. Ex-Im's confusing attempt to rebut CoA Institute is likely the result of the agency's inability to distinguish several concepts.

"**Scoping**" refers to the practice of withholding "non-responsive" portions of records. The D.C. Circuit put an end to that practice in *American Immigration Lawyers Ass'n v. Executive Office for Immigration Review*. 830 F.3d 667 (D.C. Cir. 2016) [hereinafter "*AILA*"]. As the *AILA* court explained: "[W]e do not see how [an agency's] non-responsive redactions . . . can be squared with the statute. Those redactions find no home in FOIA's scheme," which only provides for redaction of "information falling within a statutory exemption." 830 F.3d at 677.

"**Segmentation**" refers to a practice that has arisen in the wake of *AILA*. Rather than withhold portions of records as "non-responsive"—a practice that, again, is prohibited by *AILA*—agencies now try to argue those same portions are distinct *records*. The D.C. Circuit anticipated "segmentation" as a withholding strategy when it observed "[t]he practical significance of FOIA's command to disclose a responsive record as a unit (after deletion of exempt information) depends on how one conceives of a 'record.'" 830 F.3d at 678. Although the *AILA* court acknowledged it had "no cause to examine th[at] issue" in detail, it nevertheless went on in *dicta* to opine that, "[u]nder FOIA, agencies . . . in effect define a 'record' when they undertake the process of identifying records that are responsive to a request." *Id.*

The D.C. Circuit has since clarified the "antecedent question of what constitutes a distinct 'record.'" *Id.* at 678. In *Cause of Action Institute v. Department of Justice*, the court emphasized that, once an agency identifies a preexisting unified record as responsive to a FOIA request, it cannot proceed to break it apart into different pieces (*i.e.*, alleged "records"). *See* 999 F.3d 696, 703 (D.C. Cir. 2021) ("The Agency's own disclosures demonstrate that it regarded each . . . document, rather than [individual segments within it] as a record. By redacting non-exempt material from within those records, the Agency violated FOIA and this court's precedent."). The following passage from CoA Institute's opening brief is worth repeating:

> "[T]he maintenance of a 'record' and the agency's treatment of it *prior to submission* of a FOIA request is the key consideration for whether records can be segmented into discrete units (or separate 'records') for the sole purpose of bypassing FOIA's disclosure obligations." An agency cannot reverse engineer its segmentation of a record and claim it was always comprised of *multiple* "records," at least so long as the document in question was stored and managed *as a unitary whole* and identified as such during the agency's search and initial processing[.]

Mem. of P. & A. in Opp'n to Def.'s Renewed Mot. for Summ. J. & in Support of Pl.'s Cross-Mot. for Summ. J. at 5 [hereinafter "Pl.'s Mot."], ECF No. 41-1 (citation omitted and quoting Ryan P.

Mulvey & R. James Valvo, III, *Towards a Definition of a FOIA 'Record': The D.C. Circuit's Decision in* Cause of Action Institute v. Department of Justice, Yale J. on Reg. Notice & Comment Blog, June 3, 2021, https://bit.ly/3z38VWO).

Finally, "**segregation**" refers to "deleti[ng] . . . portions [of a record] which are exempt under [a statutory exemption]."  5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II) ("An agency shall . . . consider whether partial disclosure of *information* is possible whenever the agency determines that a full disclosure of a requested *record* is not possible.") (emphasis added).  Agencies can only segregate *information* (not "records") based on an *exemption*.  Indeed, "FOIA . . . distinguishes between 'records' and 'information'" in this respect.  *Cause of Action Inst.*, 999 F.3d at 699.

Ex-Im repeatedly confuses these terms.  It incorrectly claims "segmentation" refers only to the improper deletion of non-responsive information.  Def.'s Opp'n at 1 n1.  And it incorrectly insists "segregation" includes removal of "non-agency" material.  *See id.* at 1.n.1 & 2; *id.* at 3 ("Because the White House correspondence is [a] protected communication, the redacted portions were removed through 'segregation,' not segmentation.").[3]  As set out above, "segmentation" is the sub-division of an existing record *while processing a request*, so that an agency can withhold the sub-divided material as either non-response *or* outside agency control.  "Segregation" is the deletion of content within a record protected by an exemption.  The FOIA only explicitly permits "segregation," and the D.C. Circuit has limited the extent to which an agency may "segment" an existing record, if at all.

---

[3] CoA Institute has addressed the relevance of authorities that appear to suggest an agency may simply delete "non-agency" portions of records.  *See* Pl.'s Mot. at 10–11.  It is incorrect to read these authorities in that manner, especially given the conceptual refinement of the "agency record" and "record" distinction in *AILA* and *Cause of Action Institute*.

### B.    Ex-Im may not subdivide its e-mail correspondence with the White House.

The purported "records" here consist of White House-originated messages in an e-mail chain.  They have effectively been withheld as distinct "non-agency" records.  Ex-Im's use of the redaction label, "EOP not subject to FOIA," makes that clear.  Yet the FOIA provides no exemption for informational material that is "EOP not subject to FOIA."[4]  And Ex-Im does not describe its "EOP"-labeled redactions as implicating an exemption in its *Vaughn* index.  *See Vaughn* Index at Line 15.  The agency bears the burden of demonstrating portions of the e-mail chain are distinct "records."  There is no evidence support such a position, *see, e.g*, 2d Tinsley Decl. ¶ 11, and Ex-Im refuses to address CoA Institute's arguments.  *See* Pl.'s Mot. at 7–8.

*First*, there is no factual basis to conclude Ex-Im's e-mail records are not stored as unified, stand-alone files on its computer systems.  Ex-Im has thus conceded the McGarry-Calabria e-mail chain is maintained as a single file on its computer systems.  *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 151 (D.C. Cir. 2016) (Srinivasan, J., concurring).

*Second*, Ex-Im has failed to describe the McGarry-Calabria e-mail chain as a series of separate "records" in its *Vaughn* index or supporting declarations.  *See Vaughn* Index at Line 15; 2d Jackson Decl. ¶ 33.  Prior to *Cause of Action Institute*, when courts permitted segmentation of an e-mail or e-mail chain, they required the agency to show both the reasonableness of its segmentation *and* the consistency of its position, as evidenced by its *Vaughn* index.  *See Gellman v. Dep't of Homeland Sec.*, No. 16-0635, 2020 WL 1323896, at *3–4 (D.D.C. Mar. 20, 2020).  Neither showing has been made here.

---

[4] The withholding of Mr. Calabria's e-mail address under Exemption 6 is not at issue.  *See* Pl.'s Mot. at 4 n.3.  Ex-Im concedes the substance of the e-mail records is only withheld as "EOP not subject to FOIA."  *See* 2d Tinsley Decl. ¶ 11 ("The (b)(6) personal information exemption is not claimed for this portion of the communication.").

*Third*, the segmentation of the McGarry-Calabria e-mail chain violates common sense. An e-mail chain is a single record. Its status as an "agency record" or a "congressional record" or a "presidential record" is mutually exclusive; it is one of these three things, but not more than one. Although Ex-Im attempts to dismiss the relevance of *American Oversight v. Department of Health & Human Services*, *see* Def.'s Opp'n at 2, that case is instructive. The e-mail chains at issue in that case included correspondence between an agency and a non-agency entity (*viz.*, Congress). Although *American Oversight* ultimately turned on which portions of an e-mail chain were "responsive," that was a consequence of the wording of the underlying request, as well as the government's apparent failure to raise the control issue. *See* 380 F. Supp. 3d 45, 50–51 (D.D.C. 2019). The *American Oversight* court's well-reasoned consideration of the antecedent question of what a "record" is, or whether it can be segmented, is entirely on-point.

## C.  Ex-Im continues to argue the wrong legal standard.

If Ex-Im's conceptual confusion were not bad enough, the agency also continues to argue for the wrong legal standard. Setting aside the propriety of deleting portions of records as "EOP not subject to FOIA," the defensibility of that practice must rest on Ex-Im's demonstration that those "portions" are outside Ex-Im's legal control. But Ex-Im does not recite the correct "control" test. Indeed, it denies *any* control test is relevant.[5] That is plainly wrong.

Ex-Im argues that records "generated by staff or units with [the Office of the Vice President] are not agency records when they are made," solely because the Office of the Vice President is composed of "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." Def.'s Opp'n at 2–3 (cleaned up and

---

[5] The confusion is shared by one of the agency's declarants: "At the end of the day, EXIM is withholding the redacted information because it understands that it is obliged to do so because the redacted portions are communications from the EOP." 2d Tinsley Decl. ¶ 11. But the mere fact an e-mail is received from the White House (or any other component of the Executive Office of the President) does not make it exempt from the FOIA.

citations omitted). Not so. Agency control does not turn on the mere involvement of a non-agency in the creation of a record or the development of the record's content. None of the cases Ex-Im cites suggest otherwise. *See* Pl.'s Mot. at 9.

Ex-Im's preferred authority, *Judicial Watch, Inc. v. U.S. Secret Service*, supports CoA Institute's position: "[N]ot all records physically located at an agency are 'agency records,'" "[n]or are all documents that are generated by an agency 'agency records.'" 726 F.3d 208, 217 (D.C. Cir. 2013). The principal consideration must be whether an agency (1) created or obtained the "record," and—relevant here—(2) controlled it at the time of a request. Although "control" is often considered under the four-factor *Burka* test, in cases involving alleged presidential or congressional records, the so-called "modified control test" is used. *See id.* at 221 ("[W]e have indicated that a somewhat different control test applies when there are 'special policy considerations' at stake."). That test "renders the first two factors of the standard [*Burka*] test effectively dispositive." *Id.*

### D.    Ex-Im has control over the entirety of correspondence with the White House.

CoA Institute has hardly "rehash[ed] its prior argument regarding 'control.'" Def.'s Opp'n at 3. Nor has it argued for the application of the *Burka* test. *See id.* CoA Institute has advanced the correct legal test from *Judicial Watch*, which Ex-Im refuses to recognize. *See* Pl.'s Mot. at 12 ("With purported presidential records, the first two *Burka* factors are typically dispositive as part of the so-called 'modified control test.'").

Ex-Im, for its part, has failed to offer *any* argument regarding "control," either under the modified-control test or *Burka* or even one of the D.C. Circuit's less-frequently employed tests. That omission is fatal because "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records[.]'" *Dep't of Justice v. Tax Analysts*,

492 U.S. 136, 142 n.3 (1989). Ex-Im refuses to address the "control" issue and it misidentifies the relevant legal test. CoA Institute need not reargue its previous reasons for why the McGarry-Calabria e-mail chain is an "agency record" in its entirety. *See* Pl.'s Mot. at 11–14.

### III.  Ex-Im cannot rely on Exemption 4 to withhold responsive records.

Ex-Im offers four arguments in support of its use of Exemption 4. Each is unavailing.

*First*, Ex-Im contests the extent to which government-generated information is protected by Exemption 4. *See* Def.'s Opp'n at 4–6. But when trying to distinguish *Board of Trade v. Commodity Futures Trading Commission*, Ex-Im mischaracterizes the records at issue, which did not reflect government-generated "survey analysis" but rather the "identities" of plywood futures survey participants, who had ostensibly participated in the survey with an expectation of confidentiality. 627 F.2d 392, 395 (D.C. Cir. 1980); *see id.* ("The [agency] decided to release the documents . . . but with all identifying details excised."). Ultimately, the *Board of Trade* court did not even reverse the district court; it remanded for further proceedings in line with its view of the requisite Exemption 4 analysis. *See id.* at 402–403. That remand did nothing to erode *Board of Trade*'s central holding, which Ex-Im ignores: Exemption 4 only applies to "data which have not been generated within the [federal] Government." *Id.* at 403–04.

Ex-Im similarly mischaracterizes *Judicial Watch, Inc. v. Food & Drug Administration*. 449 F.3d 141 (D.C. Cir. 2006). That case reiterates "materials implicating Exemption 4 are generally not developed within the agency," but must constitute "commercial information from third parties." *Id.* at 148. To be sure, "submission-dependent" materials," such as agency-created records that directly recite information obtained "from a person," can fall within the scope of the exemption. *Id.* at 148–49. But there is nothing to suggest in *Judicial Watch*, as Ex-Im claims, that "the agency's approval process" was itself "confidential." Def.'s Opp'n at 5. On the contrary, the

court rejected the withholding of vaguely described documents the agency insisted contained information "'collected during an FDA inspection of a drug manufacturing facility.'"  *Id* at 149. And unlike the agency in *Judicial Watch*, Ex-Im cannot here point to supplemental affidavits filed by intervening companies whose ostensibly confidentially submitted (or identifying) information is included in the withheld records.  *See id.* at 150.

Ex-Im can only hang its hat on Ms. Jackson's vague assertion that withheld content "*may* [have] come from documents that EXIM has received," or "*may* [have] be[en] oral information EXIM collects by phone or in meetings."  2d Jackson Decl. ¶ 22 (emphasis added); *see* 1st Decl. of Lennell Jackson ¶ 34, ECF No. 27-3 (same).  The testimony offered by Messrs. Tinsley and Spira—to say nothing of the agency's *Vaughn* index—offers no further elaboration or specificity. Moreover, in its reply brief, Ex-Im again misstates what its prior submissions relate.  The agency claims, for example, that its *Vaughn* index explained "business and financial information [was] *provided by* applicants who are having repayment difficult."  Def.'s Opp'n at 6 (emphasis added) (citing *Vaughn* Index at Lines 3–5).  Yet the *Vaughn* says no such thing; it merely describes allegedly "confidential business information *about specific parties and impaired transactions*." *See Vaughn* Index at Lines 3–5 (emphasis added).

This example is not an outlier.  None of the Exemption 4 entries in the agency's *Vaughn* index say anything about whether the actual data at issue was "provided" or "submitted" by an outside party.  *See Vaughn* Index at Lines 3–5, 9–10, 12–14, 17–18, 20, 22, 24, 25, 27–30, 32, 34, 37, 39, 41, 46.  The First Tinsley Declaration is no different.  *See* 1st Tinsley Decl. ¶¶ 5, 8(e), 8(f). In one instance—contrary to Ex-Im's argument, *see* Def's Opp'n at 7—Mr. Tinsley confirms that redacted information *originated with* Ex-Im and was provided *to* (not obtained *from*) a private entity.  1st Tinsley Decl. ¶ 8(f)(i) (reference to "specific terms of a guarantee issued by EXIM to

the Private Export Finance Corporation").[6]  Nor does the Second Tinsley Declaration cure any defect in the first by explaining that the actual content was submitted by an outside party.  *See* 2d Tinsley Decl. ¶¶ 7(a), 7(d)(i), 10(c)(i), 10(e), 10(f)(i), 10(g).  If anything, the new declaration raises serious questions about Ex-Im attempt to withhold information created within the government, including "country risk ratings" from the governmental Interagency Credit Risk Analysis System ("ICRAS"), and agency descriptions of a "preliminary phase of a transaction."  2d Tinsley Decl. ¶ 7(d)(i); *see infra* note 8.

*Second*, Ex-Im argues it can rely on its "'experience' in determining whether specific information is 'customarily' kept private," and stands by its declarants' conclusory statements. But none of the caselaw cited by Ex-Im—which, incidentally, predates the Supreme Court's decision in *Argus Leader* except for a single case—defeats CoA Institute's interpretation of the relevant test for "customarily."  A "custom" of confidentiality cannot be based on an experience-based *assumption* by an agency about what an entire industry or set of businesses does to keep (or not keep) information secret.  The correct inquiry is whether "information communicated to [an agency] . . . remains confidential whenever it is customarily kept private . . . *by the person imparting it*[.]" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (emphasis added). "Conclusory statements by an agency official about what the agency official may believe about how a submitter customarily treats the information at issue are simply insufficient." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 111 (D.D.C. 2019). Particularity and a well-developed foundation are essential.  *See id.* at 110–14.  And despite Ex-Im's protestations, this may entail contacting submitters, or offering testimony that such an effort

---

[6] Here, Ex-Im's admission that it is withholding "aggregate" information bears repeating.  *See* Pl.'s Mot. at 18; *see also* 2d Jackson Decl. ¶ 23; 1st Jackson Decl. ¶ 34(b).

has been undertaken. *See Humane Society Int'l v. U.S. Fish & Wildlife Serv.*, No. 16-720, 2021 WL 1197726, at *2–4 (D.D.C. Mar. 29, 2021).

"At bottom, the Government must do <u>something</u> to establish how the particular information-providers [implicated in the records at issue] customarily and actually treat the relevant material." *WP Co. LLC v. U.S. Small Bus. Admin.*, No. 20-1240, 2021 WL 2982173, at *6 (D.D.C. July 15, 2021) (emphasis added). The Second Tinsley Declaration fails in this task. Mr. Tinsley's supplemental testimony is no less conclusory than the allegations previously proffered by Ms. Jackson. Admittedly, Mr. Tinsley claims "long experience with [Ex-Im's] customers generally," 2d Tinsley Decl. ¶ 6(a). But his thirty-thousand-foot view of diverse data points pertaining to "thousands of transactions" is not enough, 2d Tinsley Decl. ¶ 6(a)(i), especially considering his admission that, while "EXIM customers generally seek to minimize any publicity about pending transactions," there "are clearly exceptions." 2d Tinsley Decl. ¶ 6(a)(v). Exceptions indeed. Alas, there is no way to confirm whether any such exceptions apply here, because there is no specific evidence about the withheld information, or at least none to which Ex-Im has pointed in its briefs.

*Third*, Ex-Im argues CoA Institute has "misconstrue[d] EXIM Bank's Memorandum promising confidentiality[.]" Def.'s Opp'n at 8. Specifically, Ex-Im insists CoA Institute is "collaps[ing] two separate issues" by arguing the agency has "applied [the] 'substantial harm'" test. *Id.* at 9. That is incorrect. Although CoA Institute mentioned the undated and unsigned "Memorandum" to unknown "Interested Parties" evoked the pre-*Argus Leader* standard with its reference to "substantial harm," CoA Institute never argued Ex-Im had applied that test. CoA Institute's principal point was that "Ex-Im offers *no* evidence that relevant submitters received this document." Pl.'s Mot. at 18–19. And the agency has offered no new evidence, despite its

submission of a fifty-six-page reply declaration, to remedy that gap in the evidentiary record.  Mr. Tinsley merely avers that "[w]hen parties ask for a non-disclosure agreement or confidentiality commitment, EXIM has a standard for of [sic] letter it sends."  2d Tinsley Decl. ¶ 6(a)(iii).  That may be true, but it is not enough for the agency's present purposes.

*Fourth*, Ex-Im suggests CoA Institute failed to distinguish relevant caselaw.  CoA Institute would have addressed these cases if they had been relevant, but they are not.  Given the elimination of the "substantial harm" test, cases from twenty to forty years ago are of limited utility to the Court, at least as part as its evaluation of "confidentiality."  Moreover, the types of specific submitter-obtained information in both of Ex-Im's cited cases are not at issue here, where the Court is faced with content generated by or originating within the government.  *See generally Judicial Watch, Inc. v. Export-Import Bank of the U.S.*, 108 F. Supp. 2d 19, 31–34 (D.D.C. 2000) (*e.g.*, bank account numbers, customer lists, sales figures, credit reports, *etc.*); *Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank of the U.S.*, 464 F. Supp. 804, 809–10 (D.D.C. 1979) (*e.g.*, loan agreement and borrower-created and submitted loan progress reports).

**IV.    Ex-Im cannot rely on Exemption 5 to withhold responsive records.**

**A.    GAO Audit Responses and Document Productions**

These records reflect Ex-Im's interactions with the Government Accountability Office ("GAO") during an audit.  *See Vaughn* Index at Lines 45–47.  As CoA Institute previously argued, these GAO-related records do not meet Exemption 5's threshold "inter-agency or intra-agency memorandum or letter" requirement.  *See* Pl.'s Mot. at 19–23.  Although Ex-Im is right to observe CoA Institute reiterates its broader Exemption 5 "threshold" argument for the sake of preserving its appeal rights, the agency goes too far to suggest, as a categorical matter, that *all* records

exchanged with "non-agencies" satisfy the "inter" or "intra-agency" requirement. *See* Def.'s Opp'n at 9–10. That is wrong, and this Court has previously explained as much.

The relevant legal test—which CoA Institute properly recited—depends on *Dow Jones & Co. v. Department of Justice*, 917 F.2d 571 (D.C. Cir. 1990). "[E]xternal communications [with Congress] from a FOIA-subject agency may qualify for protection when they are 'part and parcel of the agency's deliberative process.'" Mem. Op. at 29, ECF No. 37 (citing *Dow Jones & Co., Inc.*, 917 F.2d at 575). Such records do not qualify for exemption "if they were 'created specifically to assist' or for the 'sole purpose of assisting' Congress [or a legislative branch agency] 'with *its* deliberations.'" Mem. Op. at 30 (emphasis added) (citing *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001)).

Here, Ex-Im has not met its burden under *Dow Jones* and *Rockwell*. It insists, for example, that "two of the three records turned over to GAO were pre-existing EXIM-internal documents[.]" Def.'s Opp'n at 11. But this is not how the agency originally described the records when it claimed they were property of the GAO. *See* 1st Jackson Decl. ¶ 39a.[7] More importantly, the incorporation of pre-existing records into a one response document entails creation of a new "record" that cannot be segmented from the specially prepared responses to GAO's inquiries. *See Cause of Action Inst.*, 999 F.3d at 702–03 (discussing compilation of agency component responses to "Questions for the Record" into a single, unitary file). Allowing Ex-Im to refer vaguely to "pre-existing information" would open the door to abusive application of all of the FOIA's statutory exemptions.

---

[7] Naturally, Ex-Im disputes this characterization of its recasting of documents as "pre-existing." It avers it produced a list of the records provided to GAO as part of its initial FOIA production. *See* Def.'s Mot. at 13 n.4. Yet there is nothing in that production to support this claim and, seeing as that portion of the record is not in evidence, the point is moot. The ambiguity of Ms. Jackson initial declaration speaks for itself, *see* Jackson Decl. ¶ 39a, as does Ex-Im's *Vaughn* index from the first round of summary judgment. *See* Def.'s First *Vaughn* Index at Lines 32–33, 41, ECF No. 27-4. Further, as this Court noted, Ex-Im withheld *all the records in full*, despite claiming otherwise, *see* Mem. Op. at 28, so there was never any basis for either CoA Institute or the Court to have knowledge that *anything* was "pre-existing" in Ex-Im's files, as opposed to being specially prepared for the GAO audit.

Assuming the veracity of Mr. Tinsley's brand-new descriptions of these "pre-existing" records, *see* 2d Tinsley Decl. ¶ 12(a), (c), he still cannot deflect the *sine qua non* for the agency's responses to "GAO Question No. 4": the existence of the GAO audit.  Mr. Tinsley previously conceded these records were intentionally "reformatted for purposes of responding to the GAO[.]" 1st Tinsley Decl. ¶ 10(b).  In other words, they were uniquely prepared *for GAO decision-making*, at least as far as the responsive versions at issue here are concerned.  And the Court has expressed skepticism that these records relate to Ex-Im's own deliberative processes.  *See* Mem. Op. at 32 ("The Court has its doubts as to the viability of this tack.").  Conveniently, Mr. Tinsley now claims his prior testimony was "not correct."  2d Tinsley Decl. ¶ 12(b).

Even if the Court were to accept all the GAO-related records satisfied Exemption 5's threshold requirement, the deliberative-process privilege still should not apply.  Notwithstanding Mr. Tinsley about-face, the bulk of the testimony in this case establishes that the contents of the agency's responses to "GAO Question No. 4" was created for the purpose of responding to the GAO audit.  *See* 2d Jackson Decl. ¶ 29(a); 1st Tinsley Decl. ¶ 10(b); *see also* Def.'s Renewed *Vaughn* Index at Line 46 ("Responses to the GAO questions were compiled in this particular format for GAO[.]").  More importantly, Ex-Im's declarants have done little to explain how *any* of these records are properly pre-decisional or deliberative.  *See* 2d Tinsley Decl. ¶ 12(b)(ii).  Mr. Tinsley focuses on the possible *harms* that could result from disclosure.  *See* 2d Tinsley ¶ 12(b), (b)(iii).  But that is irrelevant to the privilege inquiry.  Further, the agency offers *no* explanation for how the amount of money recovered from a particular fraud, as a concrete datapoint, is used deliberatively, or how specific "Participant Claim Activity Detail" spreadsheets were (or still are) used within the agency.  Arguments about withholding information to protect an "innocent party" are also completely irrelevant to the deliberative-process privilege.  *See* 2d Tinsley Decl. ¶ 12(b).

15

Relatedly, Ex-Im's insistence that a "GAO audit is part of EXIM's overall maturing of its enterprise risk management" is unpersuasive. *See* Def.'s Opp'n at 13–15. No matter what Ex-Im might end up doing with the conclusions and recommendations of a GAO audit *after the fact*, it flies in the face of common sense to understand the agency's participation in the audit—including its responses to GAO inquiries or document requests, *etc.*—as somehow related to the agency's own decision-making processes on the front end. The connection is too attenuated, and this Court has rightly expressed "its doubts as to the viability of [Ex-Im's] tack." Mem. Op. at 32.

With respect to the Enterprise Risk Assessment ("ERA"), CoA Institute merely notes the agency fails to appreciate the relevance of Ex-Im Inspector General ("IG") reports. It is not that any IG reports have already published the contents of the ERA. *See* 2d Tinsley Decl. ¶ 12(c)(iii); *see also* Def.'s Opp'n at 12. Rather, it is that Ex-Im's arguments about the likelihood of some "harm" materializing from disclosure are undercut by the IG's regular release of information about the agency's risk management procedures and vulnerabilities.

Finally, as an aside, CoA Institute will address Ex-Im's "confusion" over a "series of footnotes" pertaining to the "EXIM OGC Memorandum," which CoA Institute has only recently learned was part of Ex-Im's response to the GAO inquiry. *See* Def.'s Opp'n at 12 n.3. The Court previously accepted the withholding of this memo. *See* Mem. Op. at 32–33. But because the memo was withheld in full, CoA Institute was never aware that Ex-Im was treating it as *distinct* and divisible from the rest of the agency's prepared response to the GAO inquiry. *See* Pl.'s Mot. at 10 n.7; *see also id.* at 20 n.13. CoA Institute could not have known the memo had been segmented out of another larger record for the purpose of applying Exemption 5. Although CoA Institute does not insist the Court revisit its prior ruling in that regard, CoA Institute's right to challenge Ex-Im's improper segmentation has not been waived.

16

B.       **Enterprise Risk Committee Meeting Minutes**

These records are identified in Rows 3–5 of Ex-Im's *Vaughn* index and ostensibly concern "presentations regarding impaired transactions, cybersecurity risk, 'country cover,' and other risk areas."  1st Tinsley Decl. ¶ 5.  As the agency's declarants explain, the Enterprise Risk Committee "is not currently a decision making or approval body."  2d Tinsley Decl. ¶ 7(a)(ii); *see* Spira Decl. ¶ 10.  It is therefore unclear how meeting minutes can be either "pre-decisional" or "deliberative" if they reflect the goings-on of an "non-deliberative" agency component.  Moreover, Ex-Im goes too far when it suggests that, because "there is no end-point decision regarding these discussions," pseudo-deliberative portions of the minutes can be withheld, in theory, indefinitely.  2d Tinsley Decl. ¶ 7(b)(i).  That cannot be the law.

The Court can turn now to the pages related to the Republic of Belarus.  *See* 2d Decl. of Ryan P. Mulvey Ex. B at 000006–07, ECF No. 41-6.[8]  Ex-Im insists "the [First] Tinsley Declaration adequately explained the distinction between disclosing *whether* EXIM will do business in a country as compared to *why* EXIM reaches such a decision."  Def.'s Opp'n at 17.  Yet the record itself explains *why* Ex-Im does not do business with the Lukashenko regime— namely, because Congress has prohibited it from doing so under the "Belarus Democracy and Human Rights Act."  2d. Mulvey Decl. Ex. B at 000006.  Mr. Tinsley's argument about the deliberative nature of this content accordingly fails, including his suggestion that disclosure would result in "foreseeable harm" *to Belarus*, as if a foreign country had cognizable interests under Exemption 5 that could be implicated by disclosure.  *See* 2d Tinsley Decl. ¶ 7(d)(ii).

---

[8] Ex-Im previously omitted any argument for the application of Exemption 4 to these records.  *See* Pl.'s Mot. at 24 n.15; *see also* 1st Tinsley Decl. ¶ 10(d).  Mr. Tinsley now claims "specific country risk ratings obtained from ICRAS," as well as "'SBU information, and an agency-generated description of a "preliminary phase of a transaction" have been withheld.  2d Tinsley Decl. ¶ 7(d)(i); *see supra* at pp. 10–11.  This is an inappropriate use of Exemption 4.

Finally, with respect to the appearance of a new instance of Exemption 6, Ex-Im seems to feign ignorance and claims the redaction is merely "one line within a larger previous redaction." Def.'s Opp'n at 17.  But this assertion of Exemption 6 *is* new, and Ex-Im did not address the record cites provided by CoA Institute in its cross-motion.  *See* Pl.'s Mot. at 25.[9]  It does not matter that the "one line refers to a personnel move" about a public figure whose name is known.  Even then there is no reason why the *name* could not have been withheld while the remainder of the sentence disclosed.  *See* 2d Tinsley Decl. ¶ 7(b)(ii).  Either way, Ex-Im is late to the party.  The Court never sanctioned this use of Exemption 6, and the agency cannot raise it now.  *See* Mem. Op. at 34–39.

### C.    Cyber Risk Acceptance Recommendations

This record is identified in Row 6 of Ex-Im's *Vaughn* index.[10]  The agency has doubled down on its confusing insistence that a non-deliberative body can have pre-decisional and deliberative communications.  *See* 2d Tinsley Decl. ¶ 8(i).  As for Ex-Im's explanation about the "distinct role" of the risk memo within the wider agency, the Court can determine for itself whether the agency has satisfied its burden.  *See* Def.'s Opp'n at 19–22.

### D.    Presentation Slides

These slides are identified on Line 7 of Ex-Im's *Vaughn* index.  CoA Institute has explained Ex-Im failed to offer "'additional detail on the context of the presentation [reflected in the slides], its intended purpose, or its role in any agency (or broader governmental) decisionmaking process,'" as the Court expected.  Pl.'s Mot. at 27 (citing Mem. Op. at 20).  In response, the agency merely redirects the Court to the *Vaughn* index, which broadly suggests the content of the slides

---

[9] Curiously, Mr. Tinsley accuses plaintiff's counsel of "overlooking" both the agency's previous *Vaughn* index and opposing counsel's correspondence concerning Exemption 6 and the Enterprise Risk Committee Meeting Minutes. But Ex-Im's declarant himself is the one who is confused; Mr. Tinsley has mixed up *this* use of Exemption 6 with the Exemption 6 withholdings in the McGarry-Calabria e-mail chain.  *See* 2d Tinsley Decl. at 46 n.6.

[10] Ex-Im has clarified it mistakenly referred to the "Cybersecurity Dashboard" in its submissions.  *See* 2d Tinsley Decl. at 13 n.2.  That record is not at issue.  *See* Pl.'s Mot. at 26.

"set[s] forth a framework for consideration on how to address certain aspects of national security." *Vaughn* Index at Line 7. That is not enough. Ex-Im insists, for example, its "Three EXIM Responses to ECA Realities" reflect internal agency strategy. *See* 2d Tinsley Decl. ¶ 9(a)(ii). But this is difficult to countenance insofar as the "EXIM Responses" concern the agency's public-facing activity. As for supposed "proposals" for combating Chinese "weaponization" of trade policy, again, there is little detail regarding the *context* of the presentation to suggest any dire national security implications in its disclosure. See 2d Tinsley Decl. ¶ 9(a)(iii), (b). So long as this presentation was presented broadly within the agency, or even in an intragovernmental context, its deliberative aspect is suspect. An informational presentation, generally speaking, is not an integral part of an agency's decision-making process. And, regardless, Ex-Im still has not addressed the segregability concerns raised by CoA Institute. *See* Pl.'s Mot. at 27–28.

### E.    Weekly Reports

The "Staff Reports" are identified on Rows 9–11, 14, 17–19, 21–22, 24–26, 29–33, and 35–43 of Ex-Im's *Vaughn* index. Rather than provide legal argument in its reply brief, and addresses the matters raised by CoA Institute, Ex-Im has decided to incorporate by reference twenty pages from the Second Tinsley Declaration. *See* Def.'s Opp'n at 25–27; 2d Tinsley Decl. ¶ 10. On its own, this tactic suggests the agency is attempting to bypass the local rules, which limit the length of merits briefs. CoA Institute has already discussed the prejudicial nature of such a lengthy reply declaration. *See supra* at pp. 1–3.

The Second Tinsley Declaration, at the outset, admits "[t]he reports are mostly informational"—which, in common parlance, suggests they were "non-deliberative"—and provided to senior official for "aware[ness]" purposes. 2d Tinsley Decl. ¶ 10. Although "some of the information is more of an analytical nature," 2d Tinsley Decl. ¶ 10, that concession only

highlights the agency's likely failure to conduct an adequate segregability analysis, especially considering the heavy redaction of most of the reports. Resolution of the Exemption 5 dispute is best resolved with *in camera* review.

Some other problematic aspects of the Second Tinsley Declaration, which are representative of paragraph ten as a whole, are worth highlighting. Focusing in on the "OGC Weekly Report," Mr. Tinsley describes substantive content as "pre-decisional" merely because it was "presented as a continual update for the Senior Staff," and while "there will be inevitable be some kind of final decision," that decision will be entirely disconnected from the information contained in the report. 2d Tinsley Decl. ¶ 10(c)(ii). It is not enough to say that reports provide "continual updates" within the agency; that does not tie the report to a specific decision-making process. What is the nature of the "final decision" that will be made vis-à-vis impaired transactions? And if information provided in the weekly updates does not provide the foundation for the "final decision," how can it be truly deliberative? "[I]information . . . woven in with a plethora of other information that can then help inform Senior Staff" does not properly fall within the scope of the deliberative-process privilege. 2d Tinsley Decl. ¶ 10(c)(iii). There must be something more to establish how the reports formed "a direct part of the deliberative process privilege," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), and reflect the "give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980).

## V.    Ex-Im has not satisfied its burden under the "foreseeable harm" standard.

Ex-Im offers little further argument about its lackluster efforts to satisfy its obligations under the FOIA's "foreseeable harm" standard. Indeed, the agency entirely ignores the application of that standard to its Exemption 4 withholdings, both in its reply brief and the Second Tinsley

Declaration, which only addresses the deliberative-process privilege. *See* Def.'s Opp'n at 27–28; *see also* 2d Tinsley Decl. ¶ 6(b). There is nothing in the FOIA itself which precludes the standard from applying to Exemption 4, *see* 5 U.S.C. § 552(a)(8)(A)(i)(II), and multiple courts have acknowledged as much. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113; *see also Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019). The Court should consider the "foreseeable harm" matter conceded in CoA Institute's favor and order the release of records withheld under Exemption 4.

As for Ex-Im's deliberative-process withholdings, the agency's "foreseeable harm" rebuttal amounts to little more than an attempt to downplay the import of the D.C. Circuit's recent decision in *Reporters Committee for Freedom of the Press v. Federal Bureau of Investigation*, 3 F.4th 350 (D.C. Cir. 2021), and to mischaracterize CoA Institute's arguments as calling for "document-by-document" analysis. *See* Def.'s Opp'n at 27–28. That is weak stuff.

To begin with, Ex-Im distorts what it means for an agency to provide a "categorical description" of records. *See Reporters Comm. for Freedom of the Press*, 3 F.4th at 368. Even when such an approach is undertaken, an agency must address how it "'reasonably foresees that disclosure of each particular record" *within a category* "'would harm an interested protected by [an] exemption.'" *Id.* at 372 (citations omitted). The inadequacy of Ex-Im's "foreseeable harm" analysis does not lie in its failure to address *every single page* of each responsive record, but its non-specific bases for withholding records in anticipation of nebulous sorts of harms.

Ex-Im failed, for example, to offer any type of analysis attending—at either a categorical or document-by-document level—to "the subject-matter" and "age" of the records at issue, or "the circumstances surrounding [their] use within the agency, both historically and presently." *See* Pl.'s Mot. at 32–33. These are important factors to consider. *See* Dep't of Justice, Office of Info.

Policy, FOIA Update: OIP Guidance: Applying the "Foreseeable Harm" Standard Under Exemption 5, FOIA Update vol. XV, No. 2 (Jan. 1, 1994), *available at* https://bit.ly/3iDJhSi. Further, the agency did nothing—in its reply brief, at least—to respond to the specific records identified by CoA Institute in its cross-motion, including weekly reports from the Office of General Counsel, Office of Policy and International Relations, and Office of Congressional and Intergovernmental Affairs, as well as records concerning the GAO audit and the ERA. *See* Pl.'s Mot. at 33–35.

## VI.   Ex-Im did not segregate and release non-exempt portions of responsive records.

In its opening brief, CoA Institute identified the various instances where Ex-Im appeared to over-redact records, and it highlighted the conclusory statements the agency's declarants have offered regarding Ex-Im's obligations under the FOIA's segregability provision. *See* Pl.'s Mot. at 37–38.   Mere allegations of complying, absent an adequate showing that "explain[s] in detail which portions" of a record "are disclosable and which are allegedly exempt," are not enough to win the day. *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).

Ex-Im's only real response, in effect, is that it produced many records to CoA Institute and did not withhold them all in full. *See* Def.'s Opp'n at 29 ("EXIM re-reviewed and segregated the records in response to this Court's prior Memorandum Opinion and produced over 2,300 pages of re-processed documents.").   The agency knows, however, that the mere fact it processed and produced a substantial quantity of records does not satisfy its legal obligations.

## VII.   The Court should conduct another *in camera* review.

Ex-Im did not respond to CoA Institute's request for *in camera* review.   The request therefore is unopposed.   For reasons already set out in its cross-motion, *see* Pl.'s Mot. at 39–40, as

well as above, *see supra* note 1, the Court should order Ex-Im to submit unredacted versions of the records at issue for the Court's consideration.

## CONCLUSION

CoA Institute respectfully requests that the Court deny Defendant's renewed motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests that the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.

Dated: November 15, 2021                           Respectfully submitted,

                                                   */s/ Ryan P. Mulvey*
                                                   Ryan P. Mulvey
                                                   (D.C. Bar No. 1024362)
                                                   Lee A. Steven
                                                   (D.C. Bar No. 468543)

                                                   CAUSE OF ACTION INSTITUTE
                                                   1310 North Courthouse Road, Suite 700
                                                   Arlington, VA 22201
                                                   Telephone: (571) 482-4182
                                                   ryan.mulvey@causeofaction.org
                                                   lee.steven@causeofaction.org

                                                   *Counsel for Plaintiff CoA Institute*